**ROBINSON BROG LEINWAND GREENE**
**GENOVESE & GLUCK P.C.**
1345 Avenue of the Americas
New York, New York 10105
Telephone: (212) 603-6300
Facsimile: (212) 956-2164
**Robert R. Leinwand**

*Attorneys for the Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : | Case No.: 09-71979 (AST) |
| **CHAMPION MOTOR GROUP, INC**., | : |  |
|  | : |  |
| Debtor. | : |  |
|  | : |  |

-------------------------------------------------------- X

## MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 FOR FINAL FINANCING ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING; (II) MODIFYING THE AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF

  **Champion Motor Group, Inc.,** as debtor and debtor in possession (the "Debtor"), by its counsel, **Robinson Brog Leinwand Greene Genovese & Gluck P.C.**, respectfully represents:

### Background

  1.  The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on March 26, 2009 (the "Petition Date").

  2.  The Debtor has continued in possession of its property and operation and management of its business as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed in this case.

4. This Court has jurisdiction over this Motion under 28 U.S.C. §1334. Venue of this proceeding is proper pursuant to 28 U.S.C. §1409. This is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).

5. The statutory predicates for the relief requested herein are Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure.

**The Debtor's Business**

6. The Debtor is a New York corporation engaged in the business selling "high end" new and used cars. The Debtor is Long Island's only authorized Bentley and Lamborghini dealership. The Debtor at one time employed more than 90 people but since the commencement of this case has reduced its headcount to approximately 36 people as part of an overall effort to streamline its operations.

**Capital Structure**

7. Prior to the filing of the petition, on or about August 8, 2007, Manufacturers and Traders Trust Company ("M&T") and the Debtor entered a $30,000,000 Revolving Floor Plan Line of Credit Loan evidenced by (a) a $30,000,000 Revolving Demand Note dated August 8, 2007, (b) a Loan Agreement, and (c) a Security Agreement dated August 8, 2007. Pursuant to the aforementioned agreements, M&T made secured loans to the Debtor to provide it with floor plan financing to allow the Debtor to acquire inventory for sale and parts for its service department and otherwise operate its business.

8.     Under the Security Agreement, the Debtor granted M&T "a security interest in, a lien on and pledge and assignment of the Collateral."  "Collateral" is defined as "all the Debtor's present and future right, title and interest in and to any and all of the personal property of the Debtor, whether such property is now existing or hereafter created, acquired and wherever located from time to time."  M&T Bank alleges that it perfected its security interests in the Collateral by, among other things, timely filing U.C.C.-1 Financing Statements. M&T did not, however, at that time, have possession of the titles to the Debtor's automobiles which M&T had financed, nor was its security interest noted on the titles of the vehicles.

9.     Within ninety days prior to the Petition Date, pursuant to a Stipulation and Order signed by counsel to the Debtor and counsel to M&T and "So Ordered" by Justice Warshawsky of the New York State Supreme Court, Nassau County, on January 23, 2009, the Debtor for the first time relinquished titles to 130 vehicles to M&T.

10.     As of the Petition Date, the Debtor's schedules reflected an outstanding indebtedness owed to M&T of $18,000,000 with collateral securing that obligation valued at approximately $9,000,000 (at book value). The Debtor also had approximately $400,000.00 in its operating account which M&T claimed constituted "Cash Collateral" as defined in the Bankruptcy Code. Accordingly, the Debtor filed a motion seeking authorization to utilize cash collateral in accordance with a proposed budget. The motion was resolved by a series of consent orders whereby the Debtor was authorized to use these funds for the operation of its business and M&T was provided with the certain protections set forth in those consent orders, consisting principally of replacements liens on the Debtor's post-petition assets to the extent of the use of cash collateral (i.e., $400,000).

11.     Prior to the commencement of this case, M&T had alleged that the Debtor sold "out of trust"[1,] M&T refused to extend new financing to the Debtor. In addition to M&T's unwillingness to fund, under the terms of the cash collateral order, as the Debtor sold its vehicles which were subject to M&T's financing, one hundred (100%) percent of the proceeds of each sale were turned over to M&T. This resulted in no excess funds being available to purchase new inventory and essentially constituted a liquidation for the benefit of M&T in the chapter 11 case.[2] Thus, the Debtor was required to seek new financing in order to avoid running out of funds and the cessation of its business.

12.     In addition, the Debtor commenced an adversary proceeding against M&T alleging it had received a preferential transfer when it was paid the proceeds from the sales of vehicles pursuant to the stipulation entered in state court. The alleged preferences were the payment of approximately $5,000,000 in sales proceeds plus the transfer of the titles to the vehicles consisting of the Debtor's remaining inventory. As a result of these alleged transfers, the Debtor sought to recover in excess of $5,000,000 plus the titles to the Debtor's remaining inventory (or the value thereof) and also sought certain declaratory relief with respect to M&T's assertion of a lien on other alleged collateral, including deposits belonging to its customers. The adversary proceeding is still pending. The claim of M&T is the subject of a dispute as a result of these claims and is, at best, an unsecured claim

.                                    **Proposed new DIP Financing and Relief Requested**

13.     Given the circumstances and the fact that M&T is unwilling to provide further financing in this case, the Debtor has made an intensive search for new sources of DIP financing.

---

1  The Debtor does not dispute that there was a shortfall in monies owed to M&T. However, the shortfall resulted form a precipitous and unforeseen fall in the value of its collateral.
2  The Debtor has reserved its rights to recoup the expenses of this liquidation of M&T's collateral under section 506 of the Bankruptcy Code.

Needless to say, the availability of financing and the terms on which it could be obtained were restrictive.

14.     By this Motion, the Debtor respectfully requests, pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of a final order for, *inter alia*:

(a) authorization, under Sections 364(c)(1), (2) and (3) of Title 11 of the United States Code (the "Bankruptcy Code"), and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtor to obtain post-petition financing (the "Post-petition Financing") in the form of a credit facility up to a maximum outstanding principal amount of $6,000,000 (the "Total Facility"), subject to certain sub-limits as set forth in the proposed Post-petition Loan and Security Agreement among the Debtor, as borrower, and Champion Rescue LLC, as lender, substantially in the form of Exhibit "A" annexed hereto (the "Loan Agreement"), the final order authorizing the Post-petition financing (the "Final Financing Order") annexed hereto as Exhibit "B" and all other agreements, documents and instruments at any time evidencing, guaranteeing or securing the Obligations[3] or the Collateral;

(b) authorization to grant to the Lender assurances for the full and timely payment by and performance of the Obligations of the Debtor to the Lender in connection with such Final Financing under the Post-petition Loan Agreement, including, without limitation, all principal, interest, costs, fees and expenses, all as set forth in the Loan Agreements, by granting to the Lender (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, an administrative expense allowable under Section 503(b) of the Bankruptcy Code having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, Sections 503(b) and 507(b) of the Bankruptcy Code, except for the Carve Out (as defined in the Loan Agreement) which shall have priority over Lender's administrative expense claim, (ii) pursuant to Section 364(d) of the Bankruptcy Code, to the extent such property is otherwise encumbered, a senior lien on (a) The Dealer Sales and Service Agreement (as defined in the Loan Agreement) and (b) on inventory purchased with funds advanced under this Loan Agreement; and (iii) pursuant to Sections 364(c)(2) and (3) of the Bankruptcy Code, a security interest in and lien on with first priority, except as otherwise provided below, in all of the Debtor's assets, including, without limitation, in the following: (a) all of the Debtor's inventory, (b) certain personal property (c) all of the Debtor's equipment, including machinery, vehicles and furniture, (d) all of the Debtor's fixtures, (e) all of the Debtor's General Intangibles, including,

---

[3]     All terms not otherwise defined herein shall have the meanings ascribed to them in the Post-petition Loan Agreement.

without limitation, the Dealer Sales and Service Agreement, (f) all supporting obligations of all of the foregoing property and (g) all cash and non-cash proceeds of all of the foregoing wherever located and whether now existing or hereafter arising or acquired ((a) through (g), collectively, the "Collateral"). Notwithstanding the foregoing, the liens and security interests granted to the Lender as set forth in the preceding sentence shall be subject and junior in priority to the Permitted Liens (as defined in the Loan Agreement). Notwithstanding anything to the contrary contained herein, the Collateral shall not include any avoidance and similar actions and claims of the Debtor arising under Sections 502(d), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code, and

(c) granting such other and related relief as may be just and appropriate.

### The Debtors' Efforts to Obtain Financing

15. The Debtor does not have any currently available sources of funds other than the proposed Post-petition financing (the "DIP Financing") to carry on the operation of its business. The Debtor urgently requires working capital to purchase new vehicles and continue its operations. Any uncertainty concerning the Debtor's financial condition may curtail the Debtors ability to conduct business. More specifically, the Debtor's ability to maintain its most critical business relationship, its franchise agreement with Bentley, is subject to the Debtor purchasing a specified allocation of new vehicles each year. Without the instant DIP loan, the Debtor will not have the wherewithal to fund minimum required purchases and such failure could result in Bentley alleging a material breach of its dealership agreement and possible forfeiture of its rights as a franchisee. The termination of the franchise would be the death knell for the Debtor's business as the proposed financing requires the grant of a lien on such franchise. Moreover, the Debtor's other business relationships with its vendors and suppliers, is dependent on their ability to obtain the funds made available under the DIP Financing.

16. Any potential disruption of the Debtor's operations would be devastating at this critical juncture. The inability of the Debtor to obtain sufficient liquidity and to make payments on certain obligations on a timely basis may result in a permanent and irreplaceable loss of

business, causing a loss of value, to the detriment of the Debtor and all parties in interest. In light of the foregoing, the Debtor has determined, in the exercise of its sound business judgment, that a Post-petition credit facility, which permits the Debtors to obtain up to $6,000,000 in financing from Champion Rescue LLC, and to use such credit to finance the operation of its businesses and is in the best interests of the estate.

17.     Prior to the Petition Date and throughout the case, the Debtor surveyed various sources of post-petition financing and sought additional financing from both new and existing lenders. The availability of credit in the auto industry is the most restrictive it has been in the automotive industry's history. Moreover, the availability of financing for the "high end" dealers such as the Debtor is even more problematic given that certain customer market segments have virtually disappeared with the bankruptcies of large brokerage operations and the general downturn in the economy. Based upon the circumstances as they exist in June 2009, the Debtor concluded that the debtor in possession financing offered by Lender presented the best and most practical option available and would enable the Debtor to preserve its value as a going concern. Viewed in this context, the proposal received from the Lender is competitive and addresses the Debtor's working capital and liquidity needs.

### Post-petition Loan Agreement

18.     During this case, in light of M&T unwillingness to provide DIP financing to the Debtor beyond the use of cash collateral and the liquidation of the Debtor's inventory for M&T's benefit, the Debtor engaged in good-faith and extensive, arm's-length negotiations with Lender to reach agreement on terms for a debtor in possession loan. These negotiations culminated in an agreement by Lender to provide Post-petition financing on the terms and subject to the

conditions set forth in the Loan Agreement and the proposed Order. A copy of the Proposed

Order is annexed hereto as Exhibit "B".

23.     The principal terms of the Loan Documents[4,] and the proposed final financing

order, is as follows:

> (a)     **Debtor**.  Champion Motor Group Inc.
>
> (b)     **Guarantors**.  Gary Brustein and Michael Todd
>
> (c)     **Commitment and Availability.**  The Post-petition Loan Agreement provides for an available credit facility of $6,000,000 in the aggregate with a new vehicle sub-limit of $1,500,000 and a used vehicle sub-limit of $4,500,000.
>
> (d)     **Term.**  The earlier of (a) six months from the Effective Date or (b) upon the occurrence of an Event of Default. Events of Default are defined in section 10.1 of the Loan Agreement. The Debtor's failure to obtain entry of a final non-appealable Final Financing Order approving of the Post-petition Loan Agreement in form and substance acceptable to Lender, by July 31, 2009, will result in the failure of a condition precedent of the Loan.
>
> (f)     **Purpose.**  A portion of Debtor's borrowings from Lender under the Loan Agreement, and the Order will be used by the Debtor in accordance with a budget approved by Lender for the payment of (a) employee salaries, payroll, taxes, the purchase of goods, materials and other general corporate and working capital purposes, including amounts paid for such purposes which may constitute administrative expense claims under the Bankruptcy Code attributable to the operation of Debtors' businesses as authorized by order of the Court and in accordance with the Post-petition Loan Documents, and (b) the fees of the U.S. Trustee, the fees of the Clerk of this Court, and after any default,  the allowed fees and expenses of attorneys, accountants and other professionals retained under Section 327 or 1103(a) of the Bankruptcy Code by the Debtor and the Committee up to a maximum of $25,000 (the "Carve-Out"), and (c) all fees, costs and expenses related to the financing provided by Lender in accordance with the Post-petition Loan Documents and subject to the terms of the Order.  Prior to a default, the allowed fees and expenses of attorneys, accountants and other professionals retained under Sections 327 or 1103(a) of the Bankruptcy Code by the Debtor and

---

4  This summary is qualified in its entirety by reference to the provisions of the Loan Documents.

the Committee may be paid by the Debtor in the ordinary course of business in accordance with the budget.

(g) **Carve Out**. The Lender has agreed to a carve out of $25,000 for Debtor's counsel fees.

(h) **Priority and Liens**.  Subject to the Carve-Out (as defined above), the Obligations will at all times be secured by valid, perfected, enforceable and non-avoidable first priority security interests in and liens, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates (subject to the Permitted Liens) upon the Collateral.

(i) **Super-priority Claim**. The Debtor has agreed to grant the Lender an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, which claim will have priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtor, now in existence or hereafter incurred by the Debtor and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1) and/or 726 of the Bankruptcy Code (the "Superpriority Claim"), provided, however, that the Superpriority Claim will be subordinate to (i) the Carve-Out and (ii) the fees payable to the United States Trustee, as set forth in the Order

(j) **Default**.  The following shall constitute a Default: (a)(i) fail to pay the principal of the Note as and when due and payable; or (ii) fail to pay interest on the Note or any fee or other amount due hereunder as and when due and payable and such failure shall continue unremedied for ten Banking Days; (b)any material representation or material warranty made or deemed made by the Borrower in this Agreement or in any other Facility Document to which it is a party or which is contained in any certificate, document, opinion, financial or other statement furnished at any time under or in connection with any Facility Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made; (c) failure of the Borrower to maintain aggregate collateral security satisfactory to the Lender; (d) failure of the Borrower to sell eleven (11) vehicles within any two week period on a rolling basis, with the profit on same to be no less than the amount set forth in the Budget; (e)death of the Borrower or any guarantor of the [Obligations] and, if the Borrower or any guarantor of the Obligations is a partnership or limited liability company, the death of any partner or member; (f) an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court, or the Borrower shall file an application for an order with respect to the Chapter 11 Case (i) appointing a trustee in

any such Chapter 11 Case or (ii) appointing an examiner in the Chapter 11 Case with the authority to perform the duties of a trustee (other than the duties solely of an examiner) in respect of the estate of the Borrower or the operation of the business of the Borrower; (g) an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case or converting the Chapter 11 Case to a chapter 7 case; (h) an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in the Chapter 11 Case, or a plan of reorganization shall be filed, which does not contain a provision for a first priority lien on the Dealer Service and Sale Agreement and payment in full in cash of all Obligations of the Borrower hereunder and under the other Financing Documents on or before the Termination Date] or which is not otherwise satisfactory in all material respects to the Lender; (i) an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lender (i) to revoke, reverse, stay, modify, supplement or amend the Final Order or any of the Financing Documents, (ii) approving the incurrence by the Borrower of any debt not contemplated hereunder, (iii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the Lender in respect of the Obligations, except for Carve-Out Expenses, or (iv) to grant or permit the grant of a Lien on the Collateral other than Permitted Liens; (j) an application for any of the orders described in clauses (d), (e), (f), (g) or (h) above shall be made (i) by a Person other than the Borrower and such application is not contested by the Borrower or (ii) by the Borrower; (k) any judgment or order shall be entered against the Borrower or any other event shall occur   (l) condition exist which does or could reasonably be expected to have a material adverse effect on the condition (financial or otherwise), business, operation or prospects of the Borrower, and there shall be a period of ten consecutive days during which a stay or enforcement of such judgment or order shall not be in effect; (m) any levy, lien (including mechanics liens), seizure, attachment, execution or similar process shall be issued or levied on any of the property of the Borrower. (n) the Security Documents shall at any time after their execution and delivery and for any reason cease:  (A) to create a valid and perfected security interest and Lien in and to the property purported to be subject thereto having the priority specified in the Security Documents; or (B) to be in full force and effect or shall be declared null and void, or the validity or enforceability thereof shall be contested by the Borrower, or the Borrower shall deny it has any further liability or obligation under any such agreement, or the Borrower shall fail to perform any of its obligations thereunder; (o) the later of the date (i) the Borrower shall cease to have the exclusive

right to file a plan of reorganization in the Chapter 11 Case; or (ii) a party-in-interest shall file a competing plan of reorganization; or (p) the Borrower shall: (i) fail to perform or observe any other material term, material covenant or material agreement on its part to be performed or observed in any business Facility Document and such failure shall continue unremedied for thirty Business Days after notice thereof; or (ii) fail to comply with any of the terms or provisions of the Final Order.

(k)    **Notice of Default and Certain Remedies**. If an Event of Default shall occur and so long as it shall continue or, the Lender may, by notice to the Borrower, (A)declare the Commitment terminated, whereupon the Loan will terminate immediately and any fees hereunder shall be immediately due and payable on DEMAND without further order of or application to the Bankruptcy Court or another Court, presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived, and an action therefor shall immediately accrue; or (B) declare the unpaid principal amount of the Loan, interest accrued thereon, and all other amounts owing by the Borrower hereunder or under the Note to be immediately due and payable without further order of or application to the Bankruptcy Court, presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived, and an action therefor shall immediately accrue.

(l)    **Interest Rate.** The interest rate on the outstanding obligations shall be ten (10%) percent per annum. Upon and during an event of default, the default interest rate shall be twelve and one half (12.5%) percent.

(m)    (l) **Conditions of Initial Extension of Credit**. The conditions precedent to the obligations under the post-petition Loan Agreement include the following which must be received by the Lender in form and substance satisfactory to it no later than July 30, 2009 (a) this Agreement duly executed by the Borrower together with such financing statements executed by the Borrower which in the opinion of the Lender are desirable to perfect the liens and security interest created hereby; (b)the Note duly executed by the Borrower; (c) evidence of a valid and enforceable first priority lien on the Dealer Sale and Service Agreement; (d) evidence of a lease, or terms acceptable to the Lender, for appropriate and adequate use of the premises to operate and to maintain the business; (e)evidence that either the Final Order, as the case may be, shall have been entered by the Bankruptcy Court approving the Commitment (or such lesser

amount as shall be acceptable to the Lender in its sole discretion) no later than July 30, 2009, and such order shall approve a first priority lien on the Dealer Sale and Service Agreement and such order shall be in full force and effect and shall not have been reversed, stayed, modified or amended; (f)a copy of the charter, as amended and in effect, of the Borrower certified as of recent date by the Secretary of State of the state of its incorporation, and a certificate from such Secretary of State dated as of recent date as to the good standing of and charter documents filed by such Loan Party; (g) a certificate from the Secretary of the Borrower, dated the Effective Date, certifying (a) that the attached are true and complete copies of the by-laws of the Borrower as amended and in effect, (b) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of the Borrower authorizing execution, delivery and performance of this Agreement and the other Financing Documents to which the Borrower is a party and the extensions of credit hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (c) that the charter of the Borrower has not been amended since the date of the certification thereto furnished pursuant to clause (e) above, and (d) as to the incumbency and specimen signature of each officer of such Loan Party executing the Financing Documents (h) a certificate of another officer of the Borrower as to the incumbency and specimen signature of the Secretary of such Loan Party; (i) a certificate of a duly authorized officer of the Borrower, dated the Effective Date, stating that (a) the representations and warranties in Article 7 of this Agreement and in the other Financing Documents are true and correct on such date as though made on and as of such date, (b) no event has occurred and is continuing which constitutes a Default or an Event of Default hereunder and (c) prior to the Effective Date no material adverse change in the assets, business, operations or financial condition of the Borrower has occurred or become known since the Petition Date, except as disclosed in writing by the Borrower to the Lender prior to the Effective Date (j) the Liens and security interests in favor of the Lender granted pursuant hereto shall be valid and perfected first priority Liens prior (except for Permitted Liens to which such Liens and security interests are subordinate and junior) to all other Liens in or on the Collateral intended to be subject thereto, subject to the Carve-Out Expenses; (k) evidence that all fees, retainers and expenses required by this Agreement to be paid on or before the Effective Date shall have been paid in full (or shall have been authorized by the Final Order) (l) the Lender shall otherwise be satisfied in all material respects (in its sole discretion) with the results of its business, operational and legal due diligence in respect of the Borrower; and (m) such other approvals or documents as the Lender may reasonably request.

(n) **Commitment Fee.** A Commitment fee of two (2%) percent of the amount of the commitment shall be payable to the Lender in cash on the Effective Date.

(o) **Pre-payment Fee.** The obligations due and owing to Lender may be pre-paid at any time subject to a ten (10%) percent prepayment penalty**.**

(p) **Additional Conditions**. Borrower is affirmatively covenanting to sell no less than twenty-seven (27) vehicles on a monthly basis with the profit on such sales to be no less than that set forth in the budget.

### The Proposed DIP Financing Arrangement Should be Authorized

24.     The Debtor's ability to meet its working capital needs and avail itself of the opportunity to reorganize its business can be satisfied only if the Debtor is authorized to borrow up to $6,000,000 under the Loan Agreement and to use such proceeds to purchase vehicles and otherwise fund the operations of the Debtor.

25.     Credit in the Debtor's industry is extraordinarily difficult to obtain and the terms and conditions of this financing reflect the state of the market. The Debtor has few real alternatives to the proposed loan. However, the credit provided under the Loan Agreement will, the Debtor believes, enable it to continue financing its operations, pay its employees, vendors, and suppliers by providing it with the means to finance its floor plan needs, a capacity which it presently lacks, in an orderly and reasonable manner to preserve and enhance the value of its assets and enterprise for the benefit of all parties in interest. Moreover, the availability of credit under the Loan Agreement will provide employees, vendors, and suppliers and other parties with confidence in the Debtor that will enable and encourage them to resume ongoing credit relationships with the Debtor and hopefully build upon the base established with this loan.. Finally, the implementation of the Loan Agreement will be viewed favorably by the Debtor's employees and outside parties and thereby help promote the Debtor's successful reorganization.

26.     The general unavailability of credit in the Debtor's industry forces the Debtor to make the difficult choice between having an opportunity to maintain its operations in the hope that the economy will improve. The only other alternative absent approval of this loan would be for the Debtor to liquidate. The principals of this business have a strong enough belief in their ability to operate profitably that they have agreed to personally guaranty the obligations under the Loan Agreement. The proposal by the Lender is a "champion rescue" in every sense of the word.

### Approval Under Section 364(c) and (d) of the Bankruptcy Code

27.     The Debtor proposes to obtain financing under the Post-petition Loan Agreement by providing security interests and liens as set forth above pursuant to Sections 364(c) of the Bankruptcy Code. The statutory requirement for obtaining Post-petition credit under Section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]."

28.     Section 364(c) financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See, In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under Sections 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549, *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (secured credit under Section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

29.     Courts have articulated a three-part test to determine whether a debtor is entitled to Section 364(c) financing: (a) the debtor is unable to obtain unsecured credit under Section 364(b), *i.e.*, by allowing a lender only an administrative claim; (b) the credit transaction is

necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-Debtor and the proposed lender. *In re Ames Dep't Stores*, 115 B.R. at 37-39. As set forth more fully herein, all of the above conditions have been met.

30.     The Loan Agreement provides, to the extent a lien presently exists, that a "priming" lien under section 364(d) be granted on the Dealer Sales and Service Agreement. The Dealer Sales and Service Agreement is defined in the Loan Agreement as any written franchise or other agreement whereby the Debtor has the right to buy and sell automobiles from Bentley Motors Inc.  Also, out of an excess of caution and for purposes of clarity, the motion seeks a first priority lien on automobiles purchased with funds advanced under the Loan Agreement.

31.     Section 364(d) permits the Court to allow the Debtor to obtain credit secured by a senior lien on property only if the Debtor is unable to obtain such credit otherwise and there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior lien is proposed to be granted. 11 U.S.C. §364(b)(1).

32.     Here, the senior lien on the Dealer Sales and Service Agreement should be approved.  Putting aside the significant fact that M&T may not have any lien on this asset at all due to the presently pending avoidance action, or that its interest in such agreement may have no value since the agreement is a personal services contract with Bentley which M&T (or its assignee) cannot perform. Thus, in the absence of the financing from Champion Rescue, the Debtor's business is likely to liquidate.  However, if the financing is approved, as the Debtor's projections demonstrate, and as will be further shown at the hearing on this motion, the Debtor will be able to sell cars on a profitable basis, thus adding significant value to the Bentley franchise.  See, e.g., *In re 495 Central Park Avenue Corp.,* 136 B.R. 626 (Bankr. S.D.N.Y. 1992)

(finding that increase in property value in excess of amount of loan constitutes adequate protection for lien holder being primed); See, also, *In re First South Savings Association,* 820 F.2d at 712 (finding of adequate protection should be premised on facts or projections grounded on a firm evidentiary basis).

33.     Here, the Debtor will demonstrate that the proposed financing will add significant immediate value to the Debtor's business as a whole and will prevent the loss of value which will occur if operations ceased and liquidation ensued.  Given the questions surrounding the validity of any rights M&T may hold on these assets, the senior lien sought by Lender under section 364(d), should be approved.

### The Debtor Does Not Have An Alternative to the DIP Facility

34.     As will be shown at the Hearing, a working capital facility of the type needed in this case could not have been obtained on an unsecured basis. As will be shown, potential sources of the proposed DIP Financing for the Debtor, obtainable on an expedited basis and on reasonable terms, were extremely limited. None of the alternative potential sources of Post-petition financing proposed a facility that would meet the Debtor's working capital requirements. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986).

35.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Section 364(c) and (d). *Id.; see, also, In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky*

*Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989). Thus, the evidence introduced at the Hearing will satisfy the requirement of Section 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtor.

### Application of the Business Judgment Standard

36.    As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtor's management has concluded that the DIP Financing is the only alternative available in the circumstances of these cases. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. *See, Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

37.    In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assoc.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Id.* at 513-14 (footnotes omitted).

38.     The Debtor has exercised sound business judgment in determining that a Post-petition credit facility is appropriate and has satisfied the legal prerequisites to borrow under the DIP Financing. The terms of the DIP Financing are fair and reasonable and are in the best interests of the Debtor's estate. Accordingly, the Debtor should be granted authority to enter into the DIP Financing and borrow funds from the DIP Lenders on the secured, administrative superpriority basis described above, pursuant to Section 364(c) of the Bankruptcy Code, and take the other actions contemplated by the Post-petition Loan Agreement and as requested herein.

39.     Without the liquidity provided by the DIP Financing, the Debtor will be unable to pay suppliers, employees, and other constituencies that are essential to the orderly operation of their businesses. The Debtor's managers have exercised their best business judgment in negotiating the DIP Financing that is presently before the Court.

### The DIP Facility is Necessary to Effectively Preserve the Assets as of Debtor's Estate and to Operate Its Business

40.     No party in interest can seriously contend that the Debtor does not need immediate access to a working capital facility. Because M&T has refused to provide post-petition financing, the Debtor has no facility at the present time and has been operating on a shoe string, obtaining income from its service department and from the sale of consigned cars. As with most other businesses, the Debtor has significant cash needs. Accordingly, access to credit is necessary to meet the day-to-day costs associated with maintaining business relationships with the Debtor's vendors and suppliers, purchasing new inventory, and otherwise financing their operations. Access to sufficient cash is therefore critical to the Debtor. In the absence of immediate access to cash and credit, the Debtor's suppliers will refuse to sell critical supplies and services to the Debtor, and the Debtor will be unable to operate its business. The inability to

meet payments to vendors and satisfy customers' desires for particular produces would seriously impair the Debtor's prospects for reorganization.

41.     For these reasons, access to credit under the DIP Financing is critical. The Debtor cannot wait for the beneficial effects of the DIP Financing; any substantial delay could have the same impact as denial of the Motion. The Debtor's need for access to the DIP Financing therefore is immediate.

### The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate

42.     The Debtor is unable to obtain unsecured credit allowable solely as an administrative expense. The proposed DIP Financing reflects the exercise of sound and prudent business judgment. The Debtor would not have been able to obtain financing on an unsecured basis, or otherwise. In the Debtor's business judgment, the DIP Financing is the best financing option available in the circumstances in these cases.

43.     The proposed terms of the DIP Financing are fair, reasonable and adequate in that these terms neither (a) tilt the conduct of these cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits. The purpose of the DIP Financing is to enable the Debtor to meet ongoing operational expenses.

44.     The proposed DIP Financing provides that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out.  *In Ames Dep't Stores*, 115 B.R. 346 (Bankr. S.D.N.Y. 1990), this Court found that such "carve-outs" are not only reasonable, but are necessary to insure that official committees and the debtor's estate will be assured of the assistance of counsel. *Id*. at 40.

45.     Likewise, the various fees and charges required by the DIP Lender under the DIP Financing are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Section 364 of the Bankruptcy Code. *See, In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under Section 364, including a lender "enhancement fee").

46.     The terms and conditions of the Loan Agreement are fair and reasonable, and were negotiated by the parties in good faith and at an arm's length. Accordingly, the DIP Lender under the Post-petition Loan Agreement should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of such agreement.

47.     The fairness and reasonableness of the terms of the DIP Financing will be further shown at the Final Hearing.

<u>**Request for Modification of Automatic Stay**</u>

48.     As set forth more fully in the proposed Order, the proposed Loan Agreement contemplates a modification of the automatic stay established pursuant to Section 362 of the Bankruptcy Code to permit the DIP Lenders, in their sole discretion, to: (a) file financing statements, deeds of trust, mortgages or other similar documents to evidence the DIP Lender's security interests under the DIP Financing; (b) give the Debtor any notice provided for in the Post-petition Loan Agreement; (c) execute upon their security interests or exercise other remedies under the DIP Loan Documents upon the occurrence of an Event of Default, after giving five (5) business days notice in writing, upon the Debtor, Debtor's counsel, counsel to the Committee, any trustee of Debtors, if appointed, and the United States Trustee; and (d) take such other actions required or permitted by the DIP Loan Documents. Stay modification provisions of

this sort are ordinary and usual features of post-petition debtor-in-possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. The Court accordingly should modify the automatic stay to the extent contemplated by the Post-petition Loan Agreement and the Order.

## Notice

49.     Pursuant to Sections 102(1), 363(c), and 364(c) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), notice of this Motion has been provided to the Office of the United States Trustee, counsel to Lender, known holders of Pre-petition liens against the Debtor's property and the Debtor's twenty largest unsecured creditors and parties having filed notices of appearance in this case. The Debtor believes that such notice is sufficient under the circumstances.

## Waiver of Memorandum of Law

50.     cause there are no novel issues of law presented herein, the Debtor respectfully requests that the Court waive the requirement that the Debtor file a memorandum of law in support of this Motion.

**WHEREFORE**, the Debtor respectfully requests that the Court:

(a) enter the Final Financing Order; and

(b) grant the Debtor such other and further relief as is just and proper.

**DATED:**  New York, New York
June 30, 2009

> **ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**
> **Attorneys for the Debtor and Debtor in Possession**
>
>
> By: /s/ Robert R. Leinwand
> **Robert R. Leinwand**
> 1345 Avenue of the Americas
> 31st Floor
> New York, New York 10105-0143
> Tel.:  212-603-6300