# POST-PETITION LOAN AND SECURITY AGREEMENT

**THIS POST-PETITION LOAN AND SECURITY AGREEMENT** is made on July __, 2009, by and between CHAMPION MOTOR GROUP, INC., a New York corporation, which is a Chapter 11 debtor-in-possession (the "Borrower"), and Champion Rescue LLC,[1] a [Delaware limited liability company,] (the "Lender").  Capitalized terms not otherwise defined herein, have the meanings assigned to them in Article I.

## RECITALS

A.      The Borrower is a debtor-in-possession under Chapter 11 of the Bankruptcy Code in a case pending in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"), under Case No. 09-71979 (AST) (the "Chapter 11 Case").  The Borrower has requested the Lender to provide the Borrower with up to a $6,000,000 floor plan financing.

B. Subject to the terms and conditions of this Agreement and subject to the terms and conditions set forth in orders of the Bankruptcy Court approving the proposed financing, the Lender has agreed to provide such financing.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

ARTICLE 1
Definitions

Definitions.  As used in this Agreement the following terms shall have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa):

"Account" shall have the meaning ascribed to "account" in the UCC and shall include a right to payment for goods sold or leased or for services rendered that is not evidenced by an Instrument or Chattel Paper, whether or not any such right to payment has been earned by performance.

"Account Debtor" means any Person who is or may become obligated under or on account of an Account.

---

[1]  This entity is not yet formed, however, it will be formed and its two managing members will be David Luce and Antoine Dominic.

"Agreement" means this Loan and Security Agreement, as amended or supplemented from time to time.  References to Articles, Sections, Exhibits, Schedules and the like refer to the Articles, Sections, Exhibits, Schedules and the like of this Agreement unless otherwise indicated.

"Banking Day" means any day other than a day on which commercial banks are not authorized or required to close in New York City.

"Bankruptcy Code" shall mean title 11 of the United States Code, as amended.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Eastern District of New York or such other court having original jurisdiction over the Chapter 11 Case.

"Borrower" shall have the meaning assigned to such term in the preamble hereto.

"Borrowing" means a borrowing hereunder of a Loan.

"Budget" shall mean the budget for the Borrower attached hereto as Exhibit [__] for the period commencing on or about the Effective Date and ending on or about the Termination Date, as the same may be amended, modified or supplemented from time to time with the Lender's consent.

"Capital Expenditures" shall mean expenditures made for the acquisition of any fixed assets or improvements, replacements, substitutions or additions thereto which have a useful life of more than one year, including the total principal portion of Capitalized Lease Obligations.

"Capitalized Lease Obligation" shall mean any debt represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out Expenses" shall mean (i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and (ii) allowed fees and expenses of professionals retained in the Chapter 11 Case pursuant to §§ 327 and 1103 of the Bankruptcy Code up to, but not exceeding $25,000 in the aggregate (inclusive of any holdbacks, but excluding any unused retainers established prior to the date hereof); provided, that such amounts shall not be used for investigating or attacking Lender, its claims or interests, or the Loans.

"Chapter 11 Case" shall mean the Borrower's cases under chapter 11 of the Bankruptcy Code pending in the Bankruptcy Court.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall mean all Borrower's present and future right, title and interest in and to certain of the personal property of Borrower whether such property is now existing or hereafter created, acquired or arising and whenever from time to time, including without limitation, (i) inventory, including raw materials, work in process, or materials used or consumed in Borrowers' businesses, items held for sale or lease or to be furnished under contracts of service,

619538-2

sale or lease, goods that are returned, reclaimed or repossessed; (ii) equipment, including machinery, vehicles and furniture; (iii) fixtures; (iv) General Intangibles, of every kind and description, including, without limitation, the Dealer Sales and Service Agreement, payment intangibles, software, all existing and future customer lists, choses in action, claims (including claims for indemnification or breach of warranty), books, records, patents and patent applications, copyrights, trademarks, tradenames, tradestyles, trademark applications, goodwill, drawings, designs and plans, trade secrets, contracts, licenses, license agreements, franchise agreements, tax and any other types of refunds, returned and unearned insurance premiums, rights and claims under insurance policies; (v) all supporting obligations of all of the foregoing property; and (vi) all cash and noncash proceeds (including insurance proceeds) of all of the foregoing property, all products thereof and all additions and accessions thereto, substitutions therefor and replacements thereof.

"Commitment" shall mean the obligation of the Lender to make Loans to the Borrower in an aggregate principal amount not to exceed $6,000,000.

"Commitment Fee" shall mean a fee of two percent (2%) of the amount of the Commitment, payable to the Lender in cash on the Effective Date.

"Dealer Sales and Service Agreement" means any written franchise or other agreement whereby the Borrower has the contractual right to buy and sell automobiles pursuant to an agreement with Bentley Motors, Inc.

"Default" means any event, which with the giving of notice or lapse of time, or both, would become an Event of Default.

"Default Rate" shall mean, in respect of any principal of any Obligation or any other amount under this Agreement or any Note that is not paid when due (whether at stated maturity; by acceleration, by optional or mandatory prepayment or otherwise), at a rate per annum during the period from and including the due date to but excluding the date on which such amount is paid in full equal to 12.5%.

"Deposit Account" shall have the meaning ascribed to "deposit account" in the UCC and shall include any demand, time, savings, passbook, money market or other depository account, or a certificate of deposit, maintained by Borrower with any bank, savings and loan association, credit union or other depository institution.

"Dollars" and the sign "$" mean lawful money of the United States of America.

"Effective Date" shall have the meaning attributed thereto in Section 6.1 hereof.

"Environmental Laws" means all federal, state and local laws, rules, regulations, ordinances, programs, permits, guidance documents promulgated by regulatory agencies, orders

and consent decrees relating to human health and safety or the protection or pollution of the environment, including CERCLA.

"Event of Default" has the meaning given such term in Section 10.1 hereof.

"Final Order" shall mean an order of the Bankruptcy Court, in form and substance satisfactory to the Lender and its counsel and Borrower and its counsel, finally approving this Agreement and the extensions of credit made and to be made to the Borrower in accordance with this Agreement in substantially in the form of Exhibit __ hereto, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Lender.

"Financing Documents" shall mean the Agreement, the Note and the Security Documents and any and all other agreements, instruments and documents now or hereafter executed by Borrower in favor of Lender with respect to any of the transactions contemplated by the Agreement.

"General Intangible" shall have the meaning ascribed to the term "general intangible" in the UCC and shall include all interests in Intellectual Property.

"Hazardous Material" means, without limitation, any and all substances (whether solid, liquid or gas) defined, listed or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Law or that may have a negative impact on human health or the environment.

"Lender" shall have the meaning assigned to such term in the preamble hereto.

"Lien" means any lien (statutory or otherwise), security interest, mortgage, deed of trust, priority, pledge, charge, conditional sale, title retention agreement, financing lease or other encumbrance or similar right of others, or any agreement to give any of the foregoing.

"Loans" shall mean the Revolving Loans provided for in Section 2.1(a) hereof.

"Note" shall mean shall mean the promissory grid note provided for by Section 2.8 hereof and all promissory notes delivered in substitution or exchange therefor, in each case, as the same shall be modified and supplemented and in effect from time to time.

"Obligations" shall mean, without limitation, all indebtedness, obligations, loans, advances and liabilities of the Borrower to the Lender incurred under or related to this Agreement, the Note or any other Facility Document, whether such indebtedness, obligations, loans, advances or liabilities are direct or indirect, secured or unsecured, joint and/or several, contractual or tortuous, absolute or contingent, liquidated or unliquidated, due or to become due, whether for payment or performance, now existing or hereafter arising, including the principal

4

amount of Loans outstanding, together with interest thereon, and all expenses, fees and indemnities hereunder or under any other Facility Document, from time to time arising under or in connection with or evidenced or secured by this Agreement, the Note, or any other Facility Document.

"Permitted Liens" shall mean the Liens described in Section 9.1 hereof.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or entity of whatever nature.

"Petition Date" shall have the meaning assigned to such term in the preamble hereto.

"Plan of Reorganization" shall mean any chapter 11 plan for the Borrower.

"Professional Expenses" - the fees and reimbursable expenses of an attorney, accountant, appraiser, auctioneer or other professional person and who is retained, with Bankruptcy Court approval, by the Borrower pursuant to Section 327 of the Bankruptcy Code.

"Security Documents" shall mean, collectively, this Agreement, all Uniform Commercial Code financing statements required by this Agreement which have been or will be filed with respect to the security interests in personal property and fixtures created pursuant thereto, and all additional security and pledge Agreements, mortgages or Uniform Commercial Code financing statements heretofore or hereafter delivered or filed, as the case may be, by the Borrower pursuant to the terms of this Agreement.

"Subsidiary" means, as to any Person, any corporation or other entity of which at least a majority of the securities or other ownership interests having ordinary voting power (absolutely or contingently) for the election of directors or other persons performing similar functions at the time owned directly or indirectly by such Person.

"Termination Date" shall mean, with respect to the Loans, the earlier of (a) six months from the Effective Date and (b) the occurrence of an Event of Default.

"UCC" shall mean the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of New York from time to time or, when the laws of any other state govern the method or manner of the creation or perfection of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.


ARTICLE 2
The Credits

Section 2.1    The Revolving Loans.

(a) The Lender agrees, in its sole discretion, to make revolving loans the (the "Revolving Loans") to or for the account of Borrower, upon Borrower's request therefor, in such amounts as may from time to time be established by Borrower and as shall be mutually agreed upon, subject to the terms and conditions set forth herein, provided there is no continuing uncured Event of Default (as hereinafter defined) and subject to the terms and conditions set forth herein

(b) Notwithstanding anything herein to the contrary, the Lender shall have no obligation to make Loans hereunder in excess of the amounts authorized in the Chapter 11 Case and any reference herein to the amount of any Commitment shall be automatically reduced to the amounts so authorized.

Section 2.2    Revolving Loan Account.  An account shall be opened on the books of Lender in which account a record will be kept of all Revolving Loans, and all payments thereon and other appropriate debits and credits as provided by this Agreement.

Section 2.3    Revolving Loan Floor Plan Sub-Limits.    Subject to the terms and conditions of this Agreement, the Lender shall make advances to the Borrower respecting the Revolving Loans up to the Commitment, subject to the sub-limits (the "Revolving Loan Floor Plan Sub-Limits") and advance rates set forth as follows:

(a) "New Motor Vehicles" shall means new unused motor vehicles purchased by Borrower directly from the manufacturer or swapped from another deal and accompanied by a manufacturer's statement of origin and which are not demonstrator or rental/service motor vehicles.  Such agreements may be subject to such monetary and other limitations and contain such other terms and conditions as the Lender may now hereafter agree to and shall be subject to change or termination by the Lender at any time without notice to or consent by the Borrower. The Lender in no way assumes any responsibility as to the vehicles ordered by the Borrower or the shipment thereof, including without limitation, compliance of the vehicles with the Borrower's orders, condition of vehicles, delay or failure of arrival, any action or inaction of the shipper, any matter relating to insurance during shipment, any defect in or the validity or invalidity of the shipping documents, invoices or other papers relating thereto or the liability of any party thereto, or otherwise.  The Revolving Loan Floor Plan Sub-Limit for New Motor Vehicles shall be **$1,500,000.** For each advance request respecting New Motor Vehicles, the Lender will advance no more than the lesser of: (i) the manufacturer's invoice price for any such New Motor Vehicle; or (ii) the Borrower's acquisition price for such New Motor Vehicle.

(b) "Used Motor Vehicles" shall mean motor vehicles that have been previously titled and are not older than five (5) prior model years.  In the event the Borrower wants to finance the acquisition of used vehicle inventory, the Borrower shall execute and deliver to the Lender its standard form of Request for Advance on Borrower Owned Vehicle", appropriately completed.  The Lender, in its sole discretion, may approve such request and make an advance to

6

the Borrower the amount requested. It also applies to used vehicles acquired in the normal course of business. The Revolving Loan Floor Plan Sub-Limit for Used Motor Vehicles shall be **$4,500,000**. For each advance request respecting Used Motor Vehicles, the Lender will advance no more than the lesser of (i) the Borrower's acquisition price for any such Used Motor Vehicle; or (ii) for one and two year old vehicles 100% of auction price including fees and for five year old and newer vehicles 100% of NADA (Classic and Special Interest Guide Book) wholesale value.

Section 2.4<u>Borrowings</u>. The Borrower shall give the Lender notice of each Borrowing of Loans hereunder as provided in Section 4.3 hereof. On the date specified for each Borrowing hereunder, the Lender shall, subject to the terms and conditions of this Agreement make available the amount of such Borrowing to the Borrower by depositing the same, in immediately available funds, in an account of the Borrower designated for such purpose from time to time by the Borrower.

(a) Each Request for a Borrowing shall be made according to the dates set forth in the Budget. All Requests for a Borrowing shall be made in advance or in arrears and (i) for expenses to be paid in advance, such request shall be accompanied by cash projections or other estimates that support such request; and (ii) for expenses paid in arrears, such request shall be accompanied by invoices, bills, statements and any other information that is reasonably required by Lender to support or document the amounts requested in such request for Borrowing.

(b) Lender shall have no obligation to honor any deemed request for a Borrowing after the Termination Date or when any condition precedent in ARTICLE VI hereof is not satisfied, but may do so in its discretion and without regard to the existence of, and without being deemed to have waived, any Default or Event of Default and regardless of whether such Borrowing is funded after the Termination Date.

(c) Notwithstanding anything to the contrary herein, if the Lender advises Borrower of its intent to discontinue making Borrowings, and if any expenses are incurred by any Borrower that are consistent with the Budget, and if such expenses have not been previously funded by Lender, then Lender agrees to fund all such incurred expenses through the date of said notice of its intent to discontinue Borrowings; provided that such incurred expenses (A) do not otherwise exceed the Budget; and (B) otherwise comply with the other terms of Section 2.3.

Section 2.5     <u>Changes of Commitment</u>.

(a) The Commitment shall be automatically reduced to zero on the Termination Date.

(b) The Borrower shall have the right at any time or from time to time (i) so long as no Loans are outstanding, to terminate the Commitment and (ii) to reduce the unused amount

of the Commitment; provided that the Borrower shall give notice of each such termination or reduction as provided in Section 4.3 hereof.

(c) The Commitment once terminated or reduced may not be reinstated.

Section 2.6    Fees.  Lender has agreed to provide the Loans under the terms of this Agreement for the Borrower pursuant to the Budget. The Borrower has agreed to the Commitment Fee in consideration of Lender's agreement to enter into this Agreement. Therefore, in full satisfaction of any and all fees, including any termination fee, in connection with the Loans, the Borrower shall be obligated to pay Lender the Commitment Fee.

Section 2.7    Use of Proceeds.    The Borrower hereby covenants, represents and warrants that the proceeds of the Loans made to it will be used solely to finance the acquisition of a vehicle (new), used or special program, as provided for in Section 2.3 and to fund the Borrower's continued ordinary course operations, and working capital needs, in each case solely in accordance with the Budget, and the proceeds of such Loans shall not be used to fund personal, family or household purposes.  Notwithstanding anything to the contrary contained herein, in no event shall proceeds of the Loans be used to pay Professional Expenses incurred in connection with the assertion of or joinder in any claim, counterclaim, action, contested matter, objection, defense or other proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, declaration, or similar relief (a) seeking damages against Lender or any Lender Indemnities on account of any alleged cause of action arising on, before or after the Petition Date; (b) invalidating, setting aside, avoiding or subordinating, in whole or in part, any of the Obligations or Liens and security interests in any Collateral granted to Lender under this Agreement or the Financing Orders; (c) declaring any of the Financing Documents to be invalid, not binding or unenforceable in any respect; (d) preventing, enjoining, hindering or otherwise delaying Lender's enforcement of any of the Financing Documents or any realization upon any Collateral (unless such enforcement or realization is in direct violation of an explicit provision in any of the Financing Orders); (e) declaring any Liens granted or purported to be granted under any of the Financing Documents to have a priority other than the priority set forth therein; (f) objecting to the amount or method of calculation by Lender of the Obligations or any accounting rendered by Lender with respect to any of those obligations; or (g) seeking to use the cash proceeds of any of the Collateral without the prior written consent of Lender. Nothing in this Section 2.7 shall be construed to waive Lender's right to object to any requests, motions or applications made in or filed with the Bankruptcy Court, including any applications for interim or final allowances of Professional Expenses.

Section 2.8    Note.  The Loans made by the Lender hereunder shall be evidenced by a single promissory note of the Borrower in substantially the form of Exhibit __ hereto, dated as of the date hereof, payable to the Lender in a principal amount equal to the amount of the Commitment as originally in effect and otherwise duly completed.  The date and amount of each Loan made by the Lender to the Borrower, and all payments and prepayments made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of the Note, endorsed by the Lender on the schedule attached to such Note or any continuation

thereof; provided, however, that any failure by the Lender to make any such notation shall not affect the obligations of the Borrower hereunder or under such Note in respect of such obligations.

Section 2.9     Optional Prepayments.  Subject to Section 4.3 hereof, the Borrower shall have the right to prepay the Obligations, at any time or from time to time, provided the Borrower shall give the Lender notice of each such prepayment as provided in Section 4.3 hereof.  All such prepayments that occur shall be subject to a prepayment penalty of 10% of the Commitment amount.

Section 2.10     Mandatory Prepayments and Reductions of Commitment.  If at any time the Loans outstanding hereunder exceed the Commitment then available, then the Borrower shall immediately repay the Loans in the amount of such excess.

ARTICLE 3
Payments of Principal and Interest

Section 3.1     Amortization.

(a) To the extent not due and payable earlier pursuant to the terms of this Agreement, the entire unpaid principal amount of each Borrowing shall be due and payable on its Termination Date.

Section 3.2     Interest.

(a) The Borrower hereby promises to pay to the Lender interest on the unpaid principal amount of each Loan, for the period from and including the date of such Loan to the date such Loan shall be paid in full at a rate per annum equal to 10%, in accordance with the terms specified in the Note.

(b) Notwithstanding the foregoing, the Borrower hereby promises to pay to the Lender interest on the Loans at the Default Rate (i) upon the occurrence and during the continuance of an Event of Default hereunder and (ii) on any principal of any Loan and on any other amount payable by the Borrower hereunder or under the Note which shall not be paid in full when due (whether at stated maturity, by acceleration, by mandatory prepayment or otherwise), for the period from and including the due date thereof to but excluding the date the same is paid in full.

(c) Accrued interest on the Loans shall be payable at maturity.

(d) Notwithstanding anything herein to the contrary, interest payable at the Default Rate shall be payable in cash from time to time on demand.

Section 3.3  Default Interest

619538-2

Upon the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter bear interest payable on demand in cash at a rate that is 12.5% in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans. Payment or acceptance of the increased rates of interest provided for in this Section 3.3 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Lender.

ARTICLE 4
Payments; Computations; Etc.

Section 4.1 Payments.

(a) Except to the extent otherwise provided herein, all payments of principal, interest and other amounts to be made by the Borrower to the Lender under this Agreement, the Note and the other Financing Documents shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, into an account (Account No.          ) maintained in the name of the Lender at [name of bank], New York, New York (or such other account designated by the Lender from time to time) not later than 1:00 p.m. New York time on the date on which such payment shall become due (each such payment made after such time on such due date to be deemed, to have been made on the next succeeding Banking Day).

(b) The Borrower shall, at the time of making any payment or prepayment under this Agreement or any Note, specify to the Lender the Obligations or other amounts payable by the Borrower hereunder to which such payment is to be applied (and in the event that the Borrower fails to so specify, or if an Event of Default has occurred and is continuing, the Lender may apply the amount of such payment received by it in such manner as it may determine to be appropriate).

(c) If the due date of any payment under this Agreement or any Note would otherwise fall on a day that is not a Banking Day, such date shall be extended to the next succeeding Banking Day, and interest shall be payable for any principal so extended for the period of such extension.

Section 4.2    Computations.  Interest hereunder shall be computed on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed (including the first day but excluding the last day) occurring in the period for which payable.

Section 4.3 Certain Notices.  Notices by the Borrower to the Lender of terminations or reductions of the Commitments and of Borrowings shall be irrevocable and shall be effective only if received by the Lender not later than 12:00 noon New York time on the number of Banking Days prior to the date of the relevant termination, reduction, borrowing or prepayment specified below:

619538-2

| Notice | Number of Banking Days Prior |
|---|---|
| Termination or reduction of Commitment | 2 |
| Borrowing or repayment of Loans | 1 |

Each such notice of termination or reduction shall specify the amount and type of the Commitment to be terminated or reduced.  Each notice of optional prepayment shall specify the amount and type of Loan to be prepaid, and each such notice of Borrowing shall specify the type of Loan to be borrowed (subject to Section 4.3 hereof) and the date of borrowing or optional prepayment (which shall be a Banking Day).

Section 4.4  Reimbursement Obligations. Borrower shall reimburse Lender, for all reasonable legal, accounting, appraisal and other fees and expenses incurred by Lender (including fees and expenses of Lender Professionals) in connection with (i) the negotiation and preparation of any of the Financing Documents, any amendment or modification thereto, any waiver of any Default or Event of Default thereunder, or any restructuring or forbearance with respect thereto; (ii) the administration of the Financing Documents and the transactions contemplated thereby, to the extent that such fees and expenses are expressly provided for in this Agreement or any of the other Financing Documents; (iii) action taken to perfect or maintain the perfection or priority of any of Lender's Liens with respect to any of the Collateral; (iv) any inspection of or audits conducted with respect to any of Borrower's books and records or any of the Collateral; (v) any effort to verify, protect, preserve, or restore any of the Collateral or to collect, sell, liquidate or otherwise dispose of or realize upon any of the Collateral; (vi) any litigation, contest, dispute, suit, proceeding or action (whether instituted by or against Lender or Borrower) in any way arising out of or relating to any of the Collateral (or the validity, perfection or priority of any of Lender's Liens thereon), any of the Financing Documents or the validity, allowance or amount of any of the Obligations; (vii) the protection or enforcement of any rights or remedies of Lender in any Insolvency Proceeding; and (viii) any other action taken by Lender to enforce any of the rights or remedies of Lender against any Borrower or any Account Debtors to enforce collection of any of the Obligations or payments with respect to any of the Collateral. All amounts chargeable to Borrower under this Section 4.4 shall constitute Obligations that are secured by all of the Collateral and shall be payable on demand to Lender.  Borrower shall also reimburse Lender for reasonable expenses incurred by Lender in its administration of any of the Collateral to the extent and in the manner provided in this Agreement or any of the other Financing Documents.  The foregoing shall be in addition to, and shall not be construed to limit, any other provision of any of the Financing Documents regarding the reimbursement by Borrower of costs, expenses or liabilities suffered or incurred by Lender.

619538-2

Section 4.5 <u>All Borrowings to Constitute One Obligation</u>. The Borrowings shall constitute one general Obligation of Borrower and shall be secured by Lender's Lien upon all of the Collateral.


ARTICLE 5
Security: Administration; Priority

Section 5.1    <u>Grant of Lien and Security Interest</u>.

(a) Pursuant to this Agreement and the Security Documents, each Loan Party hereby assigns, pledges, transfers, grants, confirms and sets over unto the Lender, and hereby grants and creates in favor of the Lender a security interest in and to, the Collateral.

(b) The liens and security interests in favor of the Lender referred to in Section 5.1(a) hereof and under the Security Documents shall be valid and perfected liens and security interests, prior to all other liens and interests, other than Permitted Liens, and shall have first priority, with respect to Collateral; <u>provided</u> that the liens and security interests in favor of the Lender referred to in Section 5.1(a) hereof and under the Security Documents shall be subject to the Carve-Out Expenses. All liens and security interests in favor of the Lenders hereunder and their priority shall remain in effect until the Commitments have been terminated and all Obligations have been repaid in cash in full.

Section 5.2<u>Lien on Deposit Accounts</u>. As additional security for the payment and performance of the Obligations, Borrower hereby grants to Lender a Lien upon, and hereby collaterally assigns to Lender, all of Borrower's right, title and interest in and to each Deposit Account in which monies or proceed relating to the Collateral are deposited and all deposits or other sums at any time credited to each such Deposit Account, including any sums in any blocked account or any special lockbox account and in the accounts in which sums are deposited from such blocked accounts and special lockbox accounts. In connection with the foregoing, Borrower hereby authorizes and directs each such bank or other depository to pay or deliver to Lender upon its written demand therefor made at any time upon the occurrence and during the continuation of an Event of Default and without further notice to Borrower (such notice being hereby expressly waived), all balances in each Deposit Account maintained by Borrower with such depository for application to the Obligations then outstanding or as described in the Final Order, and the rights given Lender in this Section shall be cumulative with and in addition to Lender's other rights and remedies in regard to the foregoing property as proceeds of Collateral. Borrower hereby irrevocably appoints Lender as Borrower's attorney-in-fact to collect any and all such balances to the extent any such payment is not made to Lender by such bank or other depository after demand thereon is made by Lender pursuant hereto.

Section 5.3<u>Right of Set-off</u>. Lender is hereby authorized at any time and from time to time after the occurrence and during the continuance of an Event of Default, to the fullest extent permitted by law, to set-off and apply any and all monies in the Deposit Accounts at any time

held and other indebtedness at any time owing by Lender to or for the credit or the account of any Borrower against any and all of the obligations of such Borrower then existing under this Agreement and the Note. Lender agrees promptly to notify the applicable Borrower after any such set-off and application made by Lender; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application. The rights of Lender under this Article 5 are in addition to other rights and remedies (including, without limitation, other rights of set-off) which Lender may have.

Section 5.4<u>Acquired or Intellectual Property</u>. Upon the acquisition or establishment of any property used in or relating to the business of any Borrower, including intellectual property, each Borrower, as applicable, shall cause the Borrower acquiring or establishing such property to take all actions reasonably required by Lender to cause such property to become part of the Collateral for the Loans, including, but not limited to, the execution of all documents reasonably required by the Lender.

Section 5.5<u>Legends</u>. The Borrower shall promptly make, stamp or record such entries or legends on the Borrower's books and records or on any of the Collateral (including, without limitation, chattel paper) as Lender shall request from time to time, to indicate and disclose that Lender has a security interest in such Collateral.

Section 5.6<u>Purchase Money Security Interests</u>. To the extent Borrower uses proceeds of any loans to purchase Collateral, the repayment of such loans shall be on a "first-in-first-out" basis so that the portion of the loan used to purchase a particular item of Collateral shall be repaid in the order in which Borrower purchased such item of Collateral.

Section 5.7<u>Administrative Priority</u>. The Borrower hereby agrees that the Obligations of the Borrower shall constitute allowed administrative expenses in the Chapter 11 Case having super-priority status under § 364(c)(1) of the Bankruptcy Code over all other administrative expenses and unsecured claims against the Borrower now existing or hereafter arising of any kind or nature whatsoever, including without limitation all administrative expenses, charges and claims of the kind specified in §§ 503(b), 506(c), 726 and 507(b) of the Bankruptcy Code, subject, as to priority, only to Carve-Out Expenses.

Section 5.8<u>Grants, Rights and Remedies Cumulative</u>. The liens and security interests granted pursuant to Section 5.1(a) hereof and the Security Documents and the administrative priority granted pursuant to Section 5.2 hereof, may be independently granted by the Financing Documents, the Final Order and by other agreements hereafter entered into. This Agreement, the other Financing Documents, the Final Order and such other agreements hereinafter entered into supplement each other, and the grants, priorities, rights and remedies of the Lender hereunder and thereunder are cumulative.

Section 5.9<u>No Filings Required</u>. The liens and security interests referred to in Section 5.1(a) hereof, and in the other Financing Documents shall be deemed valid and perfected by the

Final Order, as the case may be, whichever occurs first. The Lender shall not be required to file any financing statements, notices of lien, mortgages or similar instruments in any jurisdiction or filing office, or to take possession of any Collateral or to take any other action in order to validate or perfect the Liens and security interests granted by or pursuant to this Agreement, the the Final Order, as the case may be, or any other Facility Document. Lender shall, in its sole discretion, from time to time choose to file such financing statements, notices of lien, mortgages or similar instruments, take possession of any Collateral, or take any other action to validate or perfect any such security interests or liens, all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of the Final Order, and the Borrower consents to the modification of the automatic stay under § 362 of the Bankruptcy Code to permit the Lender to file such financing statements, notices of lien or similar instruments, take possession of any collateral, or take any other action to validate or perfect any such security interests or liens.

Section 5.10   Survival.   The Liens, security interests, lien priorities, administrative priorities and other rights and remedies granted to the Lender pursuant to this Agreement and the other Financing Documents (specifically including but not limited to the existence, perfection and priority of the liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrower (pursuant to § 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Case, or, with respect to any Loans then outstanding, any modification, amendment or reversal or stay of the Final Order, as the case may be, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act of omission:

(a) except for the Carve-Out Expenses, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other  proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lender against the Borrower in respect of any Obligation;

(b) the Liens and security interests in favor of the Lender set forth in Section 5.1(a) hereof and in the Financing Documents shall constitute valid and perfected first priority Liens and security interests, subject only to the Permitted Liens to which such Liens and security interests hereunder shall be subordinate and junior, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor to any other Person whatsoever; provided that all such liens and security interests of the Lender set forth in Section 5.1(a) hereof or in any of the Financing Documents shall be subject to the Carve-Out Expenses; and

(c) the Liens and security interests in favor of the Lender set forth in Section 5.1(a) hereof and the Financing Documents shall be valid and perfected without the necessity that the Lender file financing statements, notices of lien, mortgages or otherwise perfect its Liens and security interests under applicable nonbankruptcy law except for such Collateral as is or may

14

be hereafter be located outside of the territorial limits of the United States of America ("Foreign Collateral") to the extent that the same may not be subject to the jurisdiction of the Bankruptcy Court.  Borrower shall take all steps required to perfect Lender's security interest in the Foreign Collateral under applicable non-bankruptcy law as promptly as practicable, but in no event later than thirty days after the Effective Date.


## ARTICLE 6
## Conditions Precedent

Section 6.1 Conditions Precedent.  The obligation of the Lender to make Loans available hereunder shall occur on the date (the "Effective Date") on or before July 30, 2009 that the Lender shall have received each of the following, in form, and substance satisfactory to the Lender and its counsel:

(a)     this Agreement duly executed by the Borrower together with such financing statements executed by the Borrower which in the opinion of the Lender are desirable to perfect the liens and security interest created hereby;

(b) the Note duly executed by the Borrower;

(c) evidence of a valid and enforceable first priority lien on the Dealer Sale and Service Agreement;

(d) evidence of a lease, or terms acceptable to the Lender, for appropriate and adequate use of the premises to operate and to maintain the business;

(e) evidence that either the Final Order, as the case may be, shall have been entered by the Bankruptcy Court approving the Commitment (or such lesser amount as shall be acceptable to the Lender in its sole discretion) no later than July 30, 2009, and such order shall approve a first priority lien on the Dealer Sale and Service Agreement and such order shall be in full force and effect and shall not have been reversed, stayed, modified or amended;

(f) a copy of the charter, as amended and in effect, of the Borrower certified as of recent date by the Secretary of State of the state of its incorporation, and a certificate from such Secretary of State dated as of recent date as to the good standing of and charter documents filed by such Loan Party;

(g) a certificate from the Secretary of the Borrower, dated the Effective Date, certifying (a) that the attached are true and complete copies of the by-laws of the Borrower as amended and in effect, (b) that attached thereto is a true and complete copy of resolutions  duly adopted by the Board of Directors of the Borrower authorizing execution, delivery and performance of this Agreement and the other Financing Documents to which the Borrower is a party and the extensions of credit hereunder, and that such resolutions have not been modified,

rescinded or amended and are in full force and effect, (c) that the charter of the Borrower has not been amended since the date of the certification thereto furnished pursuant to clause (e) above, and (d) as to the incumbency and specimen signature of each officer of such Loan Party executing the Financing Documents;

(h) a certificate of another officer of the Borrower as to the incumbency and specimen signature of the Secretary of such Loan Party;

(i) a certificate of a duly authorized officer of the Borrower, dated the Effective Date, stating that (a) the representations and warranties in Article 7 of this Agreement and in the other Financing Documents are true and correct on such date as though made on and as of such date, (b) no event has occurred and is continuing which constitutes a Default or an Event of Default hereunder and (c) prior to the Effective Date no material adverse change in the assets, business, operations or financial condition of the Borrower has occurred or become known since the Petition Date, except as disclosed in writing by the Borrower to the Lender prior to the Effective Date;

(j) the Liens and security interests in favor of the Lender granted pursuant hereto shall be valid and perfected first priority Liens prior (except for Permitted Liens to which such Liens and security interests are subordinate and junior) to all other Liens in or on the Collateral intended to be subject thereto, subject to the Carve-Out Expenses;

(k) evidence that all fees, retainers and expenses required by this Agreement to be paid on or before the Effective Date shall have been paid in full (or shall have been authorized by the Final Order, as the case may be);

(l) the Lender shall otherwise be satisfied in all material respects (in its sole discretion) with the results of its business, operational and legal due diligence in respect of the Borrower; and

(m) such other approvals or documents as the Lender may reasonably request.

Section 6.2 Certification.    Each notice of a Borrowing shall be accompanied by a certificate of a duly authorized officer of each Loan Party certifying that the statements contained in Article VII are true and correct both on the date of such notice and, unless such Loan Party otherwise notifies the Lender prior to such Borrowing, as of the date of such Borrowing.

## ARTICLE 7
### Representations and Warranties

The Borrower hereby represents and warrants that upon the occurrence of the Effective Date:

Section 7.1 <u>Incorporation, Good Standing and Due Qualification</u>.  The Borrower (a) is a corporation duly organized, validly existing and in good standing under the laws or the jurisdiction of New York; (b) has the requisite corporate power and have material governmental licenses, authorizations, consents and approvals necessary to own its assets, and carry on the business in which they are now engaged; and (c) is duly qualified to do business in the jurisdiction in which the nature of the business conducted by the Borrower makes such qualification necessary and to so qualify would have a material adverse effect on its business, financial condition or operations.

Section 7.2 <u>Corporate Power and Authority; No Conflicts</u>.  The execution, delivery and performance by the Borrower of the Financing Documents to which it is a party, the grant by the Borrower and the perfection of the security interests purported to be granted in favor of the Lender hereunder and under the Security Documents, and the exercise by the Lender of any rights and remedies hereunder or under the other Financing Documents have been duly authorized by all necessary corporate action and do not and will not:   (a) contravene any provision of its charter or bylaws; (b) violate any provision of, or require any filing, registration, consent or approval under, any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to the Borrower or its affiliates (other than entry of the Final Order, as the case may be, and as otherwise provided under Section __ hereof); (c) result in a breach of or constitute a default or require any consent under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which the Borrower is a party or by which it or its properties may be bound or affected which would not be cured by entry of the Final Order; (d) result in, or require, the creation or imposition of any Lien (other than as provided hereunder and under the Security Documents), upon or with respect to any of the properties now owned or hereafter acquired by the Borrowing; or (e) cause the Borrower or affiliate to be in default under any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or any such indenture, agreement, lease or instrument which would not be cured by entry of the Final Order.

Section 7.3 <u>Subsidiaries</u>: Borrower has no subsidiaries, other than as previously consented to in writing by the Lender, if any, and the Borrower has never consolidated, merged or acquired substantially all of the assets of any other entity or person other than as previously specifically consented to in writing by the Lender, if any.

Section 7.4 <u>Title to Properties; Absence of Liens</u>:   Borrower will deliver to Lender original title documents covering all vehicles Borrower purchases with the proceeds of the Loans.  Lender agrees to have those original title documents covering all vehicles in Champion's inventory held on-site by a representative of Champion Rescue LLC and to release those documents on a vehicle-by-vehicle basis upon confirmation that the cash sale proceeds for a particular vehicle and the title for the trade-in for that vehicle, if any, were received by Lender.

Section 7.5 <u>Legally Enforceable Agreements</u>.  Each Facility Document to which the Borrower is a party is, or when delivered under this Agreement will be, a legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with its terms.

619538-2

Section 7.6 <u>Use of Proceeds</u>:  No portion of any Loan is to be used for (i) personal, family or household purposes [or (ii) for the purpose of purchasing margin stock or margin securities with the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. 221 and 224).]

Section 7.7 <u>Litigation</u>.  Other than the Chapter 11 Case and as set forth in Schedule [__] hereto, there are no actions, suits or proceedings pending against the Borrower or any of its properties before any court, governmental agency or arbitrator which may, in any one case or in the aggregate, materially adversely affect the financial condition, operations, properties or business of the Borrower or the ability of the Borrower to perform its obligations under the Financing Documents to which it is a party.

Section 7.8 <u>No Default on Outstanding Judgments or Orders</u>. The Borrower has satisfied all judgments against it, and the Borrower is not in default with respect to any judgment, writ, injunction, decree, rule or regulation of any court, arbitrator or federal, state, municipal or other governmental authority, commission, board, bureau, agency or instrumentality, domestic or foreign, other than as a result of the Chapter 11 Case.

Section 7.9 <u>Government Regulation</u>.  The Borrower is not subject to regulation under any statute or regulation limiting its ability to incur indebtedness for money borrowed as contemplated hereby.

Section 7.10    <u>Environmental</u>.  As of the date hereof, neither the Borrower nor any of the Borrower's agents, employees or independent contractors (i) have caused or are aware of a release or threat of release of Hazardous Materials on any of the premises or personal property owned or controlled by Borrower or any property abutting such property, which could give rise to liability under any Environmental Law or any other Federal, state or local law or regulation; (ii) have arranged for the transport of or transported any Hazardous Material in a manner as to violate, or result  in potential liabilities under any Environmental Law; (iii) have receive any notice, order or demand from the Environmental Protection Agency or any other Federal, state or local agency under any Environmental Law; (iv) have incurred any liability under any Environmental Law in connection with the mismanagement, improper disposal or release of Hazardous Materials; or (v) are aware of any inspection or investigation of any of Borrower's controlled or abutting property by any Federal, state or local agency for possible violation of any Environmental Law.

Section 7.11    <u>Administrative Priority</u>.

(a) The obligations of the Borrower will constitute allowed administrative expenses in the Chapter 11 Case having priority over all other administrative expenses and unsecured claims against the Borrower, now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all other administrative expenses, charges or claims of the kind specified in Sections 503(b), 506(c), 507(b) and 723(b) of the Bankruptcy Code, subject, as to priority, only to Carve-Out Expenses.

18

(b) The Obligations of the Borrower will be secured by a valid and perfected first Lien on and security interest in all of the Collateral, subject only to the Permitted Liens to which such Liens and security interests shall be junior to and subordinate, and subject further to the Carve-Out Expenses.

Section 7.12    Bankruptcy Court Orders.  The Final Order, as the case may be, is in full force and effect, and has not been reversed, stayed, modified or amended.

ARTICLE 8
Affirmative Covenants

So long as any Note shall remain unpaid, the Borrower shall:

Section 8.1 Maintenance of Existence.  Preserve and maintain its corporate existence and good standing in the jurisdiction of its organization.

Section 8.2 Conduct of Business.    Continue to engage in an efficient and economical manner in a business of the same general type as conducted by it on the date of this Agreement, (b) obtain all licenses, permits, authorizations or other forms of permission which under federal, state and local laws are necessary or advisable for operating and maintaining the conduct of the business of the Borrower (including, without limitation, copyrights, trademarks, patents and licenses to use tangible or intangible property and similar rights), and (c) use its best efforts to preserve and protect the value of the Collateral.

Section 8.3 Sale Performance: In accordance with the projections set forth in the Budget, sell no less than twenty-seven (27) vehicles on a monthly basis, with the profit on same to be no less than the amount set forth in the Budget.

Section 8.4 Maintenance of Properties and Executory Contracts and Leases.  Maintain, keep and preserve all of its properties (tangible and intangible) including leased property, necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and shall use its best efforts to ensure that all leases and executory contracts necessary or useful in the Borrower's operations remain in full force and effect (without prejudice, however, to the Borrower's right to assume or reject such leases or executory contracts under § 365 of the Bankruptcy Code), except to the extent otherwise consented to by the Lender.

Section 8.5 Maintenance of Records.  Keep adequate records and books of account, in which complete entries will be made reflecting all financial transactions of the Borrower.

Section 8.6 Maintenance of Properties. Borrower will keep and maintain the Collateral and its properties, if any, in good repair, working order and condition. The Borrower will immediately notify the Lender of any loss or damage to or any occurrence which would adversely affect the value of any such property

Section 8.7 <u>Compliance with Laws</u>.  Comply in all respects with all applicable laws, rules, regulations and orders, such compliance to include, without limitation, paying before the same become delinquent all taxes, assessments and governmental charges imposed upon it or upon its property, subject to the limitations and requirements of the Bankruptcy Code.

Section 8.8 <u>Right of Inspection</u>.  Shall provide Lender, including, without limitation, Lender's auditor or accountant, access during normal business hours to all vehicles in Borrower's inventory and to any and all of the books and records, financial statements and other data and information, wherever held, relating to the business or financial condition of the Borrower or any of its affiliates, including, without limitation, (1) a current party inventory list, (2) a fixed asset list, (3) documents sufficient to confirm any trade-in on sold vehicles, (4) copies of fully executed sales contracts for all vehicles sold on or after the Effective Date, and (5) such documents as are required to be made available under this Agreement.

Section 8.9 <u>Location of Collateral</u>. Except for sale, processing, use, consumption or other disposition in the ordinary course of business, keep all inventory and equipment only at locations agree to by the Borrower and the Lender.  The Borrower, shall, during the term of this Agreement, keep the Bank currently and accurately informed in writing of each location where the Borrower's records relating to its accounts and contract rights, respectively, are kept.

Section 8.10  <u>Financial Statements</u>. Borrower will furnish to Lender,

(a) as soon as practicable, but in any event within 30 days after the close or each month, a full and complete signed copy of financial statement, prepared by Borrower acceptable to Lender, which shall include a balance sheet of the Borrower, as at the end of such month, and statement of profit and loss of the Borrower reflecting the results of its operations during such month, and prepared on a complied basis in accordance with generally accepted accounting principles, consistently applied, subject to year end adjustments;

(b) as soon as available to Borrower, but in any event within 90 days of the close of each fiscal tear, annual tax return, a full and complete signed copy of financial statements. Prepared by certified public accountant acceptable to Lender, which shall include a balance sheet of the Borrower, as at the end of such year, and statement of profit and loss of the Borrower reflecting the results of its operations during such year and prepared on a reviewed basis in accordance with generally acceptable accounting principles, consistently applied together with any so-called management letter;

(c) as soon as available, but in any event within 90 days of the close of each fiscal tear, annual tax return, a full and complete signed copy of financial statements. Prepared by certified public accountant acceptable to Lender, which shall include a balance sheet of the Borrower, as at the end of such year, and statement of profit and loss of the Borrower reflecting the results of its operations during such year and prepared on a reviewed basis in accordance with generally acceptable accounting principles, consistently applied together with any so-called management letter; and

619538-2

(d) from time to time, financial data and information about Borrower and Champion Leasing Group, Inc. as the Lender may reasonably request

Section 8.11    Financial Statements and Personal Guarantees of Gary Brustein and Michael Todd. Borrower will cause Gary Brustein and Michael Todd to furnish to Lender:

(a) as soon as available to Gary Brustein and Michael Todd, but in any event within 120 days after the end of the prior calendar year in any year and upon request therefore, with personal financial statements addressed to the Lender in form satisfactory to the Lender; and

(b) from time to time, such financial data and information about Gary Brustein and Michael Todd as the Lender may reasonably request.

(c) personal guarantees on account of the Loans.

Section 8.12    Insurance. Borrower will maintain in force property and casualty insurance on any property of the Borrower, if any, against risks customarily insured against by companies engaged in business similar to that of the Borrower containing such terms and written by such companies as may be satisfactory to the Lender, such insurance to be payable to the Lender as its interest may appear in the event of loss and to name the Lender as insured pursuant to a standard loss payee clause; no loss shall be adjusted thereunder without the Lender's approval; and all such policies shall provide that they may not be cancelled without first giving at least thirty (30) days written notice of cancellation to the Lender. Borrower will also maintain liability insurance containing such terms and written by such companies as may be satisfactory to the Lender, with the Lender to be named as an individual insured under such policies. At the option of the Lender, all insurance proceeds received from any loss or damage to any property shall be applied either to the replacement or repair hereof or as a payment on account of the Obligations.

Section 8.13    Further Assurances.  Execute, acknowledge, deliver, record, file, register, perform and do any and all such further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, assurances and other instruments as the Lender may reasonably request from time to time in order (a) to carry out more effectively the purposes of this Agreement or any other Facility Document, (b) to subject the Collateral to valid and perfected first priority liens and security interests (subject, as to priority, to the Permitted Liens and the Carve-Out Expenses), (c) to perfect and maintain the validity, effectiveness and priority of any of the Financing Documents and the Liens and security interests intended to be created thereby, and (d) to better assure, convey, grant, assign, transfer, preserve, protect and confirm unto the Lender the rights granted or now or hereafter intended to be granted to the Lender under any Facility Document.  The assurances contemplated by this Section 8.7 shall be given under applicable nonbankruptcy law as well as the Bankruptcy Code, it being the intention of the parties that the Lender may request assurances under applicable nonbankruptcy law, and such

21

request shall be complied with (if otherwise made in good faith by the Lender) whether or not the Final Order is in force and whether or not dismissal of the Chapter 11 Case or any other action by the Bankruptcy Court is imminent, likely or threatened.

ARTICLE 9
Negative Covenants

So long as any Note shall remain unpaid, the Borrower shall not:

Section 9.1   Liens.   Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, now owned or hereafter acquired, except:

(a) Liens provided for under the Security Documents;

(b) Liens for taxes or assessments or other government charges or levies if not yet due and payable if they are being contested in good faith by appropriate proceedings and for which appropriate reserves are maintained;

(c) Liens imposed by law, such as mechanic's, materialmen's, landlord's, warehousemen's and carrier's Liens, and other similar Liens, securing the obligations incurred in the ordinary course of business which are not past due for more than 30 days, or which are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established;

(d) Liens under workmen's compensation, unemployment insurance, social security or similar legislation;

(e) Liens, deposits or pledges or liens granted to secure the Borrower's obligations under letters of credit issued to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), leases (permitted under the terms of this Agreement), public or statutory obligations, surety, stay, appeal, indemnity, performance or other similar bonds, or other similar obligations arising in the ordinary course of business;

(f) judgment and other similar Liens arising in connection with court proceedings; provided that the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings and for which appropriate reserves have been established;

(g) easements, rights-of-way, restrictions and other similar encumbrances which, in the aggregate, do not materially interfere with the occupation, use and enjoyment by the Borrower of the property or assets encumbered thereby in the normal course of its business or materially impair the value of the property subject thereto.

Section 9.2<u>Sale of Interest</u>. There shall not be any sale or transfer of ownership of any interest in the Borrower without the Lender's prior written consent.

Section 9.3<u>Loans or Advances</u>. Borrower shall not make any loans or advances to any individual, partnership, corporation, limited liability company, trust, or other organization or person, including without limitation its officers and employees; provided, however, that Borrower may make advances to its employees, including its officers, with respect to expenses incurred or to be incurred by such employees in the ordinary course of business which expenses are reimbursable by Borrower; and provided further, however that Borrower may extend credit in the ordinary course of business in accordance with customary trade practice.

Section 9.4<u>Investments</u>. The Borrower shall not make investments in, or advances to, any individual, partnership, corporation, limited liability company, trust or other organization of person. The Borrower will not purchase or otherwise invest in or hold securities, nonoperating real estate  or other nonoperating assets or purchase all of all substantially all the assets of any entity.

Section 9.5<u>Merger</u>. Borrower will not merge or consolidate or be merged or consolidated with or into any other entity.

Section 9.6<u>Capital Expenditures</u>. The Borrower shall not, directly, or directly, make or commit to make capital expenditures by lease, purchase, or otherwise expect in accordance with the Budget and in the ordinary and usual course of business.

Section 9.7<u>Change of Name, etc</u>. Borrower shall not change its legal name or the State or the type of its organizations, without giving the Lender as least 30 days prior written notice thereof.

Section 9.8<u>Bankruptcy Court Orders; Administrative Priority; Lien Priority; Payment of Claims</u>.

(a) Seek, consent to or suffer to exist any modification, stay, vacation or amendment of the Final Order, as the case may be, except for modifications and amendments agreed to by the Lender.

(b) Seek, consent to or suffer to exist a priority for any administrative expense or unsecured claim against the Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses, charges or claims of the kind specified in Sections 503(b), 506(c), 507(b) and 723(b) of the Bankruptcy Code) equal or superior to the priority of the Lender in respect of the Obligations, except for the Carve-Out Expenses, which shall rank pari passu with the Obligations.

619538-2

(c) Suffer to exist any Lien on the Collateral having a priority equal or superior to the Liens and security interests in favor of the Lender in respect of the Obligations, except for Permitted Liens, and subject to the Carve-Out Expenses.

(d) Prior to the date on which the Obligations have been paid in full in cash and the Commitments have been terminated, pay any administrative expense claims except, so long as no Default or Event of Default has occurred and is continuing hereunder, the Borrower may pay (i) administrative expense claims incurred in the ordinary course of the business of the Borrower and (ii) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and the allowed fees and expenses of professionals under §§ 330 and 331 of the Bankruptcy Code not in excess of $300,000 in the aggregate, inclusive of any holdbacks and retainers, in each case, unless otherwise approved by the Lender, strictly in accordance with the Budget.

ARTICLE 10
Events of Default

Section 10.1   Events of Default .  Any of the following events shall be an "Event of Default":

(a) the Borrower shall:  (i) fail to pay the principal of the Note as and when due and payable; or (ii) fail to pay interest on the Note or any fee or other amount due hereunder as and when due and payable and such failure shall continue unremedied for ten Banking Days; or

(b) any material representation or material warranty made or deemed made by the Borrower in this Agreement or in any other Facility Document to which it is a party or which is contained in any certificate, document, opinion, financial or other statement furnished at any time under or in connection with any Facility Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c) failure of the Borrower to maintain aggregate collateral security satisfactory to the Lender; or

(d) failure of the Borrower to sell eleven (11) vehicles within any two week period on a rolling basis, with the profit on same to be no less than the amount set forth in the Budget; or

(e) death of the Borrower or any guarantor of the Obligations and, if the Borrower or any guaranator of the Obligations is a partnership or limited liability company, the death of any partner or member; or

(f) an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court, or the Borrower shall file an application for an order with respect to the Chapter 11 Case (i) appointing a trustee in any such Chapter 11 Case or (ii) appointing an examiner in the Chapter 11 Case with the authority to perform the duties of a trustee (other than

the duties solely of an examiner) in respect of the estate of the Borrower or the operation of the business of the Borrower; or

(g) an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court dismissing the Chapter 11 Case or converting the Chapter 11 Case to a chapter 7 case; or

(h) an order shall be entered by the Bankruptcy Court confirming a plan of reorganization in the Chapter 11 Case, or a plan of reorganization shall be filed, which does not contain a provision for a first priority lien on the Dealer Service and Sale Agreement and payment in full in cash of all Obligations of the Borrower hereunder and under the other Financing Documents on or before the Termination Date] or which is not otherwise satisfactory in all material respects to the Lender; or

(i) an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lender (i) to revoke, reverse, stay, modify, supplement or amend the Final Order or any of the Financing Documents, (ii) approving the incurrence by the Borrower of any debt not contemplated hereunder, (iii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of the Lender in respect of the Obligations, except for Carve-Out Expenses, or (iv) to grant or permit the grant of a Lien on the Collateral other than Permitted Liens; or

(j) an application for any of the orders described in clauses (d), (e), (f), (g) or (h) above shall be made (i) by a Person other than the Borrower and such application is not contested by the Borrower or (ii) by the Borrower; or

(k) any judgment or order shall be entered against the Borrower or any other event shall occur or condition exist which does or could reasonably be expected to have a material adverse effect on the condition (financial or otherwise), business, operation or prospects of the Borrower, and there shall be a period of ten consecutive days during which a stay or enforcement of such judgment or order shall not be in effect; or

(l) any levy, lien (including mechanics liens), seizure, attachment, execution or similar process shall be issued or levied on any of the property of the Borrower.

(m) the Security Documents shall at any time after their execution and delivery and for any reason cease: (A) to create a valid and perfected security interest and Lien in and to the property purported to be subject thereto having the priority specified in the Security Documents; or (B) to be in full force and effect or shall be declared null and void, or the validity or enforceability thereof shall be contested by the Borrower, or the Borrower shall deny it has any further liability or obligation under any such agreement, or the Borrower shall fail to perform any of its obligations thereunder; or

(n) the later of the date (i) the Borrower shall cease to have the exclusive right to file a plan of reorganization in the Chapter 11 Case; or (ii) a party-in-interest shall file a competing plan of reorganization; or

(o) the Borrower shall:  (i) fail to perform or observe any other material term, material covenant or material agreement on its part to be performed or observed in any business Facility Document and such failure shall continue unremedied for thirty Business Days after notice thereof; or (ii) fail to comply with any of the terms or provisions of the Final Order.

Section 10.2   Consequences of an Event of Default.  If an Event of Default shall occur and so long as it shall continue or, the Lender may, by notice to the Borrower,

(a) declare the Commitment terminated, whereupon the Loan will terminate immediately and any fees hereunder shall be immediately due and payable on DEMAND without further order of or application to the Bankruptcy Court or another Court, presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived, and an action therefor shall immediately accrue; or

(b) declare the unpaid principal amount of the Loan, interest accrued thereon, and all other amounts owing by the Borrower hereunder or under the Note to be immediately due and payable without further order of or application to the Bankruptcy Court, presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived, and an action therefor shall immediately accrue.

Section 10.3   Certain Remedies.  If an Event of Default has occurred and is continuing, the Lender may, on ten Banking Days' prior notice to the Borrower, exercise all rights and remedies which the Lender may have hereunder or under any other Facility Document, the Final Order or at law (including but not limited to the Bankruptcy Code and the Uniform Commercial Code) or in equity or otherwise, without regard to the automatic stay provided for in § 362 of the Bankruptcy Code with respect to the Borrower or any of its property.  Within such ten Banking Days, the Borrower or any other party-in-interest may seek a hearing before the Bankruptcy Court on the sole issue of whether an Event of Default has, in fact, occurred, and the Lender shall refrain from enforcing any of its remedies hereunder until the Bankruptcy Court has ruled in respect thereof or an agreement has otherwise been reached.  Unless the Bankruptcy Court shall order that no Event of Default has occurred, the automatic stay under § 362 of the Bankruptcy Code shall be vacated with respect to the Collateral, and the Lender shall be free to exercise all of its rights with respect to the Collateral, subject to the rights of the holders of Permitted Liens, without further approval of the Bankruptcy Court.  All proceeds in respect thereof shall be applied by the Lender to reduce the Obligations in the Lender's sole discretion, and the Borrower shall remain liable for any deficiencies.  With respect to any lease or executory contract constituting part of the Collateral, the Lender shall have the right to cause the Borrower to assume and assign such lease or executory contract to the Lender or its designee, although nothing herein shall be construed to limit the rights of the counterparty to such lease or executory contract to adequate assurance and cure payments under § 365 of the Bankruptcy Code or to

impose any obligation on the Lender to make any such adequate assurance or cure payments. Any proceeds received by the Borrower in connection with the assumption and assignment of any executory contract or lease shall be proceeds of the Collateral and immediately remitted to the Lender to reduce the Obligations then outstanding. All such remedies shall be cumulative and not exclusive. No failure on the part of such Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof or preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

## ARTICLE 11
### Miscellaneous

Section 11.1  <u>Amendments and Waivers</u>.  The Borrower and the Lender may from time to time enter into agreements amending, modifying or supplementing this Agreement, the Notes or any other Financing Documents, and the Lender may from time to time grant waivers or consents to a departure from the due performance of the obligations of the Borrower hereunder or thereunder.  Any such agreement, waiver or consent must be in writing and shall be effective only to the extent specifically set forth in such writing.  In the case of any such waiver or consent relating to any provision hereof, any Event of Default so waived or consented to shall be deemed to be cured and not continuing, but no such waiver or consent shall extend to any other or subsequent Event of Default or impair any right consequent thereto.

Section 11.2  <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the Lender, the Borrower and their respective successors and assigns (including, except for the right to request Loans, any trustee or examiner or other person with expanded powers succeeding to the rights of the Borrower or pursuant to any conversion to a case under chapter 7 of the Bankruptcy Code).

Section 11.3  <u>The Lender as Party-in-Interest</u>.  The Borrower hereby stipulates and agrees that the Lender is and shall remain a party-in-interest in the Chapter 11 Case and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith (including but not limited to objections to use of proceeds of the Loans, to the payment of professional fees and expenses or the amount thereof, to sales or other transactions outside the ordinary course of business or to assumption or rejection of any executory contract or lease).

Section 11.4  <u>Assignment and Participation</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the Borrower and the Lender and their respective successors and assigns, except that the Borrower may not assign or transfer its rights or obligations hereunder. The Lender may assign, or sell participations in, all or any part of the Obligations (including all or a portion of its Commitment) owing to the Lender to another Lender or other entity, in which event (a) in the case of an assignment, upon notice thereof by the Lender to the Borrower, the assignee shall have, to the extent of such assignment (unless otherwise provided therein), the same rights, benefits and obligations as it would have if it were the Lender hereunder; and (b) in the case of a participation, the participant shall have no rights under the Financing Documents.

619538-2

The agreement executed by the Lender in favor of the participant shall not give the participant the right to require the Lender to take or omit to take any action hereunder except action directly relating to (i) the extension of a payment date with respect to any portion of the principal of or interest on any amount outstanding hereunder allocated to such participant, (ii) the reduction of the principal amount outstanding hereunder or (iii) the reduction of the rate of interest payable on such amount or any amount of fees payable hereunder to a rate or amount, as the case may be, below that which the participant is entitled to receive under its agreement with the Lender. The Lender may furnish any information concerning the Borrower in the possession of the Lender from time to time to assignees and participants (including prospective assignees and participants); provided that the Lender shall require any such prospective assignee or such participant (prospective or otherwise) to agree in writing to maintain the confidentiality of such information.

Section 11.5    Waiver of Homestead. To the maximum extent permitted under applicable law, the Borrower hereby waives and terminates any homestead rights and/or exemptions respecting any of its property under the provisions of any applicable homestead law, including without limitation, Section 256 of the Civil Practice Law and Rules of New York.

Section 11.6    Notices.  Unless the party to be notified otherwise notifies the other party in writing as provided in this Section, and except as otherwise provided in this Agreement, notices shall be given to the Lender and to the Borrower by telecopier or by overnight courier or by personal delivery addressed to such party at its address on the signature page of this Agreement.

Section 11.7    Table of Contents; Headings.  Any table of contents and the headings and captions hereunder are for convenience only and shall not affect the interpretation or construction of this Agreement.

Section 11.8    Severability.   The provisions of this Agreement are intended to be severable.   If for any reason any provision of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions hereof in any jurisdiction.

Section 11.9    Counterparts.   This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing any such counterpart.

Section 11.10   Integration.   The Financing Documents set forth the entire agreement between the parties hereto relating to the transactions contemplated thereby and supersede any prior oral or written statements or agreements with respect to such transactions.

Section 11.11  <u>Governing Law</u>.  This Agreement shall be governed by, and interpreted and construed in accordance with, the internal laws of the State of New York, except to the extent governed by the Bankruptcy Code.

Section 11.12  <u>Waiver of Jury Trial</u>.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION AGAINST THE LENDER, ANY PARTICIPANT, ASSIGNEE OR INDEMNIFIED PARTY, BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE NOTES OR ANY OTHER FACILITY DOCUMENT, ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE LENDER OR THE BORROWER IN CONNECTION HEREWITH OR THEREWITH. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER TO ENTER INTO THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

CHAMPION MOTOR GROUP, INC. as Borrower

By: _____
       Title

Address for Notices


Telephone:
Telecopy No.:


CHAMPION RESCUE LLC  as Lender

By: _s/_____
       Title

Address for Notices


Telephone:
Telecopy No.:

SCHEDULE I

LICENSES

[BENTLEY FRANCHISE]

SCHEDULE II

LIENS