Park Avenue Tower
65 east 55th Street
New York, NY 10022
Michael S. Fox (MF 2612)
Jordanna L. Nadritch (JN 7647)
(212)451-2300
*Counsel for Champion Funding, LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

| | |
|---|---|
| In Re: | Chapter 11 |
| **CHAMPION MOTOR GROUP, INC.,** | Case no. 09-71979 (AST) |
| Debtor. | |

--------------------------------------------------------X

**CERTIFICATION OF COUNSEL FOR CHAMPION FUNDING LLC, IN CONNECTION WITH THE DEBTOR'S APPLICATION FOR AN ORDER PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 AUTHORIZING THE DEBTOR TO SETTLE AND COMPROMISE CLAIMS AND VOLUNTARILY DISMISSING ADVERSARY PROCEEDING PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 7041**

In accordance with this Court's direction on August 3, 2009, the undersigned counsel Michael S. Fox, makes this declaration under 28 U.S.C. §1746 and states as follows:

1.   I am a partner at the law firm of Olshan Grundman Frome Rosenzweig & Wolosky LLP, with offices located at Park Avenue Tower, 65 East 55th Street, New York, New York 10022.  I make this certification on personal knowledge and on behalf of my client, Champion Funding LLC ("Champion Funding"), in connection with the Debtor's Application for an Order Pursuant to Federal Rule of Bankruptcy Procedure 9019 Authorizing the Debtor to Settle and Compromise Claims and Voluntarily Dismiss Adversary Proceeding (the "9019 Motion").

2.   Champion Funding is a Delaware Limited Liability Company formed on July 17, 2009.  Champion Funding's only members are David Luce and Antoine Dominic.  There are no other

783032-2

members or partners of Champion Funding. As explained below, Champion Funding has the financial wherewithal to finance and complete the M&T Transaction (as defined below).

**SALE AND ASSIGNMENT AGREEMENT**

3. On July 15, 2009, in advance of the hearing on the Debtor's motion seeking approval of DIP financing, Manufacturers and Traders Trust Company ("M&T") and Champion Funding engaged in an arms'-length negotiation for the purchase and sale of M&T's senior secured lending position. The Court adjourned the Final DIP Hearing with the consent of the parties. Thereafter, negotiations between Champion Funding and M&T culminated in a written agreement wherein M&T agreed to sell and assign its interests to Champion Funding (the "M&T Transaction"). M&T selected Champion Funding over other parties interested in acquiring M&T's position. The parties not selected by M&T should not be allowed to interfere with the Sale and Assignment Agreement, dated as of July 22, 2009 (the "Sale Agreement"), (annexed as Exhibit "A" is a copy of the Sale Agreement).

4. The salient terms of the Sale Agreement are as follows:

(a) Champion Funding is purchasing, on an "as is," "where is" basis all of M&T's right, title and interest in,(i) to and under the Loan including, without limitation, all of the Assignor's interest in the Loan Agreement, the Note, the Security Agreement, the Guaranties, the Financing Statements, and any security agreements, guaranties, claims or judgments and all other related documents, agreements, instruments, collateral, files, liens, security interests, claims and other assets (collectively, the "Loan Documents"), including the right to file a proof of claim in the Bankruptcy Case, (ii) other claims and defenses under law relating to the Loan or the Loan Documents, (iii) principal, interest, fees, expenses, damages, penalties and other amounts in respect of, or in connection with, any of the foregoing; and (iv) all other claims and causes of action arising from the Loan or under the Loan Documents, including, without limitation, the rights to receive cash, securities, instruments and/or other property or distributions issued in connection with any of the foregoing or the Bankruptcy Case (collectively, the "Assigned Rights").

(b) In consideration for the purchase of the Assigned Rights, Champion Funding has agreed to pay to M&T a price in cash of $8.4 million - a price it believes is in excess of the wholesale value of the vehicles held as Collateral by M&T (the "Purchase Price").

2

This amount will be paid in immediately available funds in U.S. Dollars by wire transfer to the M&T. There is no pay out to M&T over time, there is no interest factor that will be accrued or passed on to the Debtor; it is simply a cash payment from Champion Funding resulting from the capitalization of same by its members. .

(c)     As a condition to closing, (i) the Adversary Proceeding must be dismissed with prejudice pursuant to an order of this Court; (ii) the representations and warranties set forth in the agreement must be true and correct and (iii) M&T must deliver to Champion Funding the following: (x) duly executed and acknowledged assignments and other instruments of transfer, executed by M&T, including evidence that M&T has transferred its right to file a proof of claim in the Bankruptcy Case; (y) the original executed Note (or, to the extent it is not available, a copy of same together with a lost note affidavit) duly endorsed by the M&T to Champion Funding as follows: "Pay to the order of Champion Funding LLC, without recourse"; and (z) all other original Loan Documents (where available), together with such other tangible collateral, including (with the consent of the Debtor) vehicle title documents.

(d)     The Sale Agreement further provides that Champion Funding agrees that M&T does not have any responsibility to indemnify Champion Funding for any loss, liability, claim, damage, and expense whatsoever relating to the Assigned Rights.

5.      The Sale Agreement is not subject to a final physical inventory of the vehicles from any date.

6.      Champion Funding believes that disclosure of the Purchase Price could serve to harm Champion Funding and M&T by providing other parties (not selected by M&T) with an unfair and undeserved opportunity to have this Court second guess the economics or modify the terms negotiated in the Sale Agreement. Simply put, Champion Funding is paying to M&T $8.4 million in cash at closing. This amount is liquidated, not subject to any inventory count or run, nor is it financed.

7.      As of the date hereof, the parties are prepared to close the M&T Transaction once the dismissal of the Adversary Proceeding with prejudice has been approved. Among the conditions precedent satisfied, Champion Funding has wired the full amount of the Purchase Price to my firm's escrow account and such cash will remain in escrow pending the closing of the M&T Transaction.

783032-2

**USE OF CASH COLLATERAL**

8.    Indeed, in advance of this Court's hearing on August 3, 2009 (the "August 3 Hearing"), the Debtor and Champion Funding exchanged a near finalized draft stipulation that afforded the Debtor the use of Cash Collateral. The parties' intention was to finalize the stipulation upon approval of the 9019 Motion. Since the August 3 Hearing, the Debtor and Champion Funding have executed an agreement (the "Cash Collateral Agreement") providing for the use of Cash Collateral upon the closing of the M&T Transaction. Champion Funding has agreed to allow the Debtor to use its Cash Collateral to move toward a successful reorganization. The salient terms of the Cash Collateral Agreement are as follows:

(a) The Cash Collateral shall be used by the Debtor in the ordinary course of its business to pay the reasonable and necessary operating expenses of the Debtor in accordance with the Budget (provided that the Debtor may exceed any line-item in the Budget by up to 5% without further order of the Court). The Debtor may submit supplemental budgets to Champion Funding from time to time during the case and such supplemental budgets may be approved or disapproved in accordance with the procedures set forth in the Cash Collateral Agreement. See Budget (Exhibit "B") which through December should provide for profit and excess cash flow to the Debtor of almost $1 million.

(b) In addition to a replacement lien, and as adequate protection for the Debtor's use of Cash Collateral, all liens and security interests of Champion Funding in the Cash Collateral used and consumed pursuant to this order shall constitute a secured claim, in and fully perfected lien upon all of the pre-petition and post-petition assets of the Debtor.

(c) The Debtor will deliver to Champion Funding original title documents covering all vehicles in Champion's inventory and Champion Funding will release those documents on a vehicle-by-vehicle basis provided the Debtor sells such vehicles for a gross sales price at least equal to the amount set forth in the column entitled "Minimum Retail Agreed Upon by Champion Funding" on the annexed Exhibit "C". With respect to the sale proceeds received on account of a sale of a vehicle, the Debtor shall remit the cash equivalent of the "Champion Funding Recovery Amount" (as such amount is set forth on Exhibit "C") to Champion Funding to be applied to reduce the outstanding indebtedness to Champion Funding in accordance with the applicable Loan Agreement.

783032-2

(d) With respect to (i) all cash proceeds in excess of the Champion Funding Recovery Amount (the "Minimum Retention" as set forth on Exhibit C), (ii) all net proceeds received on account of sale of inventory and service parts, (iii) all net proceeds received from service, (iv) all existing cash held by the Debtor, (v) cash on account from customer deposits and (vi) collected receivables, the Debtor shall deposit all such proceeds into a bank account designated by the Debtor as its "Cash Collateral Account" (the "Cash Collateral Account"). The Debtor shall utilize such proceeds (enumerated in (i)-(vi)) first to pay the operating expenses set forth in the Budget. It is expressly agreed and understood by the parties hereto that once an aggregate minimum of $1,600,000 in cash payments have been remitted to Champion Funding as adequate protection on account of its Collateral, then the Debtor shall be permitted to use the cash in the Cash Collateral Account to purchase new inventory provided that the following conditions are met: (i) the purchase price for the new inventory is at current wholesale market conditions, (ii) the average gross profit per car, calculated on a monthly basis, meets or exceeds the average gross profit set forth in the Debtor's Budget, (iii) the average number of cars sold per month meets or exceeds the amounts set forth in the Debtor's Budget, and (iv) the Debtor's monthly operating expenses are in compliance with the Budget pursuant to the terms of this Agreement.

8.      The Cash Collateral Agreement is structured so that it is effective immediately, subject only to the consummation of the M&T Transaction and approval of the terms of the Cash Collateral Agreement by this Court.

Pursuant to 28 U.S.C. §1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP


By:     /s/ Michael S. Fox
        Michael S. Fox (MF 2612)
        *Counsel for Champion Funding, LLC*
        Park Avenue Tower
        65 East 55th Street
        New York, New York 10022
        (212) 451-2300

783032-2

**EXHIBIT A**

# SALE AND ASSIGNMENT AGREEMENT

**July 22, 2009**

# TABLE OF CONTENTS

Page

1. SALE AND ASSIGNMENT; PURCHASE PRICE ....................................................... 2

2. CLOSING ................................................................................................................... 2

3. CONDITIONS TO CLOSING ................................................................................... 3

4. REPRESENTATIONS AND WARRANTIES OF THE ASSIGNOR ......................... 3

5. REPRESENTATIONS AND WARRANTIES OF THE ASSIGNEE .......................... 4

6. INDEMNIFICATION ................................................................................................ 6

7. LITIGATION IN NAME OF THE ASSIGNOR ......................................................... 6

8. FUTURE DISTRIBUTIONS, PAYMENTS AND NOTICES ..................................... 6

9. FURTHER ASSURANCES ....................................................................................... 6

10. GOVERNING LAW .................................................................................................. 7

11. ENTIRE AGREEMENT ............................................................................................ 7

12. MODIFICATIONS .................................................................................................... 7

13. SEVERABILITY ....................................................................................................... 7

14. NOTICES .................................................................................................................. 7

15. REFERENCES IN THIS AGREEMENT ................................................................... 8

16. JURISDICTION AND VENUE; WAIVER OF JURY TRIAL ................................... 8

17. COUNTERPARTS, DELIVERY BY TELECOPIER OR OTHER ELECTRONIC
MEANS ..................................................................................................................... 9

60729999.DOC

# SALE AND ASSIGNMENT AGREEMENT

This Sale and Assignment Agreement (this "Agreement") dated as of July 22, 2009 is executed by and between Manufacturers and Traders Trust Company, a national banking association, having an address at PA 1 HM41, 213 Market St., Attention: Pennsylvania Special Assets, Harrisburg Pa. 17101 (the "Assignor"), and Champion Funding LLC, a Delaware limited liability company, having an address at 30 Legend Circle, Melville, New York 11747 (the "Assignee").

## RECITALS:

A.      WHEREAS, the Assignor is the owner and holder of a certain Loan Agreement (Floor Plan Financing) dated as of August 8, 2007 (the "Loan Agreement") between the Assignor and Champion Motor Group, Inc. (the "Debtor");

B.      WHEREAS, the Assignor is the owner and holder of a Revolving Demand Note dated August 8, 2007 by the Debtor in favor of the Assignor in the maximum principal amount of $30,000,000 (the "Note"), and has made advances of principal that remain outstanding as of the date hereof (the "Loan");

C.      WHEREAS, the Assignor is the owner and holder of a certain Security Agreement dated as of August 8, 2007 between the Debtor and the Assignor (the "Security Agreement");

D.      WHEREAS, the Assignor is the owner and holder of a certain (i) Unlimited Guaranty dated August 8, 2007 by Michael Todd in favor of the Assignor; (ii) Unlimited Guaranty dated August 8, 2007 by Gary Brustein in favor of the Assignor and (iii) Unlimited Guaranty dated August 8, 2007 by Champion Leasing Group, Inc. in favor of the Assignor (collectively, the "Guaranties");

E.      WHEREAS, the Assignor filed two financing statements against the Debtor listing the Assignor as the secured party in the Office of the Secretary of State of the State of New York, each filed August 13, 2007, bearing filing numbers 200708130651921 and 200708130651870 (the "Financing Statements");

F.      WHEREAS, the Debtor filed a petition for relief under title 11, chapter 11 of the United States Code in the United States Bankruptcy Court of the Eastern District of New York (the "Bankruptcy Court"), Case Number 09-71979 (the "Bankruptcy Case");

G.      WHEREAS, the Debtor commenced an Adversary Proceeding against the Assignor on May 26, 2009 in the Bankruptcy Court, Case Number 09-08210 (the "Adversary Proceeding"); and

H.      WHEREAS, the Assignor has agreed to sell to the Assignee, all of its right, title and interest in and to the Loan Agreement, the Note, the Security Agreement, the

Guaranties, the Financing Statements, and any security agreements, guaranties, claims or judgments and all other related documents, agreements, instruments, collateral, files, liens, security interests, claims and other assets (collectively, the "Loan Documents").

I.      WHEREAS, the Assignor and the Assignee have agreed that the Assignor will irrevocably sell, transfer and assign to the Assignee (a) all of the Assignor's right, title and interest in, to and under the Loan including, without limitation, all of the Assignor's interest in the Loan Documents, including the right of the Assignor to file a proof of claim in the Bankruptcy Case, (b) all of the Assignor's right, title and interest in, to and under any of Assignor's other claims and defenses under law (to the extent such defenses are legally assignable) relating to the Loan or the Loan Documents, including any claims the Assignor has or may have against the Debtor in the Adversary Proceeding, (c) all of the Assignor's right to receive principal, interest, fees, expenses, damages, penalties and other amounts in respect of, or in connection with, any of the foregoing; and (d) all other claims and causes of action arising from the Loan or under the Loan Documents, together with all voting and other rights and benefits arising from, under or relating to any of the foregoing, including, without limitation, all of the Assignor's rights to receive cash, securities, instruments and/or other property or distributions issued in connection with any of the foregoing or the Bankruptcy Case (collectively, the "Assigned Rights"), all subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.      SALE AND ASSIGNMENT; PURCHASE PRICE.  Subject to the terms and conditions of this Agreement:

(a)      The Assignor shall transfer, assign, grant and convey unto the Assignee and its successors and assigns at the Closing (as defined below) the Assigned Rights on an "AS IS," "WHERE IS" BASIS, "WITH ALL FAULTS" AND WITHOUT REPRESENTATIONS, EXPRESS OR IMPLIED, OF ANY TYPE, KIND, CHARACTER OR NATURE, AND WITHOUT RECOURSE OR WARRANTIES, EXPRESS OR IMPLIED, SAVE AND EXCEPT FOR THE EXPRESS REPRESENTATIONS OR WARRANTIES SET FORTH IN THIS AGREEMENT.

(b)      In consideration for the purchase by the Assignee of the Assigned Rights, the Assignee shall pay to the Assignor at the Closing, the sum of $8,400,000 (the "Purchase Price").  Such amount shall be paid in immediately available funds in U.S. Dollars by wire transfer to the Assignor.

2.      CLOSING.  The closing (the "Closing") of the transaction contemplated by this Agreement shall take place at the offices of Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York 10004, or at such other place or by such other means, including electronic means, as the parties hereto may agree, no later than 24 hours after the entry of an order by Judge Trust in the Bankruptcy Court dismissing with prejudice

2

the Adversary Proceeding, TIME BEING OF THE ESSENCE, unless extended in writing by the Assignor, or at such other time, day or place as the parties hereto may agree upon in writing.

3.     CONDITIONS TO CLOSING. The obligations of the parties hereunder are subject to the fulfillment of the following conditions prior to or at the Closing:

(a)     The representations and warranties set forth in Sections 4 and 5 hereof shall be true and correct in all material respects on and as of the date of the Closing, except that both the Assignor and the Assignee have the right to waive a failure by the other party to comply with part or all of this Section 3(a) as a condition to the Closing.

(b)     Judge Trust shall have entered an order in the Bankruptcy Court dismissing with prejudice the Adversary Proceeding.

(c)     The Assignor shall have delivered to the Assignee at the Closing:

    (i)     Duly executed and acknowledged assignments and other instruments of transfer, as may reasonably requested by the Assignee, executed by the Assignor, including evidence that the Assignor has transferred its right to file a proof of claim in the Bankruptcy Case to the Assignee, substantially in the form of Exhibit A attached hereto;

    (ii)     The original executed Note (or, to the extent it is not available, a copy of same together with a lost note affidavit) duly endorsed by the Assignor to the Assignee as follows: "Pay to the order of Champion Funding LLC, without recourse"; and

    (iii)     All other original Loan Documents (where available), together with such other tangible collateral, including (with the consent of the Debtor) vehicle title documents, as may be in the Assignor's possession or control securing the Note.

4.     REPRESENTATIONS AND WARRANTIES OF THE ASSIGNOR. The Assignor hereby represents and warrants to the Assignee that:

(a)     The Assignor is a duly organized and validly existing national banking association.

(b)     The Assignor has the full power and authority to sell the Assigned Rights, and to enter into and consummate all transactions contemplated by this Agreement with respect to the Assigned Rights. The Assignor has duly authorized the execution, delivery and performance of this Agreement and has duly executed and delivered this Agreement; and this Agreement, assuming due authorization, execution and delivery by the Assignee, constitutes a legal, valid and binding obligation of the Assignor, enforceable against it in accordance with its terms, except as may be limited by bankruptcy, or

60729999.DOC

limitations on creditors' rights generally, or the availability of relief in equity, or the enforceability of indemnity provisions.

(c)     The consummation of the transactions contemplated by this Agreement is in the ordinary course of the Assignor's business and will not result in a breach of any of the terms, conditions or provisions of the Assignor's charter or bylaws or any legal restriction or any agreement or instrument to which the Assignor is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Assignor is subject.

(d)     No consent, approval, authorization or order of any court or governmental authority, participant or other third party is required for the execution and delivery of this Agreement by the Assignor or for the performance by the Assignor of its obligations hereunder, other than such consent, approval, authorization or order as has been or will be obtained prior to the Closing.

(e)     The Assignor is the sole owner of, and is hereby selling to the Assignee all legal and equitable interests in the Assigned Rights and no portion of the Assigned Rights has been sold, assigned or pledged in whole or in part.

(f)     Other than the Adversary Proceeding and the proceeding in the Supreme Court of the State of New York, Nassau County, Index No. 600085/09 titled <u>Manufacturers and Traders Trust Company vs. Champion Motor Group, Inc., et al.</u>, no proceedings are pending by or against the Assignor or to the best of the Assignor's knowledge, threatened against the Assignor before any relevant governmental authority that, in the aggregate, will materially and adversely affect (i) the Assigned Rights or (ii) any action taken or to be taken by the Assignor under this Agreement.

(g)     The Loan Documents constitute all of the legal instruments relating to the Loan and the Assignor is not aware of and will not become a party to or become bound by any other document or agreement that materially and adversely affects the Assigned Rights.

5.     <u>REPRESENTATIONS AND WARRANTIES OF THE ASSIGNEE.</u> The Assignee hereby represents and warrants to the Assignor that:

(a)     The Assignee is a duly organized and validly existing limited liability company under the laws of the State of Delaware.

(b)     The Assignee has the full power and authority to enter into and consummate all transactions contemplated by this Agreement with respect to the Assigned Rights.  The Assignee has duly authorized the execution, delivery and performance of this Agreement and has duly executed and delivered this Agreement, and this Agreement, assuming due authorization, execution and delivery by the Assignor, constitutes a legal, valid and binding obligation of the Assignee, enforceable against it in accordance with its

4

terms, except as may be limited by bankruptcy, or limitations on creditors' rights generally, or the availability of relief in equity, or the enforceability of any indemnity provisions.

(c)     The consummation of the transactions contemplated by this Agreement is in the ordinary course of the Assignee's business and will not result in a breach of any of the terms, conditions or provisions of the Assignee's certificate of formation or limited liability company agreement or any legal restriction or any agreement or instrument to which the Assignee is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Assignee or its property is subject.

(d)     No consent, approval, authorization or order of any court or governmental authority, participant or other third party is required for the execution and delivery of this Agreement by the Assignee or for the performance by the Assignee of its obligations hereunder, other than such consent, approval, authorization or order as has been or will be obtained prior to the Closing.

(e)     The Assignee is acquiring the Assigned Rights for its own account and not with a view toward any wholesale or bulk public sale or distribution thereof, and the Assignee does not intend to sell, offer for sale or syndicate the Assigned Rights or fractional interests in the Assignee in connection with the purchase of the Assigned Rights in wholesale or bulk; provided, however, that nothing herein shall be construed or applied to prohibit or otherwise limit the Assignee's right to dispose of all or any portion of the Assignee's interest in the Assigned Rights in compliance with all applicable laws, rules and regulations.

(f)     The Assignee has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks relating to its purchase of the Assigned Rights and making an informed purchase and investment decision in connection therewith.

(g)     The Assignee acknowledges that the Assigned Rights will have limited liquidity, and the Assignee has the financial ability to hold the Assigned Rights for an indefinite period of time and to bear the economic risk of an outright purchase of the Assigned Rights.

(h)     The Assignee has agreed to the Purchase Price on the basis of its own independent investigation and credit evaluation of the Assigned Rights. The Assignee has not relied upon any representations, warranties, statements or information, of any kind made or provided by or on behalf of the Assignor except for those representations, warranties and statements set forth in this Agreement. The Assignee acknowledges that, except for the representations and warranties of the Assignor set forth in, or to be made in instruments delivered pursuant to, this Agreement, the Assignor negates and disclaims all representations, warranties and statements of every kind or type (express or implied). The Assignee further acknowledges that the amount ultimately received by the Assignee in

5

respect of the Assigned Rights may be less than the Purchase Price, and the Assignee shall have no recourse to the Assignor for any such deficiency.

Nothing in this Section 5 shall constitute a waiver or modification of the Assignor's representations and warranties as set forth in this Agreement.

6. <u>INDEMNIFICATION</u>. The Assignee agrees to indemnify and hold harmless the Assignor and its subsidiaries, affiliates, officers, directors, shareholders, employees, agents, representatives and attorneys from and against any and all loss, liability, claim, damage and expense whatsoever (including but not limited to attorneys' fees) directly or indirectly arising out of, based upon, resulting from or otherwise relating to (a) any act or omission of the Assignee or any of its affiliates, attorneys or agents in connection with the Loan Documents or the Assigned Rights and (b) the material inaccuracy of any of the Assignee's representations or warranties contained in Section 5 hereof. The Assignee further agrees that the Assignor does not have any responsibility to indemnify the Assignee for any type of loss, liability, claim, damage and expense whatsoever relating to the Assigned Rights that may now exist or which may exist in the future. Whether or not the transactions contemplated hereunder are consummated and except to the extent expressly provided herein, the Assignor and the Assignee each shall be responsible for the payment of their own closing expenses including the conducting of any due diligence investigation, legal fees and costs, and expenses in negotiating and carrying out obligations under this Agreement. All costs and expenses incurred for amending any financing statement and any other documents necessary to evidence the transfer of the Loan to the Assignee with respect to the Loan, shall be paid by the Assignee.

7. <u>LITIGATION IN NAME OF THE ASSIGNOR</u>. The Assignee shall not, without the express prior written consent of the Assignor (which consent may be granted or withheld in the Assignor's sole discretion), institute any legal action in the name of the Assignor or continue to prosecute in the name of the Assignor any pending legal action. The Assignee shall not mislead or conceal from any person the identity of the owner of the Assigned Rights purchased hereunder. The Assignee shall not use or refer to the name of the Assignor or any name derived therefrom or confusingly similar thereto to promote the Assignee's subsequent sale, collection or management of the Assigned Rights purchased hereunder.

8. <u>FUTURE DISTRIBUTIONS, PAYMENTS AND NOTICES</u>. Assignor agrees that if Assignor receives any distributions, payments or notices with respect to or relating to the Assigned Rights after the date hereof, Assignor shall accept the same as Assignee's agent and shall hold the same in trust on behalf of and for the sole benefit of Assignee, and shall deliver the same to Assignee in the same form received (free of any withholding, set-off, claim or deduction of any kind), within a reasonable period of time, with the endorsement of Assignor when necessary or appropriate. If any cure amount is due and payable to Assignor, Assignor shall direct such cure amount to be paid to Assignee.

9. <u>FURTHER ASSURANCES</u>. The Assignor and the Assignee shall each execute and deliver to the other all further documents or instruments reasonably

requested by any of them in order to effect the intent of this Agreement and to obtain the full benefit of this Agreement. Any request by any party under this Section 9 shall be accompanied by the document proposed for signature by the party requesting it, in form and substance satisfactory to the party of whom the request is made and its attorneys. The party making the request shall bear and discharge any fees or expenses incident to the preparation, filing or recording of documents requested pursuant to this Section 9.

10. <u>GOVERNING LAW</u>. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York without reference to conflicts of law principles other than Section 5-1401 of the New York General Obligations Law.

11. <u>ENTIRE AGREEMENT</u>. THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES. The parties make no representations or warranties to each other, except as contained in this Agreement. All prior agreements and understandings among the parties hereto with respect to the transactions contemplated hereby, whether verbal or in writing, are superseded by, and are deemed to have been merged into, this Agreement unless otherwise expressly provided herein. This Agreement shall be binding on, and inure to the benefit of, the parties hereto and their successors and assigns, but no other person or entity shall have or claim any third party beneficiary rights under this Agreement. No party hereto has engaged any broker or finder or incurred or become obligated to pay any broker's commission or finder's fee in connection with the transactions contemplated by this Agreement.

12. <u>MODIFICATIONS</u>. This Agreement may not be changed, waived, discharged or terminated orally, other than by an instrument in writing signed by the party or parties against which enforcement of such change, waiver, discharge or termination is sought.

13. <u>SEVERABILITY</u>. If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable, the balance of this Agreement shall remain in full force and effect, and if any provision is inapplicable to any person, entity or circumstance, it shall nevertheless remain applicable to all other persons, entities and circumstances.

14. <u>NOTICES</u>. All notices among the parties shall be in writing and shall be served either personally, by certified mail, facsimile (followed by overnight courier) or overnight courier service. If served personally or by facsimile, notice shall be deemed given or made at the time of such service. If served by certified mail, notice shall be deemed given and made five Business Days after the deposit thereof in the United States mail, postage prepaid, addressed to the party to which said notice is to be given or made. If served by an overnight courier service promising delivery not later than 10:00 a.m. on the first Business Day after receipt by such service, notice shall be deemed given and made one

7

Business Day after the deposit thereof with such courier service, addressed to the party to which such notice is to be given or made, if such deposit is timely and appropriate in accordance with the requirements of such courier service.

All notices to the Assignor shall be given to it at:

> M&T Bank - Pennsylvania Special Assets
> PA 1 HM41
> 213 Market St.
> Harrisburg Pa. 17101
> Attention: Philip R. Jaskot, Vice President
> Fax No.: (717) 255-2370

> with a copy to:

> Hughes Hubbard & Reed LLP
> One Battery Park Plaza
> New York, New York  10004
> Attention:  David W. Wiltenburg, Esq.
> Fax No.: (212) 422-4726

All notices to the Assignee shall be given to it at:

> Champion Funding LLC
> 30 Legend Circle
> Melville, New York 11747

> with a copy to:

Olshan Grundman Frome Rosenzweig & Wolosky LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Attention:  Michael S. Fox, Esq.
Fax No.: (212) 451-2222

15.     REFERENCES IN THIS AGREEMENT.  Whenever the context of this Agreement requires, references to the singular number shall include the plural, and the plural shall include the singular, where appropriate; words denoting gender shall be construed to include the masculine, feminine and neuter where appropriate; and specific enumeration shall not exclude the general, but shall be considered as cumulative.  For purposes of this Agreement, the term "Business Day" shall mean any day other than a Saturday, Sunday or national holiday recognized by New York State chartered banks.

16.     JURISDICTION AND VENUE; WAIVER OF JURY TRIAL.  THE ASSIGNEE AND THE ASSIGNOR HEREBY CONSENT TO THE JURISDICTION OF

8

ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK COUNTY, NEW YORK, WAIVE PERSONAL SERVICE OF ANY AND ALL PROCESS UPON THEM, CONSENT TO SERVICE OF PROCESS BY REGISTERED MAIL DIRECTED TO THE DEFENDANT PARTY AT THE ADDRESS STATED IN SECTION 14 ABOVE, AND ACKNOWLEDGE THAT SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT THEREOF. IN ADDITION, THE ASSIGNEE AND THE ASSIGNOR CONSENT AND AGREE THAT VENUE OF ANY ACTION INSTITUTED UNDER THIS AGREEMENT SHALL BE PROPER IN NEW YORK COUNTY, NEW YORK, AND HEREBY WAIVE ANY OBJECTION TO VENUE. THIS AGREEMENT SHALL BE PERFORMED IN NEW YORK COUNTY, NEW YORK. BOTH THE ASSIGNOR AND THE ASSIGNEE WAIVE ANY RIGHTS THEY MAY HAVE TO A JURY TRIAL FOR DISPUTES ARISING HEREUNDER OR RELATED HERETO.

      17.    <u>COUNTERPARTS, DELIVERY BY TELECOPIER OR OTHER ELECTRONIC MEANS</u>. This Agreement may be executed in counterparts and by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but both of which shall together constitute one and the same instrument. This Agreement may be executed and delivered by telecopier, facsimile or other electronic means with the same force and effect as if the same were a fully executed and delivered original manual counterpart.

      [The remainder of this page is intentionally left blank.]

60729999.DOC

IN WITNESS WHEREOF, the undersigned have duly executed this Sale and Assignment Agreement effective as of the date first above written.

ASSIGNOR

MANUFACTURERS AND TRADERS TRUST COMPANY

By: _____
    Philip Jaskot
    Vice President

ASSIGNEE

CHAMPION FUNDING LLC

By: _____
    Antoine Dominic
    Managing Member

11

STATE OF PENNSYLVANIA          )
                                )ss.:
COUNTY OF DAUPHIN              )

On the 22 day of July, in the year 2009 before me, the undersigned, personally appeared Philip Jaskot, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as a Vice President of Manufacturers and Traders Trust Company and that by his signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Edie I. Lingle, Notary Public
City of Lebanon, Lebanon County
My Commission Expires Oct. 11, 2012
Member, Pennsylvania Association of Notaries

_____
                    Notary


STATE OF NEW YORK     )
                        )ss.:
COUNTY OF NEW YORK  )

On the ___ day of July, in the year 2009 before me, the undersigned, personally appeared Antoine Dominic, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as the Managing Member of Champion Funding LLC and that by his signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____
                    Notary

IN WITNESS WHEREOF, the undersigned have duly executed this Sale and Assignment Agreement effective as of the date first above written.

ASSIGNOR

MANUFACTURERS AND TRADERS TRUST COMPANY

By:_____
    Philip Jadkot
    Vice President

ASSIGNEE

CHAMPION FUNDING LLC

By:_____
    Antoine Dominic
    Managing Member

10

60729999 DOC

STATE OF PENNSYLVANIA      )
                           )ss.:
COUNTY OF DAUPHIN          )

    On the ___ day of July, in the year 2009 before me, the undersigned, personally appeared Philip Jaskot, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as a Vice President of Manufacturers and Traders Trust Company and that by his signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____
                Notary


STATE OF NEW YORK      )
                       )ss.:
COUNTY OF NEW YORK  )

    On the 23 day of July, in the year 2009 before me, the undersigned, personally appeared Antoine Dominic, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as the Managing Member of Champion Funding LLC and that by his signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument

_____
                Notary

ROSE BROTHERTON
Notary Public · State of New York
NO. 01BR4910411
Qualified in Suffolk County
My Commission Expires 11-3-07

60756990_1 DOC

**EXHIBIT B**

| BUDGET & CASH FLOW ANALYSIS 8/09-12/09 | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER | |
|---|---|---|---|---|---|---|
| # NEW BENTLEYS | 5 | 5 | 5 | 5 | 5 | 25 |
| # NEW LAMBOS | 1 | 0 | 1 | 0 | 1 | 3 |
| # USED CARS | 35 | 40 | 40 | 40 | 30 | 185 |
| SPREAD NEW BENTLEYS | 1500 | 1500 | 1500 | 1500 | 1500 | |
| SPREAD NEW LAMBOS | 0 | 0 | 0 | 0 | 0 | |
| SPREAD USED | 6000 | 6000 | 6000 | 6000 | 6000 | |
| svc/parts gross | 175000 | 175000 | 175000 | 175000 | 175000 | 875,000 |
| car gross | 217500 | 247500 | 247500 | 247500 | 187500 | |
| EXCESS CASH FLOW PROVIDED BY CHAMPION FUNDING INVENTORY | 350000 | 250000 | 250000 | 0 | 0 | |
| TOTAL GROSS PROFIT AND ADDITIONAL CASH FLOW | 742,500 | 672,500 | 672,500 | 422,500 | 362,500 | 2,022,500 |
| | August-09 | September-09 | October-09 | November-09 | December-09 | TOTAL |
| OPERATING INCOME | 392,500 | 422,500 | 422,500 | 422,500 | 362,500 | 2,022,500 |
| | | | | | | |
| SELLING EXPENSES | | | | | | |
| SALES COMMISSIONS | 25,000 | 35,000 | 35,000 | 35,000 | 27,000 | 157,000 |
| payroll taxes sales comm | 2,000 | 2,800 | 2,800 | 2,800 | 2,160 | 12,560 |
| CUST REL ADJ | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 40,000 |
| FLOOR PLAN CHARGES | 0 | 0 | 0 | 0 | 0 | 0 |
| DELIVERY EXPENSE | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 20,000 |
| ADVERTISING (net) | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 50,000 |
| sales commission p/r taxes | | | | | | |
| SALES PROMO | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 10,000 |
| | | | | | | |
| TOTAL SALES EXPENSES | 51,000 | 61,800 | 61,800 | 61,800 | 53,160 | 289,560 |
| | | | | | | |
| PERSONNEL EXPENSES | | | | | | |
| SALARIES-OWNERS | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 100,000 |
| SALARIES-Other | 128,000 | 128,000 | 128,000 | 128,000 | 128,000 | 640,000 |
| SALARY ADJUSTMENTS | | (10,000) | (15,000) | (15,000) | (15,000) | -55,000 |
| COMPENSATION-SPECIALISTS | 0 | 0 | 0 | 0 | 0 | 0 |
| ABSENTEE-VACATION | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 5,500 |
| WORKERS COMP | 5,176 | 5,176 | 5,176 | 5,176 | 5,176 | 25,880 |
| PAYROLL TAXES | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 65,000 |
| OTHER EMPLOYEE BENEFITS | 8,400 | 8,400 | 8,400 | 8,400 | 8,400 | 42,000 |
| | | | | | | |
| TOTAL PERSONNEL EXPENSES | 175,676 | 165,676 | 160,676 | 160,676 | 160,676 | 823,380 |
| | | | | | | |
| SEMI-FIXED EXPENSES | | | | | | |
| SUPPLIES/TOOLS | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 15,000 |
| UNIFORMS/LAUNDRY | 750 | 750 | 750 | 750 | 750 | 3,750 |
| TRAINING | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 7,500 |

| | | | | | | |
|---|---|---|---|---|---|---|
| CO VEHICLE EXPENSE | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 11,000 |
| VEHICLE LOANER EXPENSE | 0 | 0 | 0 | 0 | 0 | 0 |
| FREIGHT | 800 | 800 | 800 | 800 | 800 | 4,000 |
| CONSULTING & MGMT FEES | 750 | 750 | 750 | 750 | 750 | 3,750 |
| DATA PROCESSING | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 35,000 |
| POSTAGE & OFFICE SUPPLIES | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 12,500 |
| TELEPHONE | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 30,000 |
| T & E | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 5,000 |
| DUES & SUBSCRIPTIONS | 250 | 250 | 250 | 250 | 250 | 1,250 |
| credit card fees & bank charges | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 30,000 |
| MISCELLANEOUS | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 15,000 |
| | | | | | | |
| **TOTAL SEMI FIXED EXPENSES** | 34,750 | 34,750 | 34,750 | 34,750 | 34,750 | 173,750 |
| | | | | | | |
| **FIXED EXPENSES** | | | | | | |
| UTILITIES | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 75,000 |
| RENT | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 200,000 |
| REPAIRS & MAINTENANCE-BLDG | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 15,000 |
| INSURANCE-BLDG/OTHER | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 12,500 |
| INSURANCE-OTHER | 13,000 | 13,000 | 13,000 | 13,000 | 13,000 | 65,000 |
| REAL ESTATE TAXES | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 175,000 |
| TAXES-OTHER | 300 | 300 | 300 | 300 | 300 | 1,500 |
| DEPRECIATION-EQUIP | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 50,000 |
| EQUIPMENT RENTAL | 200 | 200 | 200 | 200 | 200 | 1,000 |
| REPAIRS & MAINTENANCE-EQUIP | 100 | 100 | 100 | 100 | 100 | 500 |
| | | | | | | |
| **TOTAL FIXED EXPENSES** | 119,100 | 119,100 | 119,100 | 119,100 | 119,100 | 595,500 |
| | | | | | | |
| **TOTAL OPERATING EXPENSES** | 380,526 | 381,326 | 376,326 | 376,326 | 367,686 | 1,882,190 |
| | | | | | | |
| **NET OPERATING PROFIT** | 11,974 | 41,174 | 46,174 | 46,174 | -5,186 | 140,310 |
| | | | | | | |
| **OTHER INCOME & EXPENSES** | | | | | | |
| INCENTIVES-LAMBORGHINI | 0 | 0 | 0 | 0 | 0 | 0 |
| HOLDBACK- BENTLEY | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 175,000 |
| PROFESSIONAL FEES | -125,000 | -3,000 | -3,000 | -50,000 | -3,000 | -184,000 |
| | | | | | | |
| **TOTAL OTHER INCOME** | -90,000 | 32,000 | 32,000 | -15,000 | 32,000 | -9,000 |
| | | | | | | |
| **TOTAL NET PROFIT** | -78,026 | 73,174 | 78,174 | 31,174 | 26,814 | 131,310 |
| **PROFIT + EXCESS CASH FLOW PROVIDED BY CHAMPION FUNDING** | 271,974 | 323,174 | 78,174 | 281,174 | 26,814 | 981,310 |



**EXHIBIT C**

| 8/5/2009 | | | CHAMPION FUNDING | MINIMUM RETAIL AGREED | MINIMUM |
|---|---|---|---|---|---|
| # VEHICLES | sale d | MFG | RECOVERY AMOUNT | UPON BY CHAMPION MANAGEMENT | RETENTION |
| 1 | 30 | BENTLEY | 135,000.00 | 145,000.00 | 10,000.00 |
| 2 | 60 | BENTLEY | 175,000.00 | 185,000.00 | 10,000.00 |
| 3 | 90 | BENTLEY | 140,000.00 | 150,000.00 | 10,000.00 |
| 4 | 60 | BENTLEY | 139,500.00 | 149,500.00 | 10,000.00 |
| 5 | 90 | BENTLEY | 270,000.00 | 275,000.00 | 5,000.00 |
| 6 | 90 | BENTLEY | 270,000.00 | 280,000.00 | 10,000.00 |
| 7 | 60 | BENTLEY | 185,000.00 | 200,000.00 | 15,000.00 |
| 8 | 60 | BENTLEY | 185,000.00 | 200,000.00 | 15,000.00 |
| 9 | 60 | BENTLEY | 175,000.00 | 185,000.00 | 10,000.00 |
| 10 | 30 | BENTLEY | 175,000.00 | 185,000.00 | 10,000.00 |
| 11 | 60 | BENTLEY | 190,000.00 | 200,000.00 | 10,000.00 |
| 12 | 60 | BENTLEY | 190,000.00 | 200,000.00 | 10,000.00 |
| 13 | 90 | BENTLEY | 270,000.00 | 280,000.00 | 10,000.00 |
| 14 | 30 | FERRARI | 120,000.00 | 130,000.00 | 10,000.00 |
| 15 | 30 | ROLLS | 90,000.00 | 125,000.00 | 35,000.00 |
| 16 | 60 | FERRARI | 45,000.00 | 55,000.00 | 10,000.00 |
| 17 | 90 | LAMBORGHINI | 150,000.00 | 165,000.00 | 15,000.00 |
| 18 | 30 | FORD | 130,000.00 | 140,000.00 | 10,000.00 |
| 19 | 90 | LAMBORGHINI | 85,000.00 | 95,000.00 | 10,000.00 |
| 20 | 90 | CHEVROLET | 50,000.00 | 60,000.00 | 10,000.00 |
| 21 | 30 | LAMBORGHINI | 90,000.00 | 100,000.00 | 10,000.00 |
| 22 | 60 | FERRARI | 145,000.00 | 155,000.00 | 10,000.00 |
| 23 | 90 | BENTLEY | 75,000.00 | 85,000.00 | 10,000.00 |
| 24 | 60 | FERRARI | 125,000.00 | 140,000.00 | 15,000.00 |
| 25 | 60 | FERRARI | 125,000.00 | 140,000.00 | 15,000.00 |
| 26 | 60 | LAMBORGHINI | 80,000.00 | 90,000.00 | 10,000.00 |
| 27 | 30 | FERRARI | 130,000.00 | 145,000.00 | 15,000.00 |
| 28 | 90 | BUICK | 125,000.00 | 145,000.00 | 20,000.00 |
| 29 | 30 | ROLLS | 300,000.00 | 325,000.00 | 25,000.00 |
| 30 | 30 | LAMBORGHINI | 250,000.00 | 295,000.00 | 45,000.00 |
| 31 | 30 | LAMBORGHINI | 140,000.00 | 175,000.00 | 35,000.00 |
| 32 | 60 | BENTLEY | 80,000.00 | 90,000.00 | 10,000.00 |
| 33 | 60 | PORSCHE | 45,000.00 | 55,000.00 | 10,000.00 |
| 34 | 30 | BENTLEY | 75,000.00 | 90,000.00 | 15,000.00 |
| 35 | 60 | BENTLEY | 70,000.00 | 90,000.00 | 20,000.00 |
| 36 | 90 | LAMBORGHINI | 105,000.00 | 155,000.00 | 50,000.00 |
| 37 | 60 | BMW | 75,000.00 | 100,000.00 | 25,000.00 |
| 38 | 30 | FERRARI | 45,000.00 | 70,000.00 | 25,000.00 |
| 39 | 30 | BMW | 75,000.00 | 100,000.00 | 25,000.00 |
| 40 | 90 | BENTLEY | 30,000.00 | 60,000.00 | 30,000.00 |
| 41 | 30 | ASTON | 80,000.00 | 95,000.00 | 15,000.00 |
| 42 | 30 | MASERATI | 40,000.00 | 50,000.00 | 10,000.00 |
| 43 | 30 | BENTLEY | 70,000.00 | 85,000.00 | 15,000.00 |
| 44 | 90 | BENTLEY | 25,000.00 | 45,000.00 | 20,000.00 |

| 8/5/2009 | | | CHAMPION FUNDING | MINIMUM RETAIL AGREED | MINIMUM |
|---|---|---|---|---|---|
| # VEHICLES | sale d | MFG | RECOVERY AMOUNT | UPON BY CHAMPION MANAGEMENT | RETENTION |
| 45 | 60 | LAMBORGHINI | 150,500.00 | 165,000.00 | 14,500.00 |
| 46 | 30 | BENTLEY | 75,000.00 | 90,000.00 | 15,000.00 |
| 47 | 60 | ASTON | 60,000.00 | 77,000.00 | 17,000.00 |
| 48 | 90 | BMW | 75,000.00 | 100,000.00 | 25,000.00 |
| 49 | 60 | FORD | 115,000.00 | 130,000.00 | 15,000.00 |
| 50 | 90 | ROLLS | 150,000.00 | 235,000.00 | 85,000.00 |
| 51 | 60 | FERRARI | 90,000.00 | 115,000.00 | 25,000.00 |
| 52 | 30 | BENTLEY | 65,000.00 | 65,000.00 | - |
| 53 | 90 | ASTON | 45,000.00 | 60,000.00 | 15,000.00 |
| 54 | 30 | LAMBORGHINI | 90,000.00 | 100,000.00 | 10,000.00 |
| 55 | 60 | BENTLEY | 175,000.00 | 200,000.00 | 25,000.00 |
| 56 | 90 | LAMBORGHINI | 130,000.00 | 145,000.00 | 15,000.00 |
| 57 | 60 | LAMBORGHINI | 140,000.00 | 170,000.00 | 30,000.00 |
| 58 | 30 | LAMBORGHINI | 140,000.00 | 170,000.00 | 30,000.00 |
| 59 | 90 | LAMBORGHINI | 135,000.00 | 160,000.00 | 25,000.00 |
| 60 | 90 | LAMBORGHINI | 140,000.00 | 160,000.00 | 20,000.00 |
| 61 | 30 | LAMBORGHINI | 170,000.00 | 180,000.00 | 10,000.00 |
| 62 | 60 | LAMBORGHINI | 175,000.00 | 200,000.00 | 25,000.00 |
| 63 | 30 | CHEVROLET | 10,000.00 | 10,000.00 | - |
| 64 | | FORD | 0.00 | | |
| 65 | | MAZDA | 0.00 | | |
| | | | | | |
| | | | 7,700,000.00 | 8,816,500.00 | 1,116,500.00 |

DEBTOR BELIEVES IT WILL EXCEED THE AGREED RETAIL PRICE BY AT LEAST $300,000