# **EXHIBIT 2**

Sale Order

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | Case No. 8-09-71979 (AST) |
| CHAMPION MOTOR GROUP, INC., | : | |
| Debtor. | : | |

## ORDER PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006 (I) AUTHORIZING SALE OF DEBTOR'S ASSETS PURSUANT TO ASSET PURCHASE AGREEMENT, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (II) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (III) GRANTING RELATED RELIEF

Upon consideration of the motion dated December 1, 2009, (the "Sale Motion") of the above-captioned debtor and debtor in possession (the "Debtor" or "Seller") for entry of an order, pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor to, *inter alia*, (i) enter into that certain Asset Purchase Agreement, dated as of November 30, 2009 (and as may be subsequently amended, supplemented or modified from time, the "Asset Purchase Agreement," copy of which is attached hereto as Exhibit A),[1] by and between Debtor Champion Motor Group and Champion Funding LLC, together with its designee (the "Purchaser"), (ii) sell (the "Sale") substantially all of its assets (the "Acquired Assets") pursuant to the term and conditions of the Asset Purchase Agreement free and clear of any and all liens, claims, encumbrances and other interests ("Liens, Claims, Encumbrances and Interests"), (iii) assume and assign certain

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the

executory contracts and unexpired leases (the "Assigned Contracts") to the Purchaser; and (iv) granting certain related relief; and this Court having entered an order dated December [_____], 2009 [Docket No. _____] (the "Bidding Procedures Order") (i) authorizing and approving certain bidding procedures (the "Bidding Procedures," a copy of which is attached as Exhibit A to the Bidding Procedures Order) for the Debtor to consider higher or otherwise better offers for the Acquired Assets in connection with the Sale, (ii) authorizing the Debtor to conduct an auction (the "Auction") in connection with the Sale and establishing a date for the Auction and a hearing to consider the Sale (the "Sale Hearing"), (iii) authorizing and approving the Debtor's form and manner of notice for the Bidding Procedures and the Auction, (iv) authorizing and approving certain procedures relating to the assumption and assignment of the Assigned Contracts, including notice of the Debtor's proposed cure amounts, and (v) granting certain related relief; and the Court having established the date of the Sale Hearing; and the Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334; and consideration of the Sale Motion, the relief requested therein, and the responses thereto, if any, being a core proceeding in accordance with 28 U.S.C. § 157(b); and the appearance of all interested parties and all responses and objections, if any, to the Sale Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and all other pleadings and proceedings in this chapter 11 case, including the Sale Motion; and it appearing that the relief requested in the Sale Motion is in the best interest of the Debtor, its estate and creditors and all other parties in interest; and after due deliberation and sufficient cause appearing therefor,

---

Asset Purchase Agreement.

2

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[2]

     A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

     B.     To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

     C.     The Court has jurisdiction over this matter and over the property of the Debtor, including the Acquired Assets to be sold, transferred or conveyed pursuant to the Asset Purchase Agreement, and its respective estate pursuant to 28 U.S.C.§§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this chapter 11 case and the Sale Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

     D.     The statutory predicates for the relief sought in the Sale Motion and the basis for the approvals and authorizations herein are sections 102, 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

     E.     On March 26, 2009 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has continued in possession and management of its business and property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

     F.     As evidenced by the affidavits of service and publication filed with the Court, proper, timely, adequate and sufficient notice of the Sale Motion, Bidding Procedures, Auction and Sale Hearing have been provided in accordance with sections 102(1) and 363(b) of

---

[2] All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale

the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9006, 9007, 9008 and 9014, the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the Eastern District of New York (the "Local Rules") and the procedural due process requirements of the United States Constitution and in compliance with the Bidding Procedures Order. The Debtor also gave due and proper notice of the assumption, sale and assignment of each Assigned Contract to each non-Debtor party under each such Assigned Contract. Such notice was good and sufficient and appropriate under the particular circumstances. No other or further notice of the Sale Motion, Bidding Procedures, Auction, Sale Hearing and assumption and assignment of the Assigned Contracts, or of the entry of this Order, is necessary or shall be required.

G.    A reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion has been afforded to all interested persons and entities, including, without limitation: (a) the Office of the United States Trustee for the Eastern District of New York; (b) counsel to the Debtor's senior secured lender; (c) the parties included on the Debtor's consolidated list of twenty (20) creditors holding the largest unsecured claims; (d) any party which, to the best of the Debtor's knowledge, information and belief, has, in the past year, expressed in writing to the Debtor an interest in buying its business and which the Debtor and its representatives reasonably and in good faith determined potentially have the financial wherewithal to effectuate the transactions contemplated by the Sale Motion; (e) all parties which, to the best of the Debtor's knowledge, information and belief, have asserted a lien or security interest against any of the Acquired Assets; (f) all taxing authorities or recording offices which have a reasonably known interest in relief requested in the Sale Motion; (g) the Office of the United States Trustee; (h) all non-Debtor parties to the Assigned Contracts; and (i) all parties

---

Motion are hereby incorporated herein to the extent not inconsistent herewith.

826588-6

requesting notice pursuant to Local Rule 2002-1(d); and Other parties interested in bidding on the Acquired Assets were provided, upon request, sufficient information to make an informed judgment on whether to bid on the Acquired Assets.

H.     The Acquired Assets are property of the Debtor's estate and title thereto is vested in the Debtor's estate.

I.     The Debtor has demonstrated a sufficient basis requiring it to enter into the Asset Purchase Agreement, sell the Acquired Assets and assume and assign the Assigned Contracts under sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtor's business judgment and in the best interest of the Debtor, its estate and creditors.

J.     The Bidding Procedures set forth in the Bidding Procedures Order were non-collusive, substantively and procedurally fair to all parties and were the result of arms' length negotiations between the Debtor and the Purchaser.

K.     The Debtor and its professionals have complied, in good faith, in all respects with the Bidding Procedures Order. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, through marketing efforts and the sale process conducted in accordance with the Bidding Procedures Order, the Debtor (a) afforded all parties (collectively, the "Potential Purchasers") interested in potentially purchasing the Acquired Assets a full, fair and reasonable opportunity to qualify as bidders in accordance with the terms and conditions of the Bidding Procedures and submit their highest or otherwise best offer to purchase the Acquired Assets, and (b) provided Potential Purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Acquired Assets. The Bidding

Procedures obtained the highest and otherwise best value for the Acquired Assets for the Debtor and its estate.

L.     The offer of the Purchaser, upon the terms and conditions set forth in the Asset Purchase Agreement, including the form and total consideration to be realized by the Debtor pursuant to such agreement, (i) is the highest and best offer received by the Debtor, (ii) is fair and reasonable, (iii) is in the best interest of the Debtor, its creditors and estate, (iv) constitutes full and adequate consideration and reasonably equivalent value for the Acquired Assets, and (v) will provide a greater recovery for the Debtor's estate and creditors and other interested parties than would be provided by any other practically available alternative.

M.     The Purchaser is a "good faith" buyer, as that term is used in the Bankruptcy Code and the decisions thereunder, and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code with respect to all of the Acquired Assets. The Asset Purchase Agreement was negotiated and entered into in good faith, based upon arms' length bargaining, and without collusion or fraud of any kind. Neither the Debtor nor the Purchaser have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of, or otherwise implicate, section 363(n) of the Bankruptcy Code to the Asset Purchase Agreement or to the consummation of the sale transaction and transfer of the Acquired Assets and Assigned Contracts to the Purchaser. The Purchaser is entitled to all the protections and immunities of section 363(m) of the Bankruptcy Code.

N.     The Debtor has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the sale of the Acquired Assets has been duly and validly authorized by all necessary corporate authority for the Debtor

826588-6

to consummate the transactions contemplated by the Asset Purchase Agreement. No consents or approvals, other than as may be expressly provided for in the Asset Purchase Agreement, are required by the Debtor to consummate such transactions.

O.     The Debtor has advanced sound business reasons for seeking to enter into the Asset Purchase Agreement and to sell and/or assume and assign the Acquired Assets, as more fully set forth in the Sale Motion and as demonstrated at the Sale Hearing, and it is a reasonable exercise of the Debtor's business judgment to sell the Acquired Assets and to consummate the transactions contemplated by the Asset Purchase Agreement. Notwithstanding any requirement for approval or consent by any person, the transfer of the Acquired Assets to the Purchaser and the assumption and assignment of the Assigned Contracts is a legal, valid and effective transfer of the Acquired Assets and any Assigned Contracts.

P.     The terms and conditions of the Asset Purchase Agreement, including the consideration to be realized by the Debtor pursuant to the agreement, are fair and reasonable, and the transactions contemplated by the Asset Purchase Agreement are in the best interest of the Debtor's estate, and satisfy applicable law.

Q.     Except as otherwise provided in the Asset Purchase Agreement, the Acquired Assets shall be sold free and clear of all Liens, Claims, Encumbrances and Interests.

R.     The transfer of the Acquired Assets to the Purchaser will be a legal, valid and effective transfer of the Acquired Assets, and, except as may otherwise be provided in the Asset Purchase Agreement, shall vest the Purchaser with all right, title and interest of the Debtor to the Acquired Assets free and clear of any and all Liens, Claims, Encumbrances and Interests. Except as specifically provided in the Asset Purchase Agreement or this Order, the Purchaser shall not assume or become liable for any Liens, Claims, Encumbrances and Interests relating to

7

the Acquired Assets being sold by the Debtor.

S.     The transfer of the Acquired Assets to the Purchaser free and clear of all Liens, Claims, Encumbrances and Interests will not result in any undue burden or prejudice to any holders of any Liens, Claims, Encumbrances and Interests, as all such Liens, Claims, Encumbrances and Interests of any kind or nature whatsoever shall attach to the net proceeds of the sale of the Acquired Assets received by the Debtor in the order of their priority, with the same validity, force and effect which such Liens, Claims, Encumbrances and Interests now have as against the Acquired Assets and subject to any claims and defenses the Debtor or other parties may possess with respect thereto. All persons having Liens, Claims, Encumbrances or Interests of any kind or nature whatsoever against or in any of the Debtor or the Acquired Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Liens, Claims, Encumbrances or Interests against the Purchasers, any of its assets, property, successors or assigns or the Acquired Assets.

T.     The Debtor may sell the Acquired Assets free and clear of all Liens, Claims, Encumbrances and Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. Those (i) holders of Liens, Claims, Encumbrances and Interests and (ii) non-Debtor parties, which did not object or which withdraw their objections to the sale of the Acquired Assets and the Sale Motion are deemed to have consented to the sale pursuant to section 363(f)(2) of the Bankruptcy Code. All objections to the Sale Motion have been resolved or overruled. Those holders of Liens, Claims, Encumbrances and Interests which did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, Claims, Encumbrances and Interests, if any, attach to the proceeds of the

8

sale of the Acquired Assets ultimately attributable to the property against or in which they claim or may claim any Liens, Claims, Encumbrances and Interests, with such Liens, Claims, Encumbrances and Interests being subject to treatment as may be prescribed by separate order of this Court.

U.      Not selling the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances would adversely impact the Debtor's estate and the sale of the Acquired Assets other than one free and clear of Liens, Claims, Encumbrances and Interests would be of substantially less value to the Debtor's estate.

V.      The Debtor and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), (B) and 365(f), in connection with the sale and the assumption and assignment of the Assigned Contracts. The Purchaser has demonstrated adequate assurance of future performance with respect to the Assigned Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code. The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order are integral to the Asset Purchase Agreement and are in the best interest of the Debtor, its estate and creditors and other parties in interest, and represents the exercise of sound and prudent business judgment by the Debtor.

W.      The Assigned Contracts are assignable notwithstanding any provisions contained therein to the contrary. The Debtor has provided for the cures and/or other payments or actions required under the Bankruptcy Code to assume and assign the Assigned Contracts to the Purchaser. The Purchaser has provided adequate assurance of its future performance under the Assigned Contracts and the proposed assumption and assignment of the Assigned Contracts.

X.      In the absence of a stay pending appeal, the Purchaser will be acting in

good faith, pursuant to section 363(m) of the Bankruptcy Code, in closing the transactions contemplated by the Asset Purchase Agreement at any time on or after the entry of this Order, and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

Y.     The transactions contemplated under the Asset Purchase Agreement do not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtor and/or the Debtor's estate, and there is not substantial continuity between the Purchaser and the Debtor, there is no continuity of enterprise between the Debtor and the Purchaser, the Purchasers are not a mere continuation of the Debtor or its estate and the Purchaser does not constitute a successor to the Debtor or its estate.

Z.     The sale of the Acquired Assets outside of a chapter 11 plan pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtor.  The sale does not constitute a *sub rosa* chapter 11 plan.

AA.    Pursuant to Section 12.16 of the Asset Purchase Agreement, the Debtor is providing the Purchaser with a general release of claims and the Purchaser is providing fair value for the release.

BB.    The Purchaser is a secured creditor of the Debtor, holding valid Liens, Claims, Encumbrances and Interests in and against the Debtor and its estate arising in connection with the various pre-petition loan and security agreements, as amended, and related documents, instruments and agreements and the Senior Secured Pre-Petition Credit Agreement.  The Purchaser holds allowed Claims for funded debt in the aggregate amount of $18,000,000 (the "Allowed Claim"), and was authorized to credit bid any or all of such Allowed Claim at the

826588-6

Auction.

CC.    The Purchaser's credit bid pursuant to the Agreement was a valid and

proper offer pursuant to the Bidding Procedures Order and sections 363(b) and 363(k) of the

Bankruptcy Code.

DD.    The total consideration provided by the Purchaser for the Acquired Assets

is the highest and best offer received by the Debtor, and the Purchase Price constitutes (a)

reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer

Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act and (c) reasonably

equivalent value, fair consideration and fair value under any other applicable laws of the United

States, any state, territory or possession or the District of Columbia, for the Acquired Assets.

EE.    Time is of the essence in consummating the Sale.  In order to maximize

the value of the Acquired Assets, it is essential that the sale of the Acquired Assets occur within

the time constraints set forth in the Asset Purchase Agreement.  Accordingly, there is cause to lift

the stays contemplated by Bankruptcy Rules 6004 and 6006.

**NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The relief requested in the Sale Motion is granted, subject to the terms and

conditions contained herein.

2.    All objections, responses, and requests for continuance concerning the

Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record

of the Sale Hearing.  To the extent any such objection, response or request for continuance was

not otherwise withdrawn, waived, settled or expressly preserved by the terms of this Order, it,

and all reservations of rights contained therein, are overruled and denied.

3.    Notice of the Sale Hearing was fair and equitable under the circumstances

and complied in all respects with 11 U.S.C. § 102(1) and Bankruptcy Rules 2002, 6004 and 6006 and the Bidding Procedures Order.

4.      The sale of the Acquired Assets, the terms and conditions of the Asset Purchase Agreement (including all schedules and exhibits affixed thereto), the credit bid by the Purchaser (the "Credit Bid Amount") and the transactions contemplated thereby be, and hereby are, authorized and approved.

5.      The sale of the Acquired Assets and the consideration provided by the Purchaser under the Asset Purchase Agreement, including the Credit Bid Amount, are fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

6.      The Purchaser is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code, including with respect to the transfer of the Assigned Contracts as part of the sale of the Acquired Assets pursuant to section 365 of the Bankruptcy Code and this Order.

7.      The Debtor and the Purchaser shall be, and hereby are, authorized and directed to fully assume, perform under, consummate and implement the terms of the Asset Purchase Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Asset Purchase Agreement, this Order and the sale of the Acquired Assets contemplated thereby, including, without limitation, deeds, assignments, stock powers and other instruments of transfer, and to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession any or all of the Acquired Assets or Assumed Liabilities, as may be necessary or

12

appropriate to the performance of the Debtor's obligations as contemplated by the Asset Purchase Agreement, without any further corporate action or orders of this Court. The Purchaser shall have no obligation to proceed with the Closing of the Asset Purchase Agreement until all conditions precedent to its obligations to do so have been met, satisfied or waived.

8.    The Debtor, the Purchaser and each other person or entity having duties or responsibilities under the Asset Purchase Agreement, any agreements related thereto or this Order, and their respective directors, officers, employees, members, agents, representatives and attorneys, are authorized and empowered, subject to the terms and conditions contained in the Asset Purchase Agreement, to: carry out all of the provisions of the Asset Purchase Agreement and any related agreements; issue, execute, deliver, file and record, as appropriate, the documents evidencing and consummating the Asset Purchase Agreement, and any related agreements; take any and all actions contemplated by the Asset Purchase Agreement, any related agreements or this Order; and issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary or appropriate to implement, effectuate and consummate the Asset Purchase Agreement, any related agreements and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court or further action by their respective directors, officers, employees, members, agents, representatives and attorneys, and with like effect as if such actions had been taken by unanimous action of the respective directors, officers, employees, members, agents, representatives and attorneys of such entities. The secretary or any assistant secretary of the Debtor shall be, and hereby is, authorized to certify or attest to any of the foregoing actions (but

13

no such certification or attestation shall be required to make any such action valid, binding and enforceable). The Debtor (or, consistent with the Asset Purchase Agreement, the Purchaser) is further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements or amendments necessary or appropriate to effectuate the transactions contemplated by the Asset Purchase Agreement, any related agreements and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtor may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporation laws of the State of New York and all other applicable business corporation, trust and other laws of the applicable governmental units with respect to the implementation and consummation of the Asset Purchase Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

9.      Effective as of the Closing, (a) the sale of the Acquired Assets by the Debtor to the Purchaser shall constitute a legal, valid and effective transfer of the Acquired Assets notwithstanding any requirement for approval or consent by any person and shall vest Purchaser with all right, title and interest of the Debtor in and to the Acquired Assets, free and clear of all Claims, Liens, Encumbrances and Interests of any kind, pursuant to section 363(f) of the Bankruptcy Code, and (b) the assumption of any Assumed Liabilities by the Purchaser shall

constitute a legal, valid and effective delegation of any Assumed Liabilities to the Purchaser and shall divest the Debtor of all liability with respect to any Assumed Liabilities.

10. The sale of the Acquired Assets by the Debtor to the Purchaser is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code.

11. Except to the extent specifically provided in the Asset Purchase Agreement, upon the closing, the Debtor shall be, and hereby is, authorized, empowered, and directed, pursuant to sections 105, 363(b) and 365 of the Bankruptcy Code, to sell the Acquired Assets, including those within the Assignment and Assumption Agreement, to the Purchaser. The sale of the Acquired Assets shall vest Purchaser with all right, title and interest of the Debtor to the Acquired Assets free and clear of any and all Liens, Claims, Encumbrances and Interests and other liabilities and claims, but subject to the Assumed Liabilities, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise, with all such Liens, Claims, Encumbrances and Interests to attach only to the proceeds of the Sale (if any) with the same priority, validity, force and effect, if any, as they now have in or against the Acquired Assets, subject to all claims and defenses the Debtor may possess with respect thereto. Following the Closing Date, no holder of any Liens, Claims, Encumbrances and Interests in the Acquired Assets shall interfere with the Purchaser's use and enjoyment of the Acquired Assets based on or related to such Liens, Claims, Encumbrances and Interests, or any actions that the Debtor may take in its chapter 11 case, and no person shall take any action to prevent, interfere with or otherwise enjoin consummation of the transactions contemplated in or

826588-6

by the Asset Purchase Agreement or this Order.

12.     The provisions of this Order authorizing the sale of the Acquired Assets free and clear of Liens, Claims, Encumbrances and Interests, other than Assumed Liabilities, shall be self-executing, and neither the Debtor nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.  However, the Debtor and the Purchaser, and each of their respective officers, employees and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtor or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the Asset Purchase Agreement and this Order.  Moreover, effective as of the Closing, the Purchaser and its successors and assigns shall be designated and appointed the Debtor's true and lawful attorney and attorneys, with full power of substitution, in the Debtor's name and stead, on behalf and for the benefit of the Purchaser, its successors and assigns, to demand and receive any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof, and from time to time to institute and prosecute in the Debtor's name, for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Acquired Assets, and to do all acts and things with respect to the Acquired Assets which the Purchaser, its successors and assigns, shall deem desirable.  The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtor.

13.     On or before the Closing Date, the Debtor's creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release any

Liens, Claims, Encumbrances and Interests of any kind against the Acquired Assets, as such Liens, Claims, Encumbrances and Interests may have been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing any Liens, Claims, Encumbrances and Interests in or against the Acquired Assets shall not have delivered to the Debtor prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such Liens, Claims, Encumbrances and Interests that the person or entity has with respect to the Acquired Assets, the Debtor is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Acquired Assets prior to the Closing, and the Purchaser is authorized to file such documents after Closing.

14.　　To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtor with respect to the Acquired Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date. Without limiting the generality of the foregoing, the Debtor is expressly authorized to enter into any transition documents necessary to facilitate the operations of the Purchaser under the Asset Purchase Agreement.

15.　　All of the Debtor's interests in the Acquired Assets under the Asset Purchase Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Purchaser. Upon the occurrence of the Closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment,

conveyance and transfer of the Acquired Assets acquired by the Purchaser under the Asset

Purchase Agreement and/or a bill of sale or assignment transferring good and marketable,

indefeasible title and interest in the Acquired Assets to the Purchaser.

16.     Except as expressly provided in the Asset Purchase Agreement or this

Order, (a) the Purchaser is not assuming; nor shall its or any affiliate thereof be in any way liable

or responsible, as a successor or otherwise, for (i) any liabilities, debts or obligations of the

Debtor in any way whatsoever relating to or arising from the Debtor's ownership or use of the

Acquired Assets prior to the consummation of the transactions contemplated by the Asset

Purchase Agreement, or (ii) any liabilities calculable by reference to the Debtor or its operations

or the Acquired Assets, or relating to continuing or other conditions existing on or prior to

consummation of the transactions contemplated by the Agreement or this Order, unless

otherwise expressly provided for in the Asset Purchase Agreement.  Except as expressly

provided in the Asset Purchase Agreement or this Order, all such liabilities, debts and obligations

are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against

the Purchaser or any affiliate of the Purchaser.

17.     Except as otherwise provided in the Asset Purchase Agreement or the

Schedules thereto, on the Closing Date, each of the Debtor's creditors is authorized and directed

to execute such documents and take all other actions as may be necessary to release their

respective Liens, Claims, Encumbrances and Interests against the Acquired Assets, if any, as

may have been recorded or may otherwise exist.

18.     Except as otherwise expressly provided in the Asset Purchase Agreement,

all persons or entities, presently or on or after the Closing Date, in possession of some or all of

the Acquired Assets are directed to surrender possession of the Acquired Assets to the Purchaser

826588-6

on the Closing Date or at such time thereafter as the Purchaser may request.

19.     The Assignment and Assumption Agreement is valid and binding, in full force and effect, and enforceable in accordance with its terms.

20.     Subject to the terms of the Asset Purchase Agreement, the Assignment and Assumption Agreement and the occurrence of the Closing Date, the assumption by the Debtor of the Assigned Contracts and the sale and assignment of such agreements to the Purchaser, as provided for or contemplated by the Asset Purchase Agreement, shall be, and hereby is, authorized and approved pursuant to sections 363 and 365 of the Bankruptcy Code.

21.     The Assigned Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtor and sold and assigned to the Purchaser at the Closing, pursuant to sections 363 and 365 of the Bankruptcy Code, subject only to (a) the payment of all cure amounts and/or other payments or actions required under the Bankruptcy Code to assume and assign the Assigned Contracts to the Purchaser, and (b) the Purchaser's right to exclude certain Assignable Contracts from the definition of Assigned Contracts in accordance with the terms of the Asset Purchase Agreement.

22.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title and interest of each Assigned Contract. The Debtor shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

23.     Pursuant to sections 365(b)(l)(A) and (B) of the Bankruptcy Code, and except as otherwise provided in this Order, or as agreed by the Purchaser and non-Debtor parties to the Assigned Contracts, the Purchaser shall promptly pay or cause to be paid to the parties to any Assigned Contracts the requisite cure amounts (the "Cure Amounts") under section 365 of

the Bankruptcy Code, if any, set forth in the notice (the "Assumption and Assignment Notice")

served by the Debtor, in accordance with the Bidding Procedures and the Bidding Procedures

Order, and substantially in the form attached to the Bidding Procedures Order as Exhibit D, on

each of the non-Debtor parties to the Assigned Contracts, except to the extent that a Cure

Amount was amended on the record of the Sale Hearing or by other agreement between the

parties, upon the assumption and assignment thereof. The Cure Amounts are hereby fixed at the

amounts set forth in the Assumption and Assignment Notice, or the amounts set forth on the

record of the Sale Hearing or by other agreement between the parties, as the case may be, and the

non-Debtor parties to the Assigned Contracts are forever bound by such Cure Amounts.

24. All defaults or other obligations under the Assigned Contracts arising prior

to the Closing (without giving effect to any acceleration clauses or any default provisions of the

kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment

of the Cure Amounts.

25. Any provision in any Assigned Contract that purports to declare a breach,

default or payment right as a result of an assignment or a change of control in respect of the

Debtor, or that purports to declare a breach, default or payment right as a result of the solvency

or financial condition of any guarantor, is unenforceable, and all Assigned Contracts shall remain

in full force and effect, subject only to payment of the appropriate Cure Amount, if any. No

sections or provisions of any Assigned Contract that purports to declare a breach, default or

payment right or that purports to provide for additional payments, penalties, charges or other

financial accommodations in favor of the non-Debtor parties to the Assigned Contracts shall

have any force and effect with respect to the sale transaction and assignments authorized by this

Order, and such provisions constitute unenforceable anti-assignment provisions under section

365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code and no assignment of any Assigned Contract pursuant to the terms of the Asset Purchase Agreement shall in any respect constitute a default under any Assigned Contract. The non-Debtor party to each Assigned Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Purchaser shall enjoy all of the rights and benefits under each such Assigned Contract as of the applicable date of assumption without the necessity of obtaining such non-Debtor party's written consent to the assumption or assignment thereof.

26.　　The Purchaser has satisfied all requirements under section 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under the Assigned Contracts.

27.　　The Debtor and its estate shall be relieved of any liability for any breach of any of the Assigned Contracts occurring from and after Closing, pursuant to and in accordance with section 365(k) of the Bankruptcy Code.

28.　　Each and every federal, state, and local governmental agency or department shall accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement and this Order.

29.　　The Purchaser has not assumed or is otherwise not obligated for any of the Debtor's liabilities other than the Assumed Liabilities as set forth in the Asset Purchase Agreement or this Order, and the Purchase has not purchased any of the Excluded Assets. Consequently, all persons, governmental units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) and all holders of Liens, Claims, Encumbrances and Interests based upon or arising out of liabilities retained by the Debtor are hereby prohibited from taking any action

against the Purchaser or the Acquired Assets to recover any Liens, Claims, Encumbrances and Interests on account of any liabilities of the Debtor other than Assumed Liabilities pursuant to the Asset Purchase Agreement. All persons holding or asserting any Liens, Claims, Encumbrances and Interests in the Excluded Assets are hereby prohibited from asserting or prosecuting such Liens, Claims, Encumbrances and Interests or any causes of action against the Purchaser or the Acquired Assets for any liability associated with the Excluded Assets.

30. The Purchaser is not a "successor" to the Debtor or its estate by reason of any theory of law or equity, and the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of the Debtor and/or its estate including, but not limited to, any bulk sales law, successor liability or similar liability except as otherwise expressly provided in the Asset Purchase Agreement with respect to the Assumed Liabilities.

31. The general release set forth in paragraph 12.16 of the Asset Purchase Agreement is approved in its entirety.

32. Subject to the terms of the Asset Purchase Agreement, the Asset Purchase Agreement and any related agreements may be waived, modified, amended or supplemented by agreement of the Debtor and the Purchaser, without further action or order of the Court; provided, however, that any such waiver, modification, amendment or supplement is not material and substantially conforms to, and effectuates, the Asset Purchase Agreement and any related agreements.

33. The failure specifically to include any particular provisions of the Asset Purchase Agreement or any related agreements in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court, the Debtor and the Purchaser that the Asset Purchase Agreement and any related agreements are authorized and approved in

their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing.

34.     To the extent any provisions of this Order conflict with the terms and conditions of the Asset Purchase Agreement, this Order shall govern and control.

35.     The provisions of this Order are non-severable and mutually dependent.

36.     Nothing in any order of this Court or contained in any chapter 11 plan in is chapter 11 case, or in any subsequent or converted case of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order.

37.     Notwithstanding Bankruptcy Rules 6004, 6006 and 7062, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the Debtor and the Purchaser are free to close under the Asset Purchase Agreement at any time, subject to the terms of the Asset Purchase Agreement.  In the absence of any person or entity obtaining a stay pending appeal, if the Debtor and the Purchaser close under the Asset Purchase Agreement, the Purchaser shall be deemed to be acting in "good faith" and shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the transactions under and pursuant to the Asset Purchase Agreement if this Order or any authorization contained herein is reversed or modified on appeal.

38.     This Court shall retain exclusive jurisdiction to enforce the terms and provisions of this Order, the Bidding Procedures Order and the Asset Purchase Agreement in all respects and to decide any disputes thereunder, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Asset Purchase Agreement and this Order including,

826588-6

but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Acquired Assets and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Liens, Claims, Encumbrances and Interests.

Dated: _____, New York
       _____, 2009

_____
United States Bankruptcy Judge

# EXHIBIT A TO SALE ORDER

Asset Purchase Agreement

ASSET PURCHASE AGREEMENT

By and Between

CHAMPION MOTOR GROUP, INC.

(As Seller)

AND

CHAMPION FUNDING LLC

(as Purchaser)

Dated as of December 1, 2009

# TABLE OF CONTENTS

**ARTICLE 1** DEFINITIONS .............................................................................................2

    1.1    Certain Terms Defined. ...........................................................................2

    1.2    Interpretation. .......................................................................................10

**ARTICLE 2** PURCHASE AND SALE OF THE ACQUIRED ASSETS ...................10

    2.1    Purchase and Sale of Assets. ................................................................10

    2.2    Excluded Assets. ..................................................................................12

    2.3    Assumption of Liabilities. ....................................................................12

    2.4    Excluded Liabilities. ............................................................................13

    2.5    Assignment and Assumption of Contracts. ..........................................13

**ARTICLE 3** CONSIDERATION ...........................................................................14

    3.1    Purchase Price. .....................................................................................14

    3.2    Allocation of Purchase Price. ...............................................................15

**ARTICLE 4** REPRESENTATIONS AND WARRANTIES OF SELLER ...............15

    4.1    Corporate Organization. .......................................................................15

    4.2    No Subsidiaries. ....................................................................................15

    4.3    Authorization of Agreement. ................................................................15

    4.4    Conflicts; Consents of Third Parties. ...................................................16

    4.5    Title to Acquired Assets. ......................................................................17

    4.6    Contracts. ..............................................................................................17

    4.7    Property. ................................................................................................18

    4.8    Intellectual Property. ............................................................................18

    4.9    Permits. .................................................................................................18

    4.10   Employee Benefit Plans. ......................................................................18

    4.11   Labor Relations. ...................................................................................19

    4.12   Environmental Matters. ........................................................................19

    4.13   Insurance. ..............................................................................................20

    4.14   No Brokers or Finders. .........................................................................20

    4.15   Litigation; Proceedings. .......................................................................20

    4.16   Taxes. ....................................................................................................20

    4.17   Compliance with Laws. ........................................................................21

    4.18   No Alternative Transactions. ................................................................21

**ARTICLE 5** REPRESENTATIONS AND WARRANTIES OF PURCHASER.........21

    5.1    Corporate Organization. .......................................................................21

    5.2    Authorization and Validity. ..................................................................22

    5.3    No Conflict or Violation. ......................................................................22

    5.4    No Broker or Finder. ............................................................................22

**ARTICLE 6** COVENANTS AND OTHER AGREEMENTS ..............................................22

    6.1    Pre-Closing Covenants of Seller. ................................................22
    6.2    Pre-Closing Covenants of Purchaser. ......................................25
    6.3    Other Covenants of Seller and Purchaser. ..............................26
    6.4    Employment Covenants and Other Undertakings.....................26
    6.5    Non-Assignment of Contracts.................................................28
    6.6    Casualty.................................................................................28
    6.7    Name Change.........................................................................28

**ARTICLE 7** TAXES ....................................................................................29

    7.1    Taxes Related to Purchase of Acquired Assets.........................29
    7.2    Cooperation. ..........................................................................30

**ARTICLE 8** BANKRUPTCY COURT MATTERS .................................................30

    8.1    Motions. ................................................................................30
    8.2    Assigned Contracts. ...............................................................30
    8.3    Procedure. .............................................................................31

**ARTICLE 9** CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES ...........31

    9.1    Conditions Precedent to Performance by Seller. .....................31
    9.2    Conditions Precedent to the Performance by Purchaser. .........32

**ARTICLE 10** CLOSING AND DELIVERIES ........................................................33

    10.1    Closing. ................................................................................33
    10.2    Seller's Deliveries.................................................................33
    10.3    Purchaser's Deliveries. .........................................................34

**ARTICLE 11** TERMINATION..........................................................................35

    11.1    Conditions of Termination. ....................................................35
    11.2    Effect of Termination.............................................................36

**ARTICLE 12** MISCELLANEOUS .....................................................................36

    12.1    Survival.................................................................................36
    12.2    Further Assurances................................................................37
    12.3    Successors and Assigns..........................................................37
    12.4    Governing Law; Jurisdiction...................................................37
    12.5    Expenses. ..............................................................................37
    12.6    Severability. ..........................................................................38
    12.7    Notices. .................................................................................38
    12.8    Amendments; Waivers............................................................39
    12.9    Entire Agreement. .................................................................39

12.10   Publicity. ..........................................................................................................39
12.11   Headings. ..........................................................................................................40
12.12   Counterparts; Facsimile Copies. .....................................................................40
12.13   Negotiated Agreement. .....................................................................................40
12.14   Construction. .....................................................................................................40
12.15   Waiver of Jury Trial. .........................................................................................40
12.16   General Release. ...............................................................................................41

(iii)

## EXHIBITS

| | |
|---|---|
| Exhibit A | Bankruptcy Sale Order |
| Exhibit B | Bidding Procedures Order |
| Exhibit C | Bill of Sale |
| Exhibit D | Assignment and Assumption Agreement |

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Leased Property |
| Schedule 1.1(b) | Liens for Taxes not yet due |
| Schedule 1.1(c) | Statutory Liens |
| Schedule 2.2(e) | Certain Excluded Assets |
| Schedule 2.3(e) | Identified Liabilities and Obligations of Seller |
| Schedule 2.5(a) | Assignable Contracts |
| Schedule 2.5 | Cure Schedule |
| Schedule 3.1 | Principal Amount of Lenders' Debt |
| Schedule 4.4(a) | Conflicts |
| Schedule 4.4(b) | Consents |
| Schedule 4.5 | Permitted Exceptions |
| Schedule 4.6(a) | Material Contracts |
| Schedule 4.6(b) | Material Modifications of Assigned Contracts |
| Schedule 4.6(c) | Non-monetary Defaults |
| Schedule 4.8(a) | Exceptions to Intellectual Property Representation |
| Schedule 4.8(b)(i) | Intellectual Property |
| Schedule 4.8(b)(ii) | Sublicenses to Intellectual Property |
| Schedule 4.9 | Permits |

Schedule 4.10        Employee Benefit Plans

Schedule 4.11(a)     Exceptions to Labor Relations Representation

Schedule 4.11(b)     Employees

Schedule 4.11(d)     Key Employees

Schedule 4.13        Insurance Policies

Schedule 4.14        Brokers, etc. Acting for Seller

Schedule 4.15        Exceptions to Litigation Representation

Schedule 4.16        Taxes

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of December 1, 2009 (the "Execution Date"), is made by and between Champion Motor Group Inc., a New York corporation (the "Seller"), and Champion Funding LLC, a Delaware limited liability company (together with its successors, assigns and/or designees, collectively, the "Purchaser").

## RECITALS

WHEREAS, Seller is engaged in the business of selling new and pre-owned luxury highline exotic automobiles and operating an authorized Bentley and Lamborghini dealership (the "Business");

WHEREAS, on March 26, 2009 (the "Petition Date"), Seller filed a voluntary petition for relief (the "Bankruptcy Case") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court");

WHEREAS, pursuant to that certain Sale and Assignment Agreement, dated as of July 22, 2009, by and between Manufacturers and Traders Trust Company ("M&T") and the Purchaser (the "Sale Agreement"), Purchaser purchased, inter alia, all of the right, title and interests of in and to that certain Loan Agreement (Floor Plan Financing) dated as of August 8, 2007, by and between the Seller and M&T (the "Loan Agreement"), Revolving Demand Note dated as of August 8, 2007, by the Seller in favor of M&T in the maximum principal amount of $30 million, Security Agreement dated as of August 8, 2007 by and between Seller and M&T, the Guaranties (as defined in the Sale Agreement), the Financing Statements (as defined in the Sale Agreement), and any security agreements, guaranties, claims or judgments and all other related documents, agreements, instruments, collateral, files, liens, security interests, claims and other assets (collectively, the "Loan Documents") owned or held by M&T;

WHEREAS, on or about the date hereof, Seller has filed a motion to seek the entry of an order by the Bankruptcy Court approving this Agreement and authorizing Seller to consummate the transactions contemplated hereby and by other transaction documents;

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to acquire and assume from Seller, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Acquired Assets and Assumed Liabilities as more specifically provided herein;

WHEREAS, the Seller has determined that it is advisable and in the best interests of its estate and the beneficiaries of such estate to consummate the transactions provided for herein pursuant to the Bidding Procedures Order and the Bankruptcy Sale Order and has approved this Agreement;

WHEREAS, certain terms used in this Agreement are defined in Section 1.1; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Bankruptcy Sale Order to be entered in the Bankruptcy Case;

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Seller and Purchaser hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     Certain Terms Defined.

As used in this Agreement, the following terms have the following meanings:

"Acquired Assets" are those assets described in Section 2.1.

"Action" means any demand, claim, action, suit or proceeding, arbitral action, inquiry, criminal prosecution or investigation by or before any Governmental Authority.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or use the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Statement" has the meaning set forth in Section 3.2.

"Alternative Transaction" means a transaction or series of related transactions pursuant to which the Seller (i) accepts a Qualified Bid, other than that of Purchaser, as the highest or best offer, or (ii) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Seller or otherwise), including but not limited to a Court-approved stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a party or parties other than Purchaser, or seeks to do any of the foregoing as set forth in this clause (ii).

"Ancillary Agreement" means any other agreement, document or instrument that Seller or Purchaser, as applicable, enters into in connection with the consummation of the transactions contemplated hereby.

"Assignable Contract" means any Contract to which Seller is a party and is permitted under the Bankruptcy Code to sell and assign, other than an Employee Benefit Plan.

"Assigned Contracts" has the meaning set forth in Section 2.5(a).

2

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement in substantially the form annexed hereto as <u>Exhibit D</u> evidencing the assignment to and assumption by Purchaser of all rights and obligations under the Assigned Contracts.

"Assumed Liabilities" has the meaning set forth in <u>Section 2.3</u>.

"Auction" means the auction for the sale of Seller's assets conducted by Seller if any Qualified Bid is received pursuant to the Bidding Procedures Order.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Sale Order" means an order, in all material respects in the form of <u>Exhibit A</u>, issued by the Bankruptcy Court, which Bankruptcy Sale Order shall be acceptable to Purchaser in its sole discretion.

"Bentley Agreements" means that certain Retailer Agreement by and between Bentley Motors, Inc. and Seller dated January 12, 2009, together with all addendums and exhibits, and the Dealer Agreement by and between Rolls-Royce & Bentley Motor Cars Inc. and Seller dated May 27, 2002, together will all exhibits.

"Bidding Procedures Motion" means a motion, in form and substance satisfactory to Purchaser, to approve the Bidding Procedures Order.

"Bidding Procedures Order" means an order, in all material respects in the form of <u>Exhibit B</u>, issued by the Bankruptcy Court that, among other things, establishes procedures for an auction process to solicit competing bids, and authorizes Purchaser to credit bid up to the Credit Bid Amount.

"Bill of Sale" means the Bill of Sale in all material respects in the form of <u>Exhibit C</u> conveying to Purchaser title to all of the Acquired Assets.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York or Delaware are authorized by Law or other governmental action to close.

"Business Employees" means employees of the Business on the date hereof.

"Cash" means all cash (including checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), cash equivalents and short-term investments.

827402-6

"Cash Collateral Agreement" means that certain Agreement Authorizing the Debtor to Use Cash Collateral on a Final and Consensual Basis dated August 7, 2009 by and between the Seller and Purchaser, as approved by the Bankruptcy Court on September 29, 2009.

"Casualty" has the meaning set forth in Section 6.6.

"Claim" has the meaning ascribed by Bankruptcy Code §101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" has the meaning set forth in Section 10.1.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

"Contract" means any agreement, contract, lease, sublease, purchase order, arrangement, license, commitment or other binding arrangement or understanding, whether written or oral, and any amendments, modifications or supplements thereto.

"Credit Bid Amount" has the meaning set forth in Section 3.1(a).

"Cure Amounts" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under the Assigned Contracts so that they may be sold and assigned to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Cure Schedule" has the meaning set forth in Section 2.5(a).

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, Web pages, etc.), cost of pricing information, business plans, quality control records and procedures, blueprints, accounting and Tax files, all files, customer files and documents (including credit information), personnel files for employees, supplier lists, records, literature and correspondence, including materials relating to Inventories, services, marketing, advertising, promotional materials, Intellectual Property, and other similar materials to the extent related to, used in, held for use in, or with respect to, the Business or the Acquired Assets in each case whether or not in electronic form, whether or not physically located on any of the premises of the Business, but excluding (i) personnel files for employees of Seller who are not hired by Purchaser as of the Closing Date

827402-6

(except records necessary for Purchaser to provide COBRA coverage if required by Law) and (iii) any materials exclusively related to any Excluded Assets.

"Employee Benefit Plans" means all (a) employee pension benefit plans as defined in Section 3(2) of ERISA, (b) employee welfare benefit plans as defined in Section 3(1) of ERISA, and (c) stock option, bonus, deferred compensation, retention, severance, or termination pay plans or policies or any other plans or policies providing for compensation or benefits (including any employment, severance, change in control or similar agreement or any arrangement relating to a sale of the Business), in each case, that is maintained, administered, or contributed to (or with respect to which any obligation to contribute has been undertaken) by Seller or any ERISA Affiliate and that covers any current or former employee, director, or consultant of Seller (or their dependents, spouses or beneficiaries).

"Encumbrances" means, to the extent not considered a Lien, any security interest, lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, charge, escrow, encumbrance, option, right of first refusal, restriction (whether on transfer, disposition or otherwise), third party right, right limited to Seller personally, other agreement term tending to limit any right or privilege of Seller under any Contract, conditional sale contract, title retention contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, license, servitude, proxy, voting trust, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral, or imposed by any Law, equity or otherwise.

"Environmental Laws" has the meaning set forth in Section 4.12.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade of business (whether or not incorporated) that is treated as a single employer with Seller under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Date" has the meaning set forth in the Preamble.

"Federal Rules of Bankruptcy Procedure" means the rules of bankruptcy courts promulgated by the United States Supreme Court and published as an appendix to title 11 of the United States Code.

"FF&E" means all fixed assets, equipment, machinery, fixtures, furniture and other tangible property owned by Seller located at any premises of Seller (unless sold to any third party in the ordinary course of business otherwise than in violation of this Agreement) or used or useful in the operation of the Business and Acquired Assets (including all such property that is damaged), including all attachments, signs, cabinets, partitions, wiring, telephones, security systems, floor coverings, wall coverings, office equipment, computers and other information

5

technology hardware, safes, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements.

"Governmental Authority" means any federal, state, local court, tribunal, governmental department, agency, board or commission, regulatory or supervisory authority, or other administrative, governmental or quasi-governmental body, subdivision or instrumentality.

"Hazardous Materials" shall mean (a) any petroleum products or byproducts, radioactive materials, friable asbestos or polychlorinated biphenyls or (b) any waste, material, or substance defined as a "hazardous substance," "hazardous material," or "hazardous waste" or "pollutant" or otherwise regulated under any applicable Environmental Law.

"Intellectual Property" means all rights of Seller and its Affiliates in and to (a) all United States and foreign patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals, and foreign counterparts thereof and all registrations and renewals in connection therewith, (b) trademark registrations, unregistered trademarks, service marks, trade dress, logos, trade names and corporate names and other indicia of origin and corporate branding, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) works of authorship, copyrightable works, and all United States and foreign registered copyrights and applications, registrations and renewals in connection therewith, (d) mask works and all applications, registrations and renewals in connection therewith, (e) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (f) Software, (g) Internet addresses, uniform resource locaters, domain names, Websites and Web pages, (h) motor vehicle code identifications, (i) any and all other intellectual property and proprietary rights, (j) company-wide telephone numbers and (k) goodwill related to all of the foregoing, in each case to the extent used or useful in the operation of the Business or related to the Acquired Assets.

"Interest" means "interest" as that term is used in Bankruptcy Code section 363(f).

"Inventories" means all inventories of materials, work-in-process, raw materials, spare parts, finished goods, supplies, packaging materials, samples and other materials owned or held for sale by Seller or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"Lamborghini Agreement" means that certain Dealer Agreement by and between Automobili Lamborghini America, LLC and Seller dated July 7, 2006.

"Law" means any law, statute, ordinance, regulation, rule, code or rule of common law or otherwise of, or any order, judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority.

"Leased Property" means all the real property leased, subleased or licensed by Seller, all of which are described on Schedule 1.1(a), and are used in connection with the operation of the Business.

"Lenders Debt" has the meaning set forth in Section 3.1(a).

"Lien" has the meaning given to that term in the Bankruptcy Code.

"Loan Agreement" has the meaning set forth in the Recitals.

"Loan Documents" has the meaning set forth in the Recitals.

"Local Bankruptcy Rules" means the local rules of bankruptcy courts promulgated under Rule 9029(a) of the Federal Rules of Bankruptcy Procedure for the Eastern District of New York.

"Material Adverse Effect" means a state of facts, event, change or effect with respect to the Business, Acquired Assets, the Assumed Liabilities or the enforceability of any Assigned Contract that results in a material adverse effect on the value of the Acquired Assets or the Business, taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (a) changes in economic, regulatory or political conditions generally; (b) the usual, customary or ordinary consequences of the filing by a debtor of a Bankruptcy Case contemplating a reorganization or liquidation of the debtor's assets; and (c) any consequences to the Business resulting from the announcement of the sale transaction contemplated by this Agreement and the process to obtain approval of the procedures to obtain approval thereof.

"M&T" has the meaning set forth in the Recitals.

"New Bentley Agreements" has the meaning set forth in Section 6.9.

"New Motor Vehicles" shall mean new unused motor vehicles purchased by Seller directly from the manufacturer or swapped from another dealer and accompanied by a manufacturer's statement of origin and which are not demonstrator or rental/service motor vehicles.

"New Lamborghini Agreement" has the meaning set forth in Section 6.9.

"Obligations" means Seller's obligations under the Loan Documents.

"Orders" means the Bankruptcy Sale Order and the Bidding Procedures Order.

"Organizational Amendment" has the meaning set forth in Section 6.7.

"Permits" means all certificates of occupancy or other certificates, permits, authorizations, filings, approvals and licenses used, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"Permitted Exceptions" has the meaning set forth in Section 4.5.

"Permitted Liens" means: (a) Liens for Taxes not yet due or which are being contested in good faith by appropriate proceedings, which are listed on Schedule 1.1(b); (b) statutory liens arising in the ordinary course of business that are not overdue and that do not materially affect the value or use of the affected asset, all of which are listed on Schedule 1.1(c); (c) pledges or deposits in connection with workers' compensation, unemployment insurance and other social-security legislation; and (d) easements, rights-of-way, restrictions and other similar encumbrances other than monetary encumbrances, judgments and monetary liens that in each case do not in any case materially detract from the value or use of the property subject thereto or materially interfere with the ordinary conduct of the business of Seller at the property subject thereto.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Purchaser" has the meaning set forth in the Preamble.

"Purchase Price" has the meaning set forth in Section 3.1.

"Qualified Bid" means a competing bid pre-qualified for the Auction in accordance with the Bidding Procedures Order.

"Related Person" means, with respect to any Person, all present and future directors, officers, members, managers, stockholders, employees, controlling persons, Affiliates, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

"Released Claims" has the meaning set forth in Section 12.15.

"Sale Agreement" has the meaning set forth in the Recitals.

"Sale Hearing" means the hearing to consider the entry of the Bankruptcy Sale Order.

"Schedules" has the meaning set forth in Section 6.3(a).

"Seller" has the meaning set forth in the Preamble.

"Seller's Knowledge" means the actual (and not constructive or imputed) knowledge of Gary Brustein, President and Treasurer, and Michael Todd, Vice President and Secretary, of the Seller.

"Software" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software.

"Special Used Motor Vehicles" shall mean vintage/older particular interest vehicles which are not part of the Seller's usual floor plan.

"Sublease" has the meaning set forth in Section 6.8.

"Subsidiary" means any Person whose securities or other ownership interests having by their terms the power to elect a majority of the board of directors or other persons performing similar functions are owned or controlled, directly or indirectly, by Seller, or which is owned 50% or more, directly or indirectly, by Seller.

"Tax" or "Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workers' compensation, customs duties, registration, documentary, value-added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Transaction Taxes" has the meaning set forth in Section 7.1.

"Transferred Employees" has the meaning set forth in Section 6.4(a).

"Used Motor Vehicles" shall mean motor vehicles that have been previously titled and are not older than five (5) prior model years.

9

1.2    Interpretation.

When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

(a) Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b) The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c) The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d) A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(e) A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(f) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(g) Any reference in this Agreement to $ shall mean U.S. dollars.

(h) The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1    Purchase and Sale of Assets.

Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the Acquired Assets as is and where is, free

and clear of all pledges, security interests, Liens, Claims, Interests or Encumbrances (other than Permitted Liens). Purchaser shall be entitled to assign all or a portion of its rights under this Agreement to one or more Affiliates. "Acquired Assets" shall mean all of the direct or indirect, right, title and interest of Seller in and to the tangible and intangible assets, properties, rights, claims and Contracts related to the Business (but excluding Excluded Assets) as of the Closing, including but not limited to:

(a) all Cash;

(b) all accounts receivable, rebates, refunds and other receivables of Seller;

(c) all chattel paper, instruments, and investment property of Seller;

(d) all New Motor Vehicles, Used Motor Vehicles, and Special Used Motor Vehicles and the related vehicle title documents as may be in the possession or control of Seller, as applicable;

(e) all Inventories, including decorative apparel, laptops, gifts and accessories, model cars, posters and other similar items owned or held for sale by Seller;

(f) all deposits, letter-of-credit rights, prepaid expenses, deferred revenue, or advance payments, including customer deposits and pre-paid support obligations, relating to any Acquired Assets;

(g) all FF&E;

(h) all Intellectual Property;

(i) all Assigned Contracts;

(j) all Documents;

(k) all Permits;

(l) all rights under or arising out of all insurance policies relating to the Business or the Acquired Assets, unless non-assignable as a matter of law;

(m) all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties, including non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction;

(n) any rights, claims or causes of action of Seller for claims arising out of the operation of the Business, including commercial tort claims;

(o) all rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products

sold, or services provided, to Seller or to the extent affecting any Acquired Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets; and

(p) all goodwill and other intangible assets associated with the Business and the Acquired Assets, including customer and supplier lists.

2.2     Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under, and all obligations with respect to the Excluded Assets.  For all purposes of and under this Agreement, and as the same may be amended pursuant to Section 2.5, the term "Excluded Assets" includes:

(a) any and all rights of the Seller under this Agreement;

(b) the Purchase Price payable to Seller under this Agreement;

(c) all rights and interests in connection with, and assets of, any Employee Benefit Plan;

(d) the capital stock of Seller;

(e) the assets listed on Schedule 2.2(e);

(f) all rights of Seller under each lease and any related agreement for the Leased Property;

(g) all rights under or arising out of insurance policies not relating to the Business or the Acquired Assets or non-assignable as a matter of law;

(h) all tax attributes of Seller, provided that any tax refunds remain subject to security interests of the lenders under the Loan Documents;

(i) all Contracts that are not Assigned Contracts; and

(j) all causes of action arising under Chapter 5 of the Bankruptcy Code relating to the Business and Acquired Assets, including (i) any actions against or otherwise involving any counterparty to any Assigned Contract, any post-Closing employees, officers or directors of the Business including Transferred Employees, and/or any of the Seller's lenders or vendors and/or (ii) relating to the ongoing or future operations of the Business.

2.3     Assumption of Liabilities.

Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge the following liabilities and obligations (the "Assumed Liabilities"):

(a) all Cure Amounts due and owing under any Assigned Contracts;

(b) all of Seller's liabilities and obligations under the Assigned Contracts accruing after the Closing;

(c) all ordinary course liabilities and obligations with respect to the Acquired Assets arising after the Closing Date; and

(d) those specific liabilities and obligations of Seller identified on Schedule 2.3(e) hereto, provided, however, that such liabilities and obligations of Seller identified on Schedule 2.3(e), shall only be paid by Purchaser to the extent not satisfied by the budget set forth in the Cash Collateral Agreement.

2.4     Excluded Liabilities.

Purchaser shall not assume or be liable for any Claims, Liens, Encumbrances or Interests or any other liabilities and obligations of Seller of any nature whatsoever, whether presently in existence or arising hereafter other than the Assumed Liabilities (the "Excluded Liabilities"). For the avoidance of doubt, Purchaser shall not assume or be liable for any liabilities and obligations that are the subject of litigation or arbitration as of the Closing Date, or that arose prior to the Closing Date and are asserted thereafter, including any such liabilities or obligations that otherwise would be Assumed Liabilities.

2.5     Assignment and Assumption of Contracts.

(a) At Closing, Seller shall, pursuant to the Bankruptcy Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents reasonably requested by Purchaser, assume and sell and assign to Purchaser (the consideration for which is included in the Purchase Price), the Assignable Contracts that are set forth on Schedule 2.5(a) (identifying the name, parties and date of each such Assignable Contract) provided by Purchaser to Seller on the date hereof and as supplemented on or before the date that is three (3) days prior to the date set for the Auction (provided that Seller provides written notice to Purchaser of the date of the Auction at least seven (7) days prior to the date on which the Auction is to begin) (the "Assigned Contracts"); provided, however, that Purchaser shall have the right in its sole and absolute discretion to notify the Seller in writing of any Assigned Contract that it does not wish to assume immediately prior to the commencement of the Sale Hearing. Purchaser shall pay all Cure Amounts in connection with such assumption and sale and assignment (as agreed to between Purchaser and Seller or as determined by the Bankruptcy Court), and Purchaser shall assume and agree to perform and discharge the Assumed Liabilities under the Assigned Contracts, pursuant to the Assignment and Assumption Agreement; provided, however, that on the date hereof, as supplemented on or before the date that is seven (7) days prior to the date set for the Auction, Seller shall provide to Purchaser (i) a schedule of the Cure Amounts (the "Cure Schedule") for the Assigned Contracts and (ii) a schedule setting forth a detailed description of all such Contracts listed on Schedule 4.6(a), and each other Contract to which Seller is a party or by which it is bound and that is used in or related to the Business or the Acquired Assets. Purchaser shall not be required to pay any obligation on the part of the Seller in excess of the amounts listed on the Cure Schedule, provided that Purchaser shall pay any Cure Amounts relating to a default on any Assignable Contracts occurring after Closing which default is not the result of Seller's breach of the Agreement. From and after the

date hereof, Seller shall not reject any Assigned Contract unless otherwise agreed to in writing by Purchaser. Seller shall provide timely and proper written notice of the motion seeking entry of the Bankruptcy Sale Order to all parties to Assigned Contracts and take all other actions necessary to cause such Assigned Contracts to be assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code, and Purchaser shall, at or prior to Closing, comply with all requirements under Section 365 necessary to assign to Purchaser the Assigned Contracts. Purchaser and Seller agree that there shall be excluded from the Acquired Assets any Assigned Contracts that are not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing, and the Closing shall proceed with respect to the remaining Acquired Assets without reduction to the Purchase Price, subject to Purchaser's termination right set forth in Section 6.6.

## ARTICLE 3
## CONSIDERATION

3.1    Purchase Price.

(a)    Seller hereby acknowledges, confirms and agrees that as of the close of business on November 30, 2009, (i) Seller was indebted to the Purchaser under the Sale Agreement in the aggregate principal amount set forth in Schedule 3.1 (the "Principal Amount") together with interest accrued on the Principal Amount, and fees, costs, expenses and other charges payable by the Seller to the Purchaser, including legal and consultant fees and expenses through the Closing (collectively with the Principal Amount, the "Lenders Debt"); (ii) the Purchaser has and shall continue to have valid, enforceable and perfected first-priority liens upon and security interests in the Acquired Assets granted to the Purchaser in connection with the Sale Agreement; and (iii) the Lenders Debt is a valid and unconditional obligation of Seller to the Purchaser and is due and owing without offset, defense or counterclaim of any kind, nature or description whatsoever and the Seller hereby expressly waives any and all rights to contest and/or challenge in any manner whatsoever Purchaser's perfected first-priority liens upon and security interests in the Acquired Assets.

(b)    Subject to the right (but not obligation) to overbid at the Auction in consideration of the sale of the Business and Acquired Assets to Purchaser, and in reliance upon the representations, warranties, covenants and agreements of Seller set forth herein, and upon the terms and subject to the conditions hereinafter set forth, the purchase price (the "Purchase Price") for the Business and Acquired Assets shall be:

(i)    $9,000,000 (the "Credit Bid Amount"), which shall be satisfied in the form of a credit against the Obligations in accordance with Section 3.1(c), plus

(ii)    assumption of the Assumed Liabilities; and

(iii)    a cash payment required to pay the Cure Amounts.

(c) At the Closing, the Purchase Price shall be payable,

(i)     with respect to the Credit Bid Amount, by Purchaser canceling that portion of the Lenders Debt in an amount equal to the Credit Bid Amount; and

(ii)     with respect to the Cure Amounts in cash.

3.2     Allocation of Purchase Price.

(a) Within the earlier of (i) 60 days after the Closing Date and (ii) 20 days prior to the extended due date of the Tax Returns to which IRS Form 8594 must be attached, Purchaser shall deliver to Seller a statement (the "Allocation Statement") allocating, for tax purposes, the consideration paid by Purchaser for the Acquired Assets among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder. Seller and Purchaser shall cooperate in the filing of any forms (including Form 8594) with respect to such allocation.

(b) The parties to this Agreement hereby agree to (i) be bound by the Allocation Statement, (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including, without limitation, in the filing of IRS Form 8594 and any corresponding other Tax forms) and (iii) take no position inconsistent with the Allocation Statement for any Tax purpose (including, without limitation, in any audit, judicial or administrative proceeding).

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

The Seller transfers the Acquired Assets to the Purchaser as is and where is and makes no representations or warranties to the Purchaser as of the date hereof and as of the Closing Date except for the following:

4.1     Corporate Organization.

Seller is duly organized, validly existing and in good standing under the Laws of the State of New York and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which the Business is currently being conducted. Seller is qualified to do business and is in good standing in all jurisdictions where it leases real property in connection with the operation of the Business or otherwise conducts the Business, except where the failure to so qualify or to so be in good standing has not had and would not reasonably be expected to have a Material Adverse Effect.

4.2     No Subsidiaries.

Seller has no Subsidiaries or equity investments in any other corporation, association, partnership, joint venture or other entity that carries on the business of Seller.

4.3     Authorization of Agreement.

Subject to entry of the Bankruptcy Sale Order and each authorization as is required by the Bankruptcy Court:

(a) Seller has, or at the time of execution will have, all necessary corporate power and authority to execute and deliver this Agreement and each Ancillary Agreement to which it is or will become a party and to perform its obligations hereunder and thereunder;

(b) the execution, delivery and performance of this Agreement and each Ancillary Agreement to which Seller is or will become a party and the consummation of the transactions contemplated hereby and thereby have been, or at the time of execution will be, duly authorized by all necessary corporate action on the part of Seller and no other corporate proceedings (shareholder or otherwise) on the part of Seller are necessary to authorize such execution, delivery and performance; and

(c) this Agreement and each Ancillary Agreement to which Seller is or will become a party have been, or when executed will be, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement and each Ancillary Agreement to which Seller is or will become a party constitutes, or will constitute, when executed and delivered, the valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.4    Conflicts; Consents of Third Parties.

(a) Except as set forth on Schedule 4.4(a), the execution, delivery and performance by Seller of this Agreement and each Ancillary Agreement, the consummation of the transaction contemplated hereby and thereby, or compliance by Seller with any of the provisions hereof do not, or will not at the time of execution, result in the creation of any Lien upon the Acquired Assets and do not, or will not at the time of execution, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provisions of:

(i)    Seller's certificate of incorporation and by-laws;

(ii)    subject to entry of the Bankruptcy Sale Order, any Assigned Contract or Permit to which Seller is a party or by which any of the Acquired Assets are bound;

(iii)    subject to entry of the Bankruptcy Sale Order, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to Seller or any of the properties or assets of Seller as of the date hereof; or

(iv)    subject to entry of the Bankruptcy Sale Order, any applicable Law.

(b) Subject to entry of the Bankruptcy Sale Order, except as set forth on Schedule 4.4(b), no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Seller in connection with the execution, delivery and performance of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is or will become a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation

of the transactions contemplated hereby or thereby, or the assignment or conveyance of the Acquired Assets.

4.5     Title to Acquired Assets.

The Seller is the owner of the Acquired Assets existing as of the date hereof. Seller has good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than any permitted exceptions set forth on Schedule 4.5 hereto (the "Permitted Exceptions") and Permitted Liens, and Purchaser will be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances. Except as set forth in Schedule 4.5, all FF&E and other tangible assets comprising the Acquired Assets are in good operating condition (normal wear and tear excepted other than with respect to Inventory) and are fit in all material respects for use in the ordinary course of business.

4.6     Contracts.

(a) To the extent written, Purchaser has received, or will receive by the Closing Date, true and complete copies of such material Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement. Except as set forth on Schedule 4.6(a), each material Contract is a valid and binding agreement of Seller and is in full force and effect, Seller is not, and to Seller's Knowledge no other party thereto is, in default or breach, and to Seller's Knowledge, no event or condition has occurred which after notice or with the lapse of time or both would constitute a default or breach, in any respect under the terms of any material Contract. Seller has not received any written notice of the intention of any party to terminate any material Contract or that any party considers Seller to be in material breach or material default thereunder or in potential breach in a material respect or default thereunder

(b) Schedule 2.5(a) sets forth a complete and accurate list of the Assigned Contracts that will be assigned to Purchaser on the Closing Date. Each Assigned Contract (i) is in full force and effect and is binding upon and enforceable against Seller and, to Seller's Knowledge, all other parties thereto in accordance with its terms, (ii) has not been materially amended or otherwise materially modified by Seller except as specified in such Schedule 4.6(b) and (iii) is not in material default due to the action of Seller or, to Seller's Knowledge, any other party thereto. Seller has not received written notice that any party to any Assigned Contract intends to cancel or terminate such Assigned Contract, and Seller is not aware of any pending, or to Seller's Knowledge, threatened dispute or other information that would reasonably be expected to result in any party to any Assigned Contract canceling or terminating such Assigned Contract.

(c) The Cure Amounts set forth on the Cure Schedule with respect to the Assigned Contracts are true and correct in all material respects. No monetary defaults exist under any Assigned Contracts other than the monetary defaults required to be cured pursuant to Section 365 of the Bankruptcy Code and listed on the Cure Schedule. To Seller's Knowledge, no non-monetary defaults exist under any Assigned Contract other than the non-monetary

defaults listed on Schedule 4.6(c).

4.7  Property.

Seller does not own any real property. Purchaser has received true and complete copies of the leases, ground leases, subleases and licenses and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement relating to the Leased Property.

4.8  Intellectual Property.

(a) Except as set forth on Schedule 4.8(a), (i) with respect to any Intellectual Property owned by Seller (as opposed to Intellectual Property of which Seller is a licensee), Seller has all right, title and interest to all Intellectual Property, without any conflict known to Seller with the rights of others, (ii) no Person other than Seller has the right to use the Intellectual Property owned by Seller, and (iii) Seller has the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in the Business that is owned by a party other than Seller.

(b) Set forth on Schedule 4.8(b)(i) are all items of Intellectual Property used or useful in connection with or related to the Business. Except as set forth on Schedule 4.8(b)(ii), the Seller has not granted any sublicense or similar right with respect to the Intellectual Property.

(c) With respect to each item that is required to be identified on Schedule 4.8(b)(i) and except as otherwise set forth on Schedule 4.8(a), (i) at the Closing, to the Seller's Knowledge, Purchaser shall hold sole and exclusive rights to all such Intellectual Property, and no other person shall have existing or contingent rights to use such Intellectual Property except with respect to software that is licensed from unaffiliated third persons; (ii) the Seller owns or possesses sufficient rights in or to such item to assign to Purchaser all rights of the Seller in such Intellectual Property and (iii) no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or, to the Seller's Knowledge, is threatened, as of the date hereof, that challenges the legality, validity, enforceability, registrations, use, or ownership of the item.

4.9  Permits.

Schedule 4.9 sets forth a list of all Permits held by Seller. The Seller possesses all material Permits necessary for the operation of the Business as currently conducted and the ownership of the Acquired Assets.

4.10  Employee Benefit Plans.

Schedule 4.10 sets forth a list of each Employee Benefit Plan. Neither Seller nor any ERISA Affiliate has maintained, sponsored, or contributed to an Employee Benefit Plan that is subject to Title IV of ERISA within the last six years or, in any way, directly or indirectly, has any liability with respect to such a plan. All Employee Benefit Plans are being administered in compliance, in all material respects, with, where applicable, ERISA and the Code, and the regulations promulgated thereunder. Each Employee Benefit Plan that is intended to be qualified

18

under Section 401(a) of the Code has received a favorable determination letter upon which Seller may rely, or has pending or has time remaining in which to file an application for such determination from the United States Internal Revenue Service.

4.11   <u>Labor Relations.</u>

(a) Except as set forth on <u>Schedule 4.11 (a)</u>, Seller is not a party to or bound by or has an obligation to perform (including make payments) under any collective bargaining agreement or any Contract with a labor union or labor organization. Seller has received no written notice of any outstanding representation petitions involving Seller before the National Labor Relations Board or any state labor board and, to Seller's Knowledge, no such petition has been threatened, and no labor dispute, strike, picketing, work slowdown, work stoppage or handbilling has been threatened in writing.

(b) <u>Schedule 4.11(b)</u> contains a list of all individuals, whether or not actively at work as of the date hereof, who are employed by the Seller in connection with the Business and (i) their titles or positions; (ii) their dates of hire; (iii) their current salaries or wages and all bonuses, commissions and incentives paid at any time during the past twelve months; (iv) their last compensation changes and the dates on which such changes were made; (v) any non-standard bonus, commission or incentive plans or agreements for or with them; (vi) any outstanding loans or advances made by or to them; and (vii) lists any verbal or written employment agreements which impacts or establishes the terms of employment of those persons. <u>Schedule 4.11(b)</u> is accurate and complete as of the date indicated thereon (which date is the most recent date for which the information contained thereon is readily available to the Seller). Correct and complete copies of all such written employment agreements have been delivered to Purchaser.

(c) Seller is not subject to any material unfair labor practice charge. The Seller is in compliance, in all material respects, with all Laws relating to employment practices. The Seller has delivered to Purchaser accurate and complete copies of all current employee manuals and handbooks, disclosure materials, policy statements and other materials prepared, disclosed or promulgated by the Seller at any time during the last three years relating to the employment of the current and former employees of the Seller

(d) Seller has not terminated, nor has any intention to terminate, the employment of any key employee listed on <u>Schedule 4.11(d)</u> nor is Seller aware that any key employee listed on <u>Schedule 4.11(d)</u> intends to terminate his or her employment with Seller through the Closing Date.

4.12   <u>Environmental Matters.</u>

To Seller's Knowledge, (a) the Acquired Assets are in material compliance with all applicable Laws, regulations, or other legal requirements relating to the protection of the environment or human health and safety as it relates to Hazardous Materials ("<u>Environmental Laws</u>"), (b) Seller has not received written notice of any investigation, suit, claim, action, or proceeding relating to or arising under Environmental Laws with respect to the Acquired Assets or the Business, nor are any of the same being threatened in writing against Seller or any real property leased by Seller, (c) Seller has not received any written notice of, or entered into, any

obligation, order, settlement, judgment, injunction, or decree involving outstanding requirements relating to or arising under Environmental Laws and (d) there has been no release of any Hazardous Material into the environment at, onto, or from any property leased by Seller that would reasonably be expected to result in material liability, costs or Claims relating to any Environmental Law. The Seller has obtained and maintains all permits, licenses and other authorizations required under all applicable Environmental Laws to operate the Business as it is currently being operated at the real property leased by Seller, and all such permits, licenses and authorizations are in full force and effect.

4.13    Insurance.

Seller maintains the insurance policies set forth on Schedule 4.13, which Schedule sets forth all insurance policies covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect and to the Seller's Knowledge, except as set forth on Schedule 4.13, will continue in full force and effect immediately following the Closing. Seller has paid all premiums on such policies due and payable prior to the Execution Date. To Seller's Knowledge, Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part.

4.14    No Brokers or Finders.

No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Seller in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement, other than as set forth on Schedule 4.14, the fees and expenses of which Seller shall bear, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transaction.

4.15    Litigation; Proceedings.

Except for the Bankruptcy Case or as set forth in Schedule 4.15, there is no material claim, action, suit, proceeding, complaint, charge, hearing, grievance or arbitration pending or, to Seller's Knowledge, threatened against or related to the Business or Seller in respect of the Business, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor are there any investigations relating to the Business, pending or, to Seller's Knowledge, threatened by or before any arbitrator or any Governmental Authority. None of the Acquired Assets is subject to any judgment, injunction, order, consent, or decree of any Governmental Authority or any settlement agreement with any Person.

4.16    Taxes.

(a) Except as set forth on Schedule 4.16, (i) Seller has timely filed with the appropriate taxing authorities all tax returns required to be filed by it with respect to the Acquired Assets and the income and operations of the Business and has paid on a timely basis all Taxes due and payable by it as set forth on such returns; (ii) the information on such tax returns is complete and accurate in all material respects; (iii) Seller has provided copies of all such tax

returns to Purchaser; and (iv) as of the Closing Date, there will be no Encumbrances for Taxes (other than for current Taxes not yet due and payable) upon the Acquired Assets.

(b) There is no audit or other matter in controversy with respect to any Taxes due and owing by any of the Seller insofar as any such matter pertains to the Acquired Assets or the income and operations of the Business, and there is no Tax deficiency or claim assessed or, to the Seller's Knowledge, proposed or threatened (whether orally or in writing) against the Seller, insofar as any such deficiency or claim pertains to the Acquired Assets or the income and operations of the Business.

(c) Except as set forth on <u>Schedule 4.16</u>, Seller has, in all material respects, withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder or other third party.

(d) Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code.

4.17    <u>Compliance with Laws.</u>

Seller (i) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws in all material respects, and (ii) holds all material Permits, concessions, grants, licenses, easements, variances, exemptions, consents, orders, franchises, authorizations and approvals of all Governmental Authorities necessary for the lawful conduct of the Business.  Seller has not received any written notice or other written communication from any Governmental Entity or other Person (i) asserting any violation of, or failure to comply with, any requirement of any Permit or (ii) notifying Seller of the non-renewal, revocation or withdrawal of any Permit.  Seller is in material compliance with the terms of the Permits.

4.18    <u>No Alternative Transactions.</u>

Other than this Agreement and each of the Ancillary Agreements, Seller is not a party to or bound by any agreement with respect to a possible Alternative Transaction or other sale, transfer or disposition of any of the Acquired Assets.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

5.1    <u>Corporate Organization.</u>

Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite power and authority to own its properties and assets and to conduct its business as now conducted.

827402-6

5.2    Authorization and Validity.

Purchaser has, or at the time of execution will have, all necessary corporate power and authority to execute and deliver this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and the performance of Purchaser's obligations hereunder and thereunder have been, or at the time of execution will be, duly authorized by all necessary action by the managing managers of Purchaser, and no other limited liability company proceedings on the part of Purchaser is necessary to authorize such execution, delivery and performance. This Agreement and each Ancillary Agreement to which Purchaser is or will become a party have been, or at the time of execution will be, duly executed by Purchaser and constitute, or will constitute, when executed and delivered, Purchaser's valid and binding obligations, enforceable against it in accordance with their respective terms except as may be limited by bankruptcy or other Laws affecting creditors' rights and by equitable principles.

5.3    No Conflict or Violation.

The execution, delivery and performance by Purchaser of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party do not or will not at the time of execution (a) violate or conflict with any provision of the organizational documents of Purchaser, (b) violate any provision of applicable Law, or any order, writ, injunction, judgment or decree of any court or Governmental Authority applicable to Purchaser or (c) violate or result in a breach of or constitute (with due notice or lapse of time, or both) an event of default or default under any Contract to which Purchaser is a party or by which Purchaser is bound or to which any of Purchaser's properties or assets are subject.

5.4    No Broker or Finder.

No broker, finder or financial advisor has been engaged by Purchaser in connection with the transactions contemplated by this Agreement.

## ARTICLE 6
## COVENANTS AND OTHER AGREEMENTS

6.1    Pre-Closing Covenants of Seller.

Seller covenants with Purchaser that, during the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)    Cooperation.  Seller shall, without payment of funds to counterparties, use commercially reasonable efforts to obtain, and assist Purchaser in obtaining, at no cost to Purchaser (other than Cure Amounts payable at or after the Closing), such consents, waivers or approvals of any third party or Governmental Authority required for the consummation of the transactions contemplated hereby, including the sale and assignment of the Acquired Assets. Seller shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby.  Prior to the Closing,

the Seller shall take any and all necessary actions to transfer, assign, record or perfect in its name record title to any of its Acquired Assets that is not presently held or recorded in its name, including, without limitation, filing any necessary notices of assignment in the United States Patent and Trademark Office or United States Copyright Office, as applicable, with respect to the Intellectual Property.

(b) <u>Access to Records and Properties</u>. Seller agrees, prior to the Closing Date, (i) that Purchaser and its Related Persons shall be entitled to reasonable access upon reasonable notice to the facilities, offices and personnel of Seller and to the books and records of Seller, related to the Business or the Acquired Assets or otherwise reasonably requested by Purchaser, including access to perform field examinations and inspections of the Inventory and FF&E of the Business; (ii) to furnish Purchaser with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties or operations of Seller as Purchaser shall reasonably request; and (iii) to permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may require; <u>provided</u>, <u>however</u>, that Purchaser shall use commercially reasonable efforts to prevent any such inspection from unreasonably interfering with the operation of the Business or the duties of any employee of Seller. Purchaser agrees not to contact any customer or supplier of the Seller with respect to this Agreement without prior notice to the Seller. The Seller shall cooperate with Purchaser to facilitate such contact and discussions between Purchaser and such employees, customers and suppliers.

(c) <u>Conduct of Business Prior to Closing</u>. Except as expressly contemplated by this Agreement, the Sale Agreement and the Loan Documents, the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court:

(i) without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not take any action that would constitute or result in an Event of Default (as defined therein) under the Loan Agreement;

(ii) without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not directly or indirectly sell or otherwise transfer, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer, any of the Acquired Assets other than the sale of Inventory in the ordinary course of business or the use of cash collateral in accordance with the Cash Collateral Agreement;

(iii) without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim, Interest or Encumbrance, except for Permitted Exceptions and Permitted Liens;

(iv) without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall

827402-6

not enter into any transaction or take any other action that could be reasonably expected to cause or constitute a breach of any representation or warranty made by Seller in this Agreement;

(v)     Seller shall notify Purchaser promptly in writing of any Material Adverse Effect;

(vi)    without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not make any promise or representation, oral or written, or otherwise, (x) to increase the annual level of compensation payable or to become payable by Seller to any of their directors or Business Employees, (y) to grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director or Business Employee, or increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (z) to hire any new individuals or enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller is a party or involving a director or Business Employee of Seller, except, in each case, as required by Law, or as required by any plans, programs or agreements existing on the Execution Date and disclosed on <u>Schedule 4.10</u>;

(vii)   Seller shall (x) comply in all material respects with all Laws applicable to its or having jurisdiction over the Business or any Acquired Asset, (y) maintain all existing Permits applicable to the Business, and (z) pay all applicable Taxes as approved by the Bankruptcy Court;

(viii)  without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not enter into any Contract material to Seller to which Seller is a party or by which it is bound and that is used in or related to the Business or the Acquired Assets, or assume, amend, modify, terminate, or release or assign any material rights or claims under, any Contract to which Seller is a party or by which it is bound and that is used in or related to the Business or the Acquired Assets (including any Assigned Contract);

(ix)    without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not cancel or compromise any material debt or claim or waive or release any right of Seller that constitutes an Acquired Asset;

(x)     without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not enter into any commitment for capital expenditures except pursuant to any budget approved by the Purchaser pursuant to the Cash Collateral Agreement;

(xi)    without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not terminate, amend or modify in any manner any lease for Leased Property;

(xii)   Seller shall use commercially reasonable efforts to (1) conduct the Business in substantially the same manner as conducted as of the date of this Agreement and

only in the ordinary course, (2) preserve the existing business organization and management of the Business intact, (3) keep available the services of the current officers and employees of the Business, to the extent reasonably feasible, (4) maintain existing relations with customers, distributors, suppliers, creditors, business partners, employees and others having business dealings with the Business, to the extent reasonably feasible, and (5) refrain from changing in any material respect any of its product prices or pricing policies (e.g., discount policies) for any of their products, except as shall be necessary to meet competition or customer requirements;

(xiii) Seller shall at all times maintain, preserve and protect all of its material Intellectual Property, and preserve all the remainder of its material property, in use or useful in the conduct of the Business and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices, so that the business carried on in connection therewith may be properly and advantageously conducted at all times; and

(xiv) Seller shall not take, or agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing.

6.2     Pre-Closing Covenants of Purchaser.

Purchaser covenants with Seller that, during the period from the Execution Date through and including the Closing or the earlier termination of this Agreement:

(a) Cooperation.  Purchaser shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby; provided, that the foregoing shall not require Purchaser to participate in the Auction.

(b) Adequate Assurances Regarding Assigned Contracts and Required Orders. With respect to each Assigned Contract, Purchaser shall provide adequate assurance of the future performance of such Assigned Contract by Purchaser.  Purchaser shall take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of the Bankruptcy Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(c) Sufficient Funds.  Purchaser shall ensure that, on the Closing Date, it will have sufficient funds to pay Cure Amounts respecting the Assigned Contracts and all of its fees and expenses incurred in connection with the transactions contemplated hereby.

(d) Permits.  Purchaser shall use commercially reasonable efforts to cooperate with Seller to obtain or consummate the transfer to Purchaser of any Permit required to own or operate the Acquired Assets under applicable Laws.

6.3     Other Covenants of Seller and Purchaser.

(a) Disclosure Schedules and Supplements.  Seller, on the one hand, shall notify Purchaser of, and Purchaser on the other hand, shall notify Seller of, and shall supplement or amend the disclosure schedules (the "Schedules") to this Agreement with respect to, any matter that (i) arises after the Execution Date and that, if existing or occurring at or prior to such delivery of the Schedules, would have been required to be set forth or described in the Schedules to this Agreement or (ii) makes it necessary to correct any information in the Schedules to this Agreement or in any representation and warranty of Seller or Purchaser, as applicable, that has been rendered inaccurate thereby.  Each such notification and supplementation, to the extent known, shall be made no later than two (2) Business Days after discovery thereof and no later than three (3) days before the date set for the Closing by the parties.  No such supplement or amendment to the Schedules to this Agreement shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement.

(b) Personally Identifiable Information.  Purchaser shall honor and observe, in connection with the transactions contemplated by this Agreement, any and all policies of the Seller in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

(c) Access to Records after Closing.  Following Closing, Purchaser and Seller agree to permit their respective representatives to have access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business operations, to the books and records acquired pursuant to this Agreement so as to enable Purchaser and Seller to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal actions or for other like purposes.  If either party desires to dispose of any such records, such party shall, prior to such disposition, provide the other party with a reasonable opportunity to remove such of the records to be disposed of at the removing party's expense.

6.4     Employment Covenants and Other Undertakings.

(a) Employees.  Purchaser shall have the right, but not the obligation, to employ or engage as contractors any or all of the Business Employees as Purchaser determines in its sole and absolute discretion.  The terms of employment offered to any Business Employees shall be determined by Purchaser in its sole and absolute discretion.  Any Business Employees actually employed by Purchaser are referred to herein as "Transferred Employees."  Purchaser shall deliver a list of the Business Employees it intends to hire no later than five (5) days prior to the hearing to approve the Bankruptcy Sale Order.  Seller shall deliver to Purchaser on or before the Closing Date all personnel files and employment records relating to the Transferred Employees (including completed I-9 forms and attachments with respect to all Transferred Employees, except for such employees as Seller certifies in writing are exempt from such requirement).

(b) Purchaser Employee Benefit Plans.  At Closing, Purchaser shall provide, or shall cause to be provided, for the benefit of the Transferred Employees and their beneficiaries and dependents, employee welfare benefits plans as defined in Section 3(1) of ERISA that are no

less favorable than those provided to the Transferred Employees, their beneficiaries and dependents, immediately prior to Closing. For all purposes under such employee welfare benefits plans of the Purchaser, whether now existing or hereafter adopted ("Purchaser Plans"), Purchaser shall credit (i) each Transferred Employee with his or her service with the Seller, to the same extent such service would have been credited had such service been with Purchaser, and (ii) the Transferred Employees with all service recognized by Seller under employee plans as service with Purchaser for purposes of eligibility to participate and vesting under all employee benefit plans, programs and policies of Purchaser. The Purchaser shall waive any coverage waiting period, pre-existing condition and actively-at-work requirements that have been satisfied under corresponding plans of Seller and shall provide that any eligible expenses incurred before the Closing Date by a Transferred Employee (and his or her beneficiaries or dependents) or Seller during the calendar year of the Closing and disclosed to Purchaser by such Transferred Employee shall be taken into account for purposes of satisfying the applicable deductible, coinsurance and maximum out-of-pocket provisions, and applicable annual and/or lifetime maximum benefit limitations of Purchaser Plans.

(c) <u>Seller Employee Benefit Plans</u>. Unless the Purchaser, in its sole discretion, elects on or after the Closing, to adopt any of the Seller's Employee Benefit Plans, Seller shall retain (i) all liabilities and obligations in respect of its past, present and future employees under applicable Laws and (ii) all liabilities and obligations under any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or program maintained or contributed to by a Seller or any ERISA Affiliate, including any Employee Benefit Plans, and Purchaser shall have no liability or obligation whatsoever under the Employee Benefit Plans nor shall Purchaser assume the sponsorship of the Employee Benefit Plans.

(d) <u>Other Obligations</u>. Except as otherwise required by Law, specified in this Agreement, or otherwise agreed in writing by Purchaser and/or its Affiliates, neither Purchaser nor its Affiliates shall be obligated to provide any severance, separation pay, or other payments or benefits, including any key employee retention payments, to any employee of Seller on account of any termination of such employee's employment on or before the Closing Date, and such benefits (if any) shall remain obligations of the Seller.

(e) <u>Forms W-2 and W-4</u>. Seller and Purchaser shall adopt the "standard procedure" for preparing and filing IRS Forms W-2 (Wage and Tax Statements) and Forms W-4 (Employee's Withholding Allowance Certificate) regarding the Transferred Employees. Under this procedure, Seller shall keep on file all IRS Forms W-4 provided by the Transferred Employees for the period required by applicable law concerning record retention and Purchaser shall obtain new IRS Forms W-4 with respect to each Transferred Employee.

(f) <u>Employee Communications</u>. Prior to making any written or oral communications to the Business Employees pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, Seller shall provide Purchaser with a copy of the intended communication.

827402-6

6.5     Non-Assignment of Contracts.

Anything contained herein to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign an Assigned Contract or any Permit, if, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of any other Person party thereto, would constitute a breach thereof or in any way negatively affect the rights of Purchaser (unless the restrictions on assignment would be rendered ineffective pursuant to sections 9-406 through 9-409, inclusive, of the Uniform Commercial Code, as amended), as the assignee of such Assigned Contract or Permit, as the case may be, thereunder. If, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, neither Seller nor Purchaser shall be in breach of this Agreement nor shall the Purchase Price be adjusted or the Closing delayed, provided that Seller shall cooperate with Purchaser without further consideration, in any reasonable arrangement designed to provide Purchaser with all of the benefits of or under any such Assigned Contract or Permit, including but not limited to enforcement for the benefit of Purchaser of any and all rights of Seller against any Person party to the Assigned Contract or Permit arising out of the breach or cancellation thereof by such Person; provided, however, that after Closing, Purchaser shall be responsible for all payment and other obligations under, and for all costs of enforcing rights under, such Assigned Contract or Permit to the same extent as if such Assigned Contract or Permit had been assigned. Any assignment to Purchaser of any Assigned Contract or Permit that shall, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained. For the avoidance of doubt, nothing in this Section 6.5 shall be deemed to alter any rights of the Purchaser under Section 11.1(c)(vii) of this Agreement.

6.6     Casualty.

If, between the date of this Agreement and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause ("Casualty"), then Purchaser shall have the option to: (a) acquire such Acquired Assets on an "as is" basis and take an assignment from Seller of all insurance proceeds payable to Seller in respect of the Casualty, or (b) in the event that the Casualty would have a Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby.

6.7     Name Change.

At Closing, Seller shall deliver to Purchaser a duly and properly authorized and executed evidence (in form and substance satisfactory to Purchaser) as to the amendment of Seller's certificate of incorporation (the "Organizational Amendment") changing Seller's name to another name that does not include any of the following words "Champion" or "Motor Group." Upon the Closing Date, Seller shall obtain authority from the Bankruptcy Court to change the name of the case caption to reflect the foregoing name change. Upon the Closing, Seller hereby irrevocably authorizes Purchaser to file the Organizational Amendment with the Secretary of State of the State of New York and in each State in which Seller is qualified to do business on Seller's behalf. Furthermore, after the Closing, Seller shall discontinue the use of its current name (and any other tradenames currently utilized by Seller) and shall not subsequently change

its name to or otherwise use or employ any name that includes the words "Champion" or "Motor Group" without the prior written consent of Purchaser. From and after the Closing, Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, dba's or similar Intellectual Property rights utilized by Seller in the conduct of the Business, which rights are included in the Acquired Assets purchased hereunder.

6.8　　Sublease. At Closing, Seller shall have entered into a sublease with Purchaser with respect to the Leased Property (the "Sublease") on substantially the same terms and conditions as provided to Seller on the date of this Agreement.

6.9　　Retailer and Dealer Agreements. On or prior to Closing, Purchaser shall have entered into a Retailer Agreement with Bentley Motors, Inc. and/or its Affiliates (the "New Bentley Agreements") and any other related document required thereunder, providing for the Purchaser to become an authorized Bentley retailer in Nassau County, New York, on substantially the same terms and conditions as provided to Seller under the Bentley Agreements on the date of this Agreement. At Purchaser's discretion, Purchaser shall have entered into a new Dealer Agreement with Automobili Lamborghini America, LLC and/or its Affiliates (the "New Lamborghini Agreement"), providing for the Purchaser to become an authorized Lamborghini dealer in Nassau County, New York, on substantially the same terms and conditions as provided to Seller under the Lamborghini Agreement on the date of this Agreement.

## ARTICLE 7
## TAXES

7.1　　Taxes Related to Purchase of Acquired Assets.

(a) All Taxes, including all state and local Taxes in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, "Transaction Taxes"), that are imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets shall be borne solely by Seller. Purchaser and Seller shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

(b) To the extent permitted by applicable Law, all Taxes relating to the Acquired Assets which have accrued and become payable prior to the Closing Date shall be paid by Seller. All Taxes that accrue and become payable subsequent to the Closing Date shall be paid by Purchaser. All Taxes in respect of a period that commences prior to the Closing Date and ends subsequent to the Closing Date shall be prorated between and paid by Seller and Purchaser based upon the number of days in each such portion of such period. The amount due any party as a result of proration shall be paid to such party at the Closing.

827402-6

7.2   <u>Cooperation</u>.

Purchaser and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Business as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer of any governmental or regulatory inquiry relating to Tax matters. Purchaser agrees to retain possession of all Tax files, books and records delivered to Purchaser by Seller for a period of at least three (3) years from the Closing Date. If Purchaser determines to destroy or discard any of such files, books or records after the end of such three-year period, Purchaser will give Seller reasonable notice thereof and will allow Seller to take possession of such files, books and records at Seller's expense. From and after the Closing Date, Purchaser agrees that it will provide reasonable access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to such files, books and records as Seller may reasonably deem necessary to prepare for, file, prove, answer, prosecute or defend any claim, suit, inquiry or other proceeding, related to Taxes in connection with the Acquired Assets and the Business.

## ARTICLE 8
## BANKRUPTCY COURT MATTERS

8.1   <u>Motions</u>.

Seller shall file with the Bankruptcy Court, within one (1) Business Day after the date of this Agreement, a motion or motions (the "<u>Motion</u>") seeking the Bankruptcy Court's approval of the Bidding Procedures Order and the Bankruptcy Sale Order, in form and substance reasonably satisfactory to Purchaser. Seller shall affix a true and complete copy of this Agreement to the Motion filed with the Bankruptcy Court. The Motion shall request, among other things, pursuant to, inter alia, Bankruptcy Code Sections 105, 365(b), (f), (k), (m) and (n), 365 and Bankruptcy Rules 2002, 6004, 6006 and 9014 (i) the scheduling of the date for the Auction to be commenced no later than January 6, 2010, and the Sale Hearing not more than one (1) Business Day following the completion of the Auction, (ii) the entry of the Bidding Procedures Order in all material respects on the terms set forth in <u>Exhibit B</u> by no later than December 14, 2009 and (iii) the entry of the Bankruptcy Sale Order in all material respects on the terms set forth in <u>Exhibit A</u> by no later than January 8, 2010.

8.2   <u>Assigned Contracts</u>.

Seller shall serve on all counterparties to those Contracts that may be designated as Assigned Contracts pursuant to <u>Section 2.5(a)</u> a notice specifically stating that Seller is or may be seeking the assumption and assignment of the Assigned Contracts and shall notify such parties of the deadline for objecting to the Cure Amounts, which deadline shall not be less than five (5) days prior to the Auction. In cases in which the Seller is unable to establish that a default exists, the relevant cure amount shall be set at $0.00. The Motion shall reflect Purchaser's agreement to perform from and after the Closing under the Assigned Contracts, which, subject to Court approval shall be the only adequate assurance of future performance

necessary to satisfy the requirements of section 365 of the Bankruptcy Code in respect of the assignment to Purchaser of such Assigned Contracts.

8.3 Procedure.

To the extent practicable under the circumstances, Seller shall provide Purchaser with drafts of any and all pleadings and proposed orders to be filed or submitted in connection with this Agreement for Purchaser's prior review and comment and shall cooperate with Purchaser to make reasonable changes. Seller agrees to diligently prosecute the entry of the Bankruptcy Sale Order. In the event the entry of the Bankruptcy Sale Order shall be appealed, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal. Notwithstanding the foregoing, any resulting material changes to this Agreement or any Ancillary Agreement or any resulting material changes to the Orders shall be subject to Purchaser's approval in its sole discretion, and any resulting non-material changes to the Agreement, Ancillary Agreements or Orders shall be subject to Purchaser's approval in its reasonable discretion.

## ARTICLE 9
## CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES

9.1 Conditions Precedent to Performance by Seller.

The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the condition contained in Section 9.1(c)) may be waived by Seller, in its sole discretion:

(a) Representations and Warranties of Purchaser. The representations and warranties of Purchaser made in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct as of the Closing Date (or on the date when made in the case of any representation and warranty which specifically relates to an earlier date), and the representations and warranties of Purchaser made in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects as of the Closing Date (or on the date when made in the case of any representation and warranty which specifically relates to an earlier date), and Seller shall have received a certificate signed by an authorized officer of the Purchaser on behalf of the Purchaser, dated as of the Closing Date, to the foregoing effect.

(b) Performance of the Obligations of Purchaser. Purchaser shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which it is party that are to be performed by it on or before the Closing Date (except with respect to (i) the obligation to pay the Purchase Price in accordance with the terms of this Agreement and (ii) any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement), and Seller shall have received a certificate signed by an authorized officer of the Purchaser on behalf of the Purchaser, dated as of the Closing Date, to the foregoing effect.

(c) Bankruptcy Court Approval. The Bankruptcy Sale Order shall have been entered and shall not be subject to a stay.

827402-6

(d) <u>No Violation of Orders</u>. No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e) <u>Bidding Procedures Order</u>. On or prior to December 14, 2009, the Bidding Procedures Order shall have been entered in the Bankruptcy Case.

(f) <u>Bankruptcy Sale Order</u>. On or prior to January 8, 2010, the Bankruptcy Sale Order shall have been entered in the Bankruptcy Case.

(g) <u>Assumption, Sale and Assignment of Contracts</u>. Subject to <u>Section 6.5</u>, the Assignable Contracts designated hereunder as Assigned Contracts shall be so assumed, sold and assigned to Purchaser by order of the Bankruptcy Court.

9.2    <u>Conditions Precedent to the Performance by Purchaser.</u>

The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in <u>Section 9.2(e)</u> and <u>Section 9.2(g)</u>, except as expressly provided therein) may be waived by Purchaser, in its sole discretion:

(a) <u>Representations and Warranties of Seller</u>. The representations and warranties of Seller made in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct as of the Closing Date (or on the date when made in the case of any representation and warranty which specifically relates to an earlier date), and the representations and warranties of Seller made in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects as of the Closing Date (or on the date when made in the case of any representation and warranty which specifically relates to an earlier date), and Purchaser shall have received a certificate signed by an authorized officer of the Seller on behalf of the Seller, dated as of the Closing Date, to the foregoing effect.

(b) <u>Performance of the Obligations of Seller</u>. Seller shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which it is a party that are to be performed by it on or before the Closing Date (except with respect to any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement), and Purchaser shall have received a certificate signed by an authorized officer of the Seller on behalf of the Seller, dated as of the Closing Date, to the foregoing effect.

(c) <u>Consents</u>. All required consents, approvals and actions of, filings with and notices to any Person or Governmental Authority set forth on <u>Schedule 4.4(b)</u> shall have been duly obtained, delivered, made or given and shall be in full force and effect.

(d) <u>No Material Adverse Effect</u>. There shall not have occurred an event or failure to act causing a Material Adverse Effect.

(e) <u>Bankruptcy Court Approval</u>. The Bankruptcy Sale Order shall have been entered and shall not be subject to a stay and the Bankruptcy Court shall have provided such

827402-6

other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement. The Bankruptcy Sale Order shall have become a final and nonappealable order, unless this condition has been waived in writing by Purchaser in its sole discretion.

(f) No Violation of Orders. No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(g) Credit Bid Approval. The Bankruptcy Court shall have entered an order, binding on all parties in interest in the Bankruptcy Case (which order may be the Bankruptcy Sale Order) unconditionally allowing, authorizing and approving the credit bid by Purchaser contemplated by this Agreement pursuant to Section 363(k) of the Bankruptcy Code of a Claim by Purchaser in the Bankruptcy Case in an amount equal to the Obligations.

(h) Bidding Procedures Motion. On or prior to December 1, 2009, the Bidding Procedures Motion shall have been filed in the Bankruptcy Case.

(i) Bidding Procedures Order. On or prior to December 14, 2009, the Bidding Procedures Order shall have been entered in the Bankruptcy Case.

(j) Bankruptcy Sale Order. On or prior to January 8, 2010, the Bankruptcy Sale Order shall have been entered in the Bankruptcy Case.

(k) Assumption, Sale and Assignment of Contracts. Subject to Section 6.5, the Assignable Contracts designated hereunder as Assigned Contracts shall be so assumed, sold and assigned to Purchaser by order of the Bankruptcy Court satisfactory to Purchaser.

## ARTICLE 10
## CLOSING AND DELIVERIES

10.1    Closing.

The consummation and effectuation of the transactions contemplated hereby pursuant to the terms and conditions of this Agreement (the "Closing") shall be held two (2) Business Days after the date that all conditions to the parties' obligations to consummate the transactions contemplated herein have been satisfied (the "Closing Date") (except for closing conditions that by their terms can only be satisfied on the Closing Date) or, if applicable, waived by the appropriate party or parties, at 10:00 a.m., local time, in the offices of Olshan Grundman Frome Rosenzweig & Wolosky LLP, or on such other date or at such other place and time as may be mutually agreed to in writing by the parties. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

10.2    Seller's Deliveries.

At the Closing,

(a) the sale, transfer, assignment, conveyance and delivery by Seller of the Acquired Assets to Purchaser shall be effected by the execution and delivery by Seller of (i) the Bill of Sale, (ii) the Assignment and Assumption Agreement, and (iii) such special or limited warranty deeds, additional bills of sale, endorsements, assignments and other instruments of transfer and conveyance reasonably satisfactory in form and substance to Purchaser;

(b) Seller shall have executed and delivered to Purchaser, to the extent required by Purchaser, any Ancillary Agreements;

(c) Seller shall have executed and delivered to Purchaser a duly executed Sublease;

(d) Seller shall have executed and delivered to Purchaser duly executed assignments of (i) the patents and trademarks that are included in Intellectual Property (if applicable), in forms suitable for recording in the United States Patent and Trademark Office, and (ii) duly executed assignments of the copyright registrations and applications for copyright registration owned by the Seller that are included in Intellectual Property (if applicable);

(e) Seller shall deliver an officer's certificate, duly executed by a senior officer of Seller, certifying the matters set forth in Section 9.2(a) and Section 9.2(b), in form and substance satisfactory to Purchaser;

(f) Seller shall deliver a non-foreign affidavit dated as of the Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code so that Purchaser is exempt from withholding any portion of the Purchase Price;

(g) Seller shall deliver possession of the Acquired Assets;

(h) Seller shall deliver a duly and properly authorized and executed Organizational Amendment;

(i) Seller shall deliver a certified copy of the Bankruptcy Sale Order;

(j) Seller shall deliver final copies of the Schedules hereto; and

(k) Seller shall deliver all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Acquired Assets to Purchaser.

10.3    Purchaser's Deliveries.

At the Closing,

(a) Purchaser shall credit the Purchase Price against the Obligations;

(b) Purchaser shall pay in cash the amount required to pay the Cure Amounts;

(c) Purchaser shall execute and deliver to Seller the Assignment and Assumption Agreement;

(d) Purchaser shall execute and deliver to Seller the Sublease;

(e) Purchaser shall deliver an officer's certificate, duly executed by a senior officer of Seller, certifying the matters set forth in Section 9.1(a) and Section 9.1(b), in form and substance satisfactory to Seller; and

(f) Purchaser shall execute and deliver to Seller such other instruments of conveyance and transfer, in form and substance reasonably acceptable to the Seller, as may be necessary to convey the Acquired Assets to Purchaser.

## ARTICLE 11
## TERMINATION

11.1 <u>Conditions of Termination.</u>

This Agreement may be terminated only in accordance with this Section 11.1. This Agreement may be terminated at any time before the Closing as follows:

(a) by mutual written consent of Seller and Purchaser;

(b) automatically and without any action or notice by either Seller to Purchaser, or Purchaser to Seller, immediately upon:

(i) the issuance of a final and nonappealable order, decree, or ruling or any other action by a Governmental Authority to restrain, enjoin or otherwise prohibit the transfer of the Acquired Assets contemplated hereby;

(ii) approval by the Bankruptcy Court of an Alternative Transaction;

(iii) acceptance by Seller of an Alternative Transaction; or

(iv) Purchaser not being declared the winning bidder upon completion of the Auction.

(c) by Purchaser:

(i) if the Bidding Procedures Order shall not have been entered by December 14, 2009, unless agreed to in writing by Purchaser;

(ii) if the Auction has not concluded by January 6, 2010, unless agreed to in writing by Purchaser;

(iii) if the Bankruptcy Court has not entered the Bankruptcy Sale Order by January 8, 2010 (or such later date as Purchaser may have designated in writing to Seller);

(iv)     if there has been a violation or breach by Seller of any material representation, warranty or covenant contained in this Agreement that (x) has rendered the satisfaction of any condition to the obligations of Purchaser impossible or not curable or, if curable, has not been cured within five (5) Business Days following receipt by Seller of written notice of such breach from Purchaser, and (y) has not been waived by Purchaser;

(v)     at any time after January 31, 2010, if the Closing shall not have occurred and such failure to close is not caused by or the result of Purchaser's breach of this Agreement;

(vi)     if, prior to the Closing Date, Seller's Bankruptcy Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Case;

(vii)     if there shall be excluded from the Acquired Assets any Assigned Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing and such Assigned Contract shall, in the opinion of Purchaser in its absolute discretion, prevent it from effectively operating the Business; or

(viii)     if the New Bentley Agreement shall not be executed and delivered on or prior to the Closing Date.

(ix)     if Purchaser so elects in writing pursuant to Section 6.6 hereof.

(d) by Seller, if there has been a violation or breach by Purchaser of any material representation or warranty contained in this Agreement that (x) has rendered the satisfaction of any condition to the obligations of Seller impossible or is not curable or, if curable, has not been cured within five (5) days following receipt by Purchaser of written notice of such breach from Seller, and (y) has not been waived by Seller.

11.2     Effect of Termination.

In the event of termination pursuant to Section 11.1, this Agreement shall become null and void and have no effect and neither party shall have any liability to the other (other than those provisions of Article 11 and Article 12 that expressly survive termination), provided, however, that nothing in this Section 11.2 shall relieve Purchaser or Seller of any liability for a breach of this Agreement prior to the date of termination.

**ARTICLE 12**
**MISCELLANEOUS**

12.1     Survival.

No representations, warranties, covenants and agreements of Seller and Purchaser made in this Agreement shall survive the Closing Date except where, and only to the extent that, the terms of any such covenant or agreement expressly provide for obligations extending after the

Closing, including Purchaser's assumption of the Assumed Liabilities or as otherwise expressly provided in this Agreement.

12.2 <u>Further Assurances.</u>

At the request and the sole expense of the requesting party, Purchaser or Seller, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Purchaser or Seller, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

12.3 <u>Successors and Assigns.</u>

(a) Purchaser shall have the right to assign to an Affiliate any of its rights or obligations in whole or in part (including the right to acquire any of the Acquired Assets). In the event of any assignment pursuant to this <u>Section 12.3(a)</u>, Purchaser shall not be relieved of any liability or obligation hereunder.

(b) Purchaser shall have the right to assign this Agreement or any of its rights or obligations hereunder as collateral to any lender of Purchaser; <u>provided</u>, <u>however</u>, that no such assignment shall relieve Purchaser of its obligations to Seller hereunder.

(c) Except as provided in <u>Section 12.3(a)</u> and <u>Section 12.3(b)</u>, Seller shall not assign this Agreement or any of its rights or obligations hereunder and any such assignment shall be void and of no effect. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto, including any trustee appointed in any of the Bankruptcy Case or subsequent chapter 7 cases and Seller, if the Bankruptcy Case is dismissed. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided above.

12.4 <u>Governing Law; Jurisdiction.</u>

This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of New York (without giving effect to the principles of conflicts of laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in New York.

12.5 <u>Expenses.</u>

Except as otherwise provided in this Agreement, each of the parties shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees and commissions or finder's fees, whether or not the transactions contemplated hereby are consummated. Notwithstanding the foregoing, in the event of any

827402-6

action or proceeding to interpret or enforce this Agreement, the prevailing party in such action or proceeding shall be entitled to have and recover from the non prevailing party such costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

12.6 <u>Severability.</u>

In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable and the application of any provision so substituted, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date this Agreement was last amended.

12.7 <u>Notices.</u>

(a) All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller:   Champion Motor Group, Inc.
115 South Service Road
Jericho, New York 11753
Attention: Kevin Buxbaum
Facsimile: (516) 203-3069

With a copy (which shall not constitute notice) to:

Robinson Brog Leinwand Greene Genovese & Gluck P.C.
1345 Avenue of the Americas
New York, New York 10105
Attention: Robert Leinwand, Esq.
Facsimile: (212) 581-5981

If to Purchaser:

Champion Funding LLC
30 Legend Circle
Melville, New York 11747
Attention: Antoine Dominic

Facsimile: (631) 293-2942

With a copy (which shall not constitute notice) to:

> Olshan Grundman Frome Rosenzweig & Wolosky LLP
> Park Avenue Tower
> 65 East 55th Street
> New York, New York 10022
> Attention: Michael S. Fox, Esq.
> Facsimile: (212) 451-2222

(b) Any party may change its address or facsimile number for the purpose of this Section 12.7(b) by giving the other parties written notice of its new address in the manner set forth above.

12.8   Amendments; Waivers.

This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Purchaser and Seller, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

12.9   Entire Agreement.

This Agreement and the other Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All Exhibits and Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

12.10   Publicity.

Neither the Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of the Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or the Seller list securities, provided that the party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

827402-6

12.11  Headings.

The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.12  Counterparts; Facsimile Copies.

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement. Signed facsimile copies of this Agreement will legally bind the parties to the same extent as original documents.

12.13  Negotiated Agreement.

Each of the Seller and Purchaser acknowledges that it has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or its representatives drafted such provision.

12.14  Construction.

Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" means including without limitation. Any reference to the singular in this Agreement shall also include the plural and vice versa.

12.15  Waiver of Jury Trial.

EACH PARTY HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.

827402-6

12.16   General Release.

Effective upon the Closing, Seller, on behalf of itself and its estate, acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever (including, for the avoidance of doubt, actions for avoidance, subordination or recharacterization of any of Purchaser's pre-Petition Date Claims, Encumbrances, and Liens) against Purchaser and any of its Related Persons, that directly or indirectly arise out of, are based upon, or in any manner are connected with the pre-Petition Date agreements to which Purchaser (or its Affiliates) and the Seller were parties and all transactions referred to in such agreements (the "Released Claims").  Should any Released Claims nonetheless exist, the Seller, on behalf of itself and its estate, hereby (i) releases and discharges each of Purchaser and its Related Persons from any liability whatsoever on such Released Claims and (ii) releases, waives and discharges all such Released Claims against Purchaser and its Related Persons.

[Signatures on following page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**PURCHASER:**

CHAMPION FUNDING LLC

By: _____
     Name:
     Title:


**SELLER:**

CHAMPION MOTOR GROUP, INC.

By: _____
     Name:
     Title:

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

# EXHIBIT B



# BENTLEY

December 1, 2009

*Via Electronic Delivery*

Antoine Dominic
30 Legends Circle
Melville, New York 11747

David Luce
3128 Casseekey Island Road
Jupiter, Florida 33477

Antoine Dominic, Managing Member
David Luce, Managing Member
Champion Rescue, LLC
30 Legends Circle
Melville, New York 11747

Re:    Memorandum of Understanding - Bentley Retailer Agreement

Dear Mr. Dominic and Mr. Luce:

Each of you, both in your individual capacity and your capacity as owner and representative of Champion Rescue, LLC, has requested that Bentley Motors, Inc. ("**BMI**") enter into a Bentley Retailer Agreement with Champion Rescue, LLC (the "**New Retailer Entity**") appointing the New Retailer Entity as an authorized Bentley retailer in Nassau County, New York.

You have advised us that you have formed the New Retailer Entity as a limited liability company organized under the laws of the State of Delaware. You also have advised us that Mr. Dominic owns 50 percent of the ownership interests in the New Retailer Entity, and Mr. Luce owns 50 percent of the ownership interests in the New Retailer Entity.

Subject to the foregoing, and based upon the representations, disclosures, and commitments made by you, your representatives, and your affiliates, BMI hereby agrees that, upon the full, complete, and timely satisfaction of the conditions precedent set forth below *on or before January 31, 2010*, and only in such event, and subject to the terms and conditions set forth in this document, it will enter into a Bentley Retailer Agreement with the New Retailer Entity, in the form attached at **Exhibit A**.

The conditions precedent are as follows:

1.     You and the New Retailer Entity shall provide satisfactory written evidence of the corporate organization of the New Retailer Entity to BMI, including satisfactory written evidence of (i) the formation of the New Retailer Entity, and (ii) the ownership of the New Retailer Entity. Continuing throughout the entire period of time that this Memorandum of Understanding remains in effect, you shall cause the New Retailer Entity to retain the organization set forth above, and you shall not permit any person to hold, directly or indirectly, any ownership interest in the New Retailer Entity if BMI, in its sole discretion, has not approved in advance and in writing such person as a holder of an ownership interest.

2.     You and the New Retailer Entity shall cause the operating agreement of the New Retailer Entity to contain provisions acceptable to BMI, in its reasonable discretion, preventing deadlock voting scenarios.

3. You shall cause the New Retailer Entity to adopt as an assumed name "Bentley Long Island".

4. You and the New Retailer Entity cause the New Retailer Entity to become qualified to conduct business in the State of New York, and you shall provide satisfactory written evidence of such qualification to BMI.

5. You and the New Retailer Entity shall cause the New Retailer Entity to obtain approval from the Bankruptcy Court for the Southern District of New York to consummate the sale of assets set forth in that certain Asset Purchase Agreement dated December 1, 2009 by and among Champion Motor Group, Inc. and Champion Funding, LLC, together with its successors, assigns and/or designees (the "**Asset Purchase Agreement**"), and you shall provide satisfactory written evidence of such approval to BMI.

6. You and the New Retailer Entity shall cause the New Retailer Entity to consummate the sale of assets set forth in the Asset Purchase Agreement, and you shall provide satisfactory written evidence of the consummation of such sale to BMI.

7. You and the New Retailer Entity shall cause the New Retailer Entity to obtain all appropriate governmental licenses or permits necessary for the lawful operation by the New Retailer Entity of a Bentley motor vehicle dealership, including, but not limited to, a dealer license authorizing Bentley retailer operations, and you shall provide satisfactory written evidence of the New Retailer Entity's receipt of such licenses or permits to BMI.

8. You and the New Retailer Entity shall cause the New Retailer Entity to retain a senior management team experienced in the ultra-luxury vehicle segment acceptable to BMI in its reasonable discretion, and you shall provide satisfactory written evidence of such retention to BMI.

9. You and the New Retailer Entity shall cause the New Retailer Entity to meet all of the operational requirements for a Bentley retailer as set forth in the Bentley Retailer Agreement, including, without limitation, owners' equity and working capital requirements and employee training requirements, but excluding the new vehicle floorplan financing requirement set forth in Part II(E)(1) of the Bentley Retailer Operating Standards, and you shall provide written evidence satisfactory to BMI of the New Retailer Entity's meeting of all such operational requirements to BMI.

10. In the event that BMI and the New Retailer Entity do not enter into the Bentley Retailer Agreement contemplated by this Memorandum of Understanding on or before November 24, 2009, then you and the New Retailer Entity shall have caused Champion Motor Group, Inc., no later than November 24, 2009, to have accepted delivery of, and paid for in full, all of the vehicles under the heading "November 2009" in the November 2009 – March 2010 Vehicle Purchase Plan attached hereto as **Exhibit D**. BMI acknowledges that, as of the date of this Memorandum of Understanding, you and the New Retailer Entity have satisfied the requirements of this Paragraph 10.

11. In the event that BMI and the New Retailer Entity do not enter into the Bentley Retailer Agreement contemplated by this Memorandum of Understanding on or before December 28, 2009, then you and the New Retailer Entity shall have caused Champion Motor Group, Inc., no later than December 28, 2009, to have accepted delivery of, and paid for in full, all of the vehicles under the heading

"December 2009" in the November 2009 – March 2010 Vehicle Purchase Plan attached hereto as **Exhibit D**.

12.     You and the New Retailer Entity shall cause no other company to be operating a business or conducting any business operations at the Dealer's Premises for the New Retailer Entity, including without limitation, Champion Motor Cars, LLC, Champion Leasing, LLC, or any entity affiliated with Champion Motor Cars, LLC and/or Champion Leasing, LLC.

13.     You and the New Retailer Entity shall cause the New Retailer Entity to deliver to BMI, for counter-execution, a Bentley Retailer Agreement executed by the New Retailer Entity, in the form attached as **Exhibit A**. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE BENTLEY RETAILER AGREEMENT SHALL NOT BECOME EFFECTIVE, AND THE NEW RETAILER ENTITY SHALL NOT BECOME A BENTLEY RETAILER, UNLESS AND UNTIL THE BENTLEY RETAILER AGREEMENT IS COUNTER-SIGNED BY BMI.

14.     You and the New Retailer Entity shall cause the New Retailer Entity to deliver to BMI a Hold Harmless Agreement and Covenant Not To Sue, executed by you and the New Retailer Entity, in the form attached as **Exhibit B**.

15.     Each of you shall execute and deliver to BMI a Personal Guaranty, in the form attached hereto as **Exhibit C**.

The rights and obligations set forth in this Memorandum of Understanding are expressly subject to the terms and conditions set forth below:

a.      If you or the New Retailer Entity fail to perform in a timely manner any of the conditions precedent set forth in this Memorandum of Understanding, regardless of the materiality of the non-performance, then BMI shall be under no obligation to enter into a Bentley Retailer Agreement with the New Retailer Entity, or any other person or entity, or to appoint the New Retailer Entity, or any other person or entity, as a Bentley retailer, and this Memorandum of Understanding shall terminate and be null and void. In such an event, neither BMI nor any of its agents, employees, officers, directors, parents, subsidiaries, affiliates, successors, and/or assigns (collectively, the "**BMI Parties**") shall be liable to you, the New Retailer Entity or any other person or entity by reason of any reliance upon this Memorandum of Understanding or any prior performance under this Memorandum of Understanding.

b.      Notwithstanding the timely performance of the conditions precedent set forth in this Memorandum of Understanding, BMI may revoke and terminate this Memorandum of Understanding, with no liability on its part, if: (a) an order is issued by any court or administrative agency, pursuant to any law or regulation, prohibiting the transaction(s) contemplated herein; or (b) in the judgment of BMI's counsel, there is a significant possibility any such order may be issued. In such an event, BMI shall be under no obligation to enter into a Bentley Retailer Agreement with the New Retailer Entity, and neither BMI nor any of the BMI Parties shall be liable to you, the New Retailer Entity or any other person or entity by reason of any reliance upon this Memorandum of Understanding or any prior performance under this Memorandum of Understanding.

c.      In the event that BMI and the New Retailer Entity have entered into the Bentley Retailer Agreement contemplated by this Memorandum of Understanding on or before December 28, 2009, then the New Retailer Entity shall purchase, accept

delivery of, and pay for all of the vehicles under the heading "December 2009" in the November 2009 – March 2010 Vehicle Purchase Plan attached hereto as **Exhibit D** on or before December 28, 2009.

d.   No later than March 31, 2010, the New Retailer Entity shall purchase, accept delivery of, and pay for all of the vehicles under the heading "March 2010" in the November 2009 – March 2010 Vehicle Purchase Plan attached hereto as **Exhibit D**.

e.   You and the New Dealer Entity shall indemnify, defend, and hold harmless BMI and the BMI Parties from and against all claims, losses, costs, actions, penalties, fines, liabilities, damages, judgments, proceedings and third party expenses (including, without limitation, court costs and attorneys' reasonable fees) suffered or incurred by BMI or the BMI Parties in connection with any act, omission, or negligence on your and/or the New Retailer Entity's behalf, any violation or alleged violation by you and/or the New Retailer Entity of any laws, or any breach or default by you and/or the New Retailer Entity under this Memorandum of Understanding.

f.   This Memorandum of Understanding, together with the exhibits hereto, constitutes the entire agreement and understanding between you and the New Retailer Entity and BMI with respect to BMI's agreement to enter into a Bentley Retailer Agreement with the New Retailer Entity. No prior or contemporaneous agreement between BMI and any party, including you, whether oral or written, concerning BMI's agreement to enter into a Bentley Retailer Agreement with the New Retailer Entity shall be of any force or effect.

g.   This Memorandum of Understanding has been executed voluntarily, and prior to the execution of this Memorandum of Understanding, you and the New Retailer Entity have had adequate time and information to consult with accountants, attorneys, financial advisors, or other consultants of your and the New Retailer Entity's choice.

h.   This Memorandum of Understanding does not create an agency relationship, either express or implied, between BMI and you, the New Retailer Entity or any other person or entity. BMI shall not be liable for any act, omission, or negligence on the part of you, the New Retailer Entity or any other person or entity based upon any alleged agency relationship.

i.   Time is of the essence of all matters set forth in this Memorandum of Understanding.

j.   Any evidence or notice required to be given under this Memorandum of Understanding shall be deemed received when delivered to and received by:

   Bentley Motors, Inc.:

        Mr. Thomas G. Holtman
        Franchise Development Manager
        Bentley Motors, Inc.
        3 Copley Place
        Suite 3701
        Boston, Massachusetts 02116
        Facsimile: (845) 987-9486

with a copy to:

Randall L. Oyler, Esq.
Barack Ferrazzano Kirschbaum & Nagelberg LLP
200 West Madison Street
Suite 3900
Chicago, Illinois 60606
Facsimile: (312) 984-3150

Antoine Dominic:

Mr. Antoine Dominic
30 Legends Circle
Melville, New York 11747
Facsimile: (631) 293-2942

with a copy to:

Michael S. Fox, Esq.
Olshan Grundman Frome Rosenzweig & Wolosky LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Facsimile: (212) 451-2222

David Luce:

Mr. David Luce
3128 Casseekey Island Road
Jupiter, Florida 33477
Facsimile: (561) 746-8716

with a copy to:

Michael S. Fox, Esq.
Olshan Grundman Frome Rosenzweig & Wolosky LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Facsimile: (212) 451-2222

The evidence or notice may be delivered by certified United States mail, courier delivery, facsimile transmission, or personal hand delivery.

k.  None of you or the New Retailer Entity may assign any of your rights or liabilities under this Memorandum of Understanding without the prior written consent of BMI's, which may be withheld in BMI's sole discretion.

l.  There are no third-party beneficiaries to this Memorandum of Understanding.

m.  Any delay by BMI in exercising any right or rights provided to it in this Memorandum of Understanding shall not be a waiver of such right or rights. No waiver of any right under this Memorandum of Understanding by BMI shall affect BMI's right to thereafter enforce such right or to exercise any other right or remedy, whether or not similar, in the future.

n.      The words used in this Memorandum of Understanding shall be deemed words chosen by both BMI and you to express mutual intent.  No rule of strict construction against either BMI or you shall apply to any term or provision of this Memorandum of Understanding.

o.      If a court of competent jurisdiction finds any term or provision of this Memorandum of Understanding to be invalid or unenforceable, any such offending term or provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending term or provision cannot be so modified, it shall be stricken.  All other terms and provisions of this Memorandum of Understanding shall remain valid and enforceable.

p.      The terms and provisions of this Memorandum of Understanding shall be construed according to the laws of the State of New York.

q.      This Memorandum of Understanding shall be deemed to have been executed and delivered in the County of Nassau in the State of New York.  If any legal action is commenced concerning this Memorandum of Understanding, jurisdiction shall be proper in a court of proper jurisdiction sitting in the State of New York.

r.      This Memorandum of Understanding cannot be modified, altered, or amended in any respect except by the written consent of you, the New Retailer Entity, and BMI.

s.      During the discussions between the parties concerning this Memorandum of Understanding and the performance by you and the New Retailer Entity hereunder, BMI may provide or may have provided to you and the New Retailer Entity certain confidential, proprietary and/or trade-secret information and material (including, without limitation, information concerning the business, operations, customers, assets and methods of doing business of BMI and certain of the BMI Parties) (collectively, the "**Information**").  It is understood that unauthorized disclosure or use, whether intentional or unintentional, of any of the Information may be detrimental to BMI and the BMI Parties.  Accordingly, you and the New Retailer Entity hereby agree:  (i) not to use any of the Information for any purposes other than in connection with your and the New Retailer Entity's performance under this Memorandum of Understanding; (ii) to maintain all of the Information in confidence and not to disclose any portion of the Information to any person or entity other than your representatives (which term includes your employees, agents and advisors) who must use the Information in connection with your and/or the New Dealer Entity's performance under this Memorandum of Understanding; and (iii) to cause your and the New Retailer Entity's representatives to keep the Information in a safe and secure location and take reasonable steps and appropriate precautions to preserve the Information's security and confidentiality.  Unless otherwise agreed by BMI, the provisions of this paragraph shall survive the termination of this Memorandum of Understanding.  In addition, without the prior written consent of BMI, you and the New Retailer Entity shall not, and shall not permit your or its representatives to, disclose to any person the existence of this Memorandum of Understanding or any of the terms hereof, or the fact that discussions or negotiations are taking place concerning a Bentley Retailer Agreement, or any of the terms, conditions or other facts with respect to a Bentley Retailer Agreement, including the status thereof.

t.      In the event of the termination of this Memorandum of Understanding for any reason, (i) the agreements contained in **paragraphs (a)**, **(b)** and **(e)-(t)** shall

survive such termination; (ii) you, the New Retailer Entity and your representatives shall immediately cease all actions being taken to further your performance under this Memorandum of Understanding; and (iii) and you, the New Retailer Entity and your representatives shall promptly return to BMI all Information in your or their possession, if any.

u.      Notwithstanding any provisions to the contrary contained in the Retailer Agreement, the conditions contained in **paragraphs (c)-(d)** shall survive the execution of the Retailer Agreement.

Please indicate your and the New Retailer Entity's agreement to this Memorandum of Understanding by signing and delivering a copy of this Memorandum of Understanding to BMI on or before December 1, 2009. In the event that you do not sign and return a copy of this Memorandum of Understanding to BMI on or before such date, then BMI's offer to enter into this Memorandum of Understanding shall expire and shall be null and void. Once this Memorandum of Understanding becomes effective, it will remain valid until the earlier of (i) January 31, 2010, and (ii) the execution of a Bentley Retailer Agreement between BMI and the New Retailer Entity.

[ The Remainder of This Page Intentionally Has Been Left Blank. ]

IN WITNESS WHEREOF, the parties hereto have caused this Memorandum of Understanding to be executed by their duly authorized representatives on the day and year first above written.

BENTLEY MOTORS, INC.

By: _____

Christophe Georges
President and Chief Operating Officer

By: _____

Donald Fieditsian
Regional Manager

ANTOINE DOMINIC, INDIVIDUALLY

By: _____

Antoine Dominic

DAVID LUCE, INDIVIDUALLY

By: _____

David Luce

CHAMPION RESCUE, LLC
ANTOINE DOMINIC, MANAGING MEMBER

By: _____

Antoine Dominic
Member

DAVID LUCE, MANAGING MEMBER

By: _____

David Luce
Member

8

IN WITNESS WHEREOF, the parties hereto have caused this Memorandum of Understanding to be executed by their duly authorized representatives on the day and year first above written.

**BENTLEY MOTORS, INC.**

By: _____
Christophe Georges
President and Chief Operating Officer

By: _____
Donald Heditslan
Regional Manager

**ANTOINE DOMINIC, INDIVIDUALLY**

By: _____
Antoine Dominic

**DAVID LUCE, INDIVIDUALLY**

By: _____
David Luce

**CHAMPION RESCUE, LLC**
**ANTOINE DOMINIC, MEMBER**

By: _____
Antoine Dominic
Member

**DAVID LUCE, MEMBER**

By: _____
David Luce
Member

8

IN WITNESS WHEREOF, the parties hereto have caused this Memorandum of Understanding to be executed by their duly authorized representatives on the day and year first above written.

**BENTLEY MOTORS, INC.**

By: _____                    By: _____
    Christophe Georges                                   Donald Heditsian
    President and Chief Operating Officer                Regional Manager

**ANTOINE DOMINIC, INDIVIDUALLY**                **DAVID LUCE, INDIVIDUALLY**

By: _____                    By: _____
    Antoine Dominic                                      David Luce

**CHAMPION RESCUE, LLC**
**ANTOINE DOMINIC, MEMBER**                      **DAVID LUCE, MEMBER**

By: _____                    By: _____
    Antoine Dominic                                      David Luce
    Member                                               Member

8